# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY JANE WILLIAMS,                         )
c/o North Carolina Justice Center          )
224 S. Dawson St.                          )
Raleigh, NC 27601,                         )
                                           )
MARY HESTER LEWIS,                         )
c/o North Carolina Justice Center          )
224 S. Dawson St.                          )
Raleigh, NC 27601,                         )
                                           )
                                           )      No. 1:21-cv-1150
MARTIN JOHNSON, JR.,                       )
c/o North Carolina Justice Center          )
224 S. Dawson St.                          )
Raleigh, NC 27601,                         )
                                           )
DANIELLE LEE,                              )
c/o North Carolina Justice Center          )
224 S. Dawson St.                          )
Raleigh, NC 27601,                         )
                                           )
NEW ORLEANS WORKERS' CENTER FOR            )
RACIAL JUSTICE                             )
c/o North Carolina Justice Center          )
224 S. Dawson St.                          )
Raleigh, NC 27601, and                     )
                                           )
MARTHA ICELA FLORES GAXIOLA,               )
c/o Southern Migrant Legal Services        )
A Project of Texas RioGrande Legal Aid     )
311 Plus Park Blvd., Ste. 135              )
Nashville, TN 37217,                       )
                                           )
                            Plaintiffs,    )
            v.                             )
                                           )
MARTIN J. WALSH, in his official capacity  )
as U.S. Secretary of Labor,                )
200 Constitution Ave. NW                   )
Washington, DC 20210,                      )
                                           )
U.S. DEPARTMENT OF LABOR,                  )
200 Constitution Ave. NW                   )
Washington, DC 20210,                      )

| | |
|---|---|
| ALEJANDRO MAYORKAS, in his official capacity as U.S. Secretary of Homeland Security 2707 Martin Luther King Jr. Ave. SE Washington, DC 20528, and | ) ) ) ) ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, 2707 Martin Luther King Jr. Ave. SE Washington, DC 20528, | ) ) ) ) ) ) |
| Defendants, | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This Administrative Procedure Act case challenges procedures for determining prevailing wages required to be paid by employers seeking to import foreign workers pursuant to the H-2B temporary visa program.

2.      In 2011 the Department of Labor (DOL) determined that the prevailing wage set by the Bureau of Labor Statistics Occupational Employment Statistics (OES) survey was "the most consistent, efficient, and accurate means of determining the prevailing wage rate for the H-2B program." DOL, Final Rule, Wage Methodology for the Temporary Non-agricultural Employment H-2B Program, 76 Fed. Reg. 3452, 3465 (Jan. 19, 2011) (2011 Wage Rule).

3.      The OES survey remains DOL's principal tool for measuring prevailing wages for the H-2B program. Nevertheless, in 2015 Defendants jointly promulgated a final rule that authorizes employers to provide wage surveys produced by state entities as an alternative to using the OES prevailing wage. Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, 80 Fed. Reg. 24146 (Apr. 29, 2015) (2015 Wage Rule).

4.      Defendants did this without providing an opportunity for notice and comment and despite DOL's finding in 2011 that employer-provided surveys, including state surveys, are not

generally reliable and are only used to "lower wages below the prevailing wage rate." 2011 Wage Rule, 76 Fed. Reg. at 3465.

5.      Moreover, Defendants promulgated the challenged 2015 Wage Rule despite the Third Circuit's December 2014 ruling that permitting the use of employer-provided surveys as an alternative to a valid OES wage was both unexplained and arbitrary in that accepting such surveys "structurally encouraged" employers to undercut the OES wage. *Comité de Apoyo a los Trabajadores Agrícolas v. Perez* (*CATA III*), 774 F.3d 173, 189 (3d Cir. 2014).

6.      That ruling led to the issuance of the 2015 Wage Rule, but the 2015 Wage Rule still does not offer any explanation why employers should be "structurally encouraged" to undercut the OES wage with employer-provided surveys.

7.      The policy of allowing the use of employer-provided surveys as an alternative to a valid OES wage remains as arbitrary and contrary to law as it was when the Third Circuit struck that policy down in 2014. Allowing employers to use their own surveys when a valid OES wage rate is available allows the importation of foreign workers at wages that adversely affect the wages and working conditions of similarly employed U.S. workers in direct violation of the statutes and regulations governing the H-2B program.

8.      The methodology for evaluating employer-provided surveys set forth in the 2015 Wage Rule is also arbitrary, capricious, and contrary to law.

## JURISDICTION

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346 over this suit for review of final agency action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

10.     This Court has authority to issue the requested declaratory relief pursuant to 28 U.S.C. § 2201.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(e).

## PARTIES

**<u>Plaintiffs</u>**

12.     Plaintiffs Mary Jane Williams, Mary Hester Lewis, and Martin Johnson, Jr., are U.S. citizens who are currently employed at a crawfish processing plant in Breaux Bridge, Louisiana, Crawfish Distributors, Inc. They perform work described in Crawfish Distributors, Inc.'s H-2B application for crawfish processors. All three are paid less than the wage rate for that occupation, 53-7062, and geographic region set by the OES survey. Their wage rate has not changed significantly in several years. The plant also employs Mexican workers on H-2B visas.

13.      Plaintiff Mary Jane Williams has worked off and on in the Louisiana crawfish industry for more than thirty years, with the last ten crawfish seasons at the Breaux Bridge plant. Though she worries about the low wages, she plans on continuing to work in the crawfish industry in the years to come just as she has in the past.

14.     Plaintiff Mary Hester Lewis has worked at a Louisiana crawfish processing plant every season for about fifteen years, with the past several seasons spent at the Breaux Bridge plant. She struggles to earn a living from this seasonal work, but she plans to remain in the job.

15.     Plaintiff Martin Johnson, Jr., has worked at the Breaux Bridge plant for more than five years. He struggles to get by on the low wages but has no plans to leave his current job, which is one of few positions available in the area.

16.     Plaintiff Danielle Lee is a 45-year-old U.S. citizen who has worked off and on peeling crawfish since she was a teenager. She currently peels crawfish at CJ's Seafood Restaurant in Breaux Bridge, Louisiana, where she has worked for the past four years. She is paid on a piece

4

rate of $3 per pound of peeled crawfish, a rate that has remained steady for the last few years. She would like to see the wages increase but plans to remain in the position.

17.     Plaintiff New Orleans Workers' Center for Racial Justice (NOWCRJ) is a membership organization based in New Orleans, Louisiana. NOWCRJ is dedicated to building workers' power and advocating for justice in the workplace. In 2017 NOWCRJ created the Seafood Worker Alliance, which is made up of members engaged in Louisiana's seafood industry who are organizing for improved workplaces. NOWCRJ members in the Seafood Worker Alliance work in crawfish, oysters, blue crabs, and shrimp. Seafood Worker Alliance members include U.S. workers who work or have worked in the Louisiana seafood industry as well as workers who come temporarily to work on H-2 visas in Louisiana seafood plants.

18.     Plaintiff Martha Icela Flores Gaxiola is a Mexican citizen who worked in Louisiana crawfish plants on H-2 visas in 2011, 2013, 2018, and 2020. Most recently, in 2020, she worked on an H-2B visa for a crawfish processing company in central Louisiana. Her work contract promised payment at a rate of $9.75 per hour or $2.25 per pound, whichever was higher. In practice, the piece rate added up to less than $9.75 per hour. She plans to get another H-2B crawfish job in Louisiana next year.

**Defendants**

19.     Defendant Martin J. Walsh is the Secretary of Labor and is charged with the supervision and management of all decisions and actions within DOL. Plaintiffs sue Secretary Walsh in his official capacity.

20.     Defendant DOL is an agency of the United States within the meaning of the APA. DOL is responsible for issuing labor certifications in connection with petitions to import H-2B workers and was jointly responsible for issuing the challenged rule.

21.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and is charged with the supervision and management of all decisions and actions within DHS. Plaintiffs sue Secretary Mayorkas in his official capacity.

22.     Defendant DHS is an agency of the United States within the meaning of the APA. DHS is responsible for granting employer petitions for H-2B workers and was jointly responsible for issuing the challenged rule.

23.     Defendants DOL and DHS are collectively referred to herein as "the Departments."

## FACTS

**Statutory and Regulatory Framework**

24.     The Immigration and Nationality Act (INA) permits employers to petition for temporary work visas for foreign workers coming to the United States to perform nonagricultural services or labor only if "unemployed persons capable of performing . . . such services or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). This visa program is commonly referred to as the H-2B program.

25.     The INA broadly charges DHS[1] with the authority to grant an employer's request for H-2B visas "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1184(c)(1). DHS has designated DOL as the appropriate agency with which to consult by requesting DOL to determine with respect to each H-2B application (1) whether qualified workers are available in the United States to fill the employer's job and (2) whether the alien's employment will adversely affect the wages and working conditions of similarly employed U.S. workers. Dep't of Justice, Miscellaneous Amendments of the Immigration Regulations, 18 Fed. Reg. 4925 (Aug.

---

[1] The Homeland Security Act of 2002 transferred the authority for administering certain immigration functions from the Attorney General to the new DHS. 6 U.S.C. §§ 202, 236.

19, 1953); 8 C.F.R. § 214.2(h)(6)(iii)(A). If DOL determines that U.S. workers are unavailable and that the working conditions offered will not adversely affect similarly employed U.S. workers, it issues a "temporary labor certification" to that effect. DHS will not approve H-2B visas without such a certification. 8 C.F.R. § 214.2 (h)(6) (iv)(A).

26.      Before issuing a temporary labor certification, DOL reviews an employer's offer of employment to ensure that it meets certain minimum requirements, including ensuring that it offers wages no less than the "prevailing wage" for the occupation and geographic area for which the employer seeks foreign workers. This prevailing wage requirement is designed to ensure accurate testing of the U.S. labor market[2] and that the employment of H-2B workers will not adversely affect the wages of similarly employed U.S. workers. *See* DOL, Miscellaneous Amendments, 16 Fed. Reg. 9142 (Sept. 8, 1951); 20 C.F.R.§ 655.0(a)(2). All H-2B employers must pay at least the prevailing wage both to their H-2B workers and to any U.S. workers they employ in corresponding employment. 20 C.F.R. § 655.10(a).

27.      Beginning with the creation of the H-2B program in 1986, DOL relied on informal guidance documents to regulate the H-2B labor certification process and set the method for determining prevailing wages. Between 1986 and 2008 these guidance documents changed the method for calculating prevailing wages on several occasions but were never subjected to notice and comment rulemaking procedures. *CATA III*, 774 F.3d at 178.

**The 2008 Rule**

28.      DOL first engaged in notice and comment rulemaking with respect to H-2B labor certification procedures in 2008. *See* DOL, Labor Certification Process and Enforcement for

---

[2] Because U.S. workers cannot be expected to accept employment at substandard wages, offering at least the prevailing wage is a prerequisite to testing the availability of U.S. workers.

Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes, 73 Fed. Reg. 29942 (May 22, 2008) (2008 NPRM); DOL, Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes, 73 Fed. Reg. 78020 (Dec. 19, 2008) (2008 Rule).

29.     Although the 2008 NPRM allowed comment on other aspects of the proposed rules, the 2008 Rule explicitly refused to consider any comments on the prevailing wage regulations and procedures that were ultimately included in the 2008 Rule. 2008 Rule, 73 Fed. Reg. at 78031.

30.     The procedures set forth in the 2008 Rule provided that if a job opportunity was covered by a Collective Bargaining Agreement (CBA), the CBA wage would be considered the prevailing wage for labor certification purposes. In the absence of a CBA wage, the Rule set the prevailing wage at "the arithmetic mean . . . of the wages of workers similarly employed at the skill level in the area of employment" as determined by the OES survey. 20 C.F.R. §§ 655.10(b)(1)–(2) (2008); 2008 Rule, 73 Fed. Reg. at 78056.

31.     The OES wage survey is among the largest continuous statistical survey programs of the Federal Government. 2008 Rule, 73 Fed. Reg. at 8550–51 ("The wage component of the OES survey is, with the exception of the Decennial Census, the most comprehensive survey conducted by any agency of the Federal Government."). The OES survey collects data from over one million establishments and reports wage information for occupations based on the Standard Occupational Classification (SOC) system of occupational categories. Salary levels for SOC occupations are reported by geographic areas and are available at the national and state levels and 334 metropolitan areas. *Id.*

32.     The OES survey does not collect or report data by skill level within an occupation. The 2008 Rule, however, required DOL to artificially manipulate the OES data for an occupation to generate four "skill-level" prevailing wages.[3]

33.     Even if a valid OES prevailing wage was available for an employer's occupation, the 2008 Rule gave employers the option of using an "employer-provided survey" to set their prevailing wage. 20 C.F.R. § 655.10(f) (2008); 2008 Rule, 73 Fed. Reg. at 78056.

34.     The methodological standards applicable to employer-provided surveys were set forth in DOL's November 2009 Prevailing Wage Determination Policy Guidance for Nonagricultural Immigration Programs (2009 Wage Guidance) which, with respect to employer-provided surveys, was unchanged from the May 2005 Prevailing Wage Determination Policy Guidance for Nonagricultural Immigration Programs.[4] Both of these guidance documents were adopted by DOL without affording the public an opportunity to comment.

***CATA I* and the Promulgation of the 2011 Wage Rule**

35.     In August 2010, Judge Louis H. Pollak of the Eastern District of Pennsylvania found DOL's policy of dividing survey wage results into four "skill-level" prevailing wages to be

---

[3] The four wage levels used by DOL were calculated by applying a mathematical formula to the wage distribution reported by the OES survey for a particular occupational classification in the area of intended employment. The Level I wage was established by taking the arithmetic mean of the bottom one-third of the wage distribution; the Level IV wage rate was determined by establishing the arithmetic mean of the top two-thirds of the wage distribution; the Level II and Level III wages were derived from a formula established by section 212(p)(4) of the INA which provides for the reconstitution of two-level Government surveys and creation of two intermediate levels by dividing by the number three the difference between the initial two levels and adding the quotient to the first level to create Level II, and subtracting that quotient from the second level to create Level III. *See* 2011 Wage Rule, 76 Fed. Reg. at 3460.

[4] The 2009 Wage Guidance is available at
https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/NPWHC_Guidance_Revised_11_2009.pdf.
The 2005 policy is available at
https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/policy_nonag_progs.pdf.

arbitrary and capricious. *Comité de Apoyo a los Trabajadores Agrícolas v. Solis* (*CATA I*), Civil Action No. 09-240, 2010 WL 3431761, at *19 (E.D. Pa. Aug. 10, 2010). The Court ordered DOL to publish a new wage rule in 120 days but left the 2008 Rule in place until the new rule became effective. *Id.* at *25.

36.     Pursuant to the final judgment in *CATA I*, DOL issued an NPRM and, after considering the comments of interested parties, published a new wage rule on January 19, 2011. 2011 Wage Rule, 76 Fed. Reg. 3452. The 2011 Wage Rule eliminated the use of "skill levels" and set the prevailing wage for an occupation at the highest of any applicable (i) CBA wage, (ii) Service Contract Act (SCA) wage, (iii) Davis Bacon Act (DBA) wage, or (iv) the mean wage for the occupation reported by the OES survey. *Id.* at 3484.

37.     In that same 2011 rulemaking, DOL prohibited employers from using employer-provided surveys to set the prevailing wage where a valid CBA, OES, DBA, or SCA wage was available. DOL explained this change in policy by noting:

> [T]he prevailing wage rate is best determined through reliable Government surveys of wage rates, rather than employer-provided surveys that employ varying methods, statistics, and surveys. The Department has concluded that using only CBA, SCA, DBA, and OES to determine the prevailing wage is the most consistent, efficient, and accurate means of determining the prevailing wage rate for the H-2B program. . . . [T]he Department agrees that employer-provided surveys, generally, are not consistently reliable. . . . Moreover, employers typically provide private surveys when the result is to lower wages below the prevailing wage rates. Such a result is contrary to the Department's role in ensuring no adverse impact. . . . The Department believes that the values commenters identified, including expedience, consistency, fairness, and accuracy, are best accomplished by using CBA, SCA, DBA, and OES wages, not employer-provided surveys.

*Id.* at 3465.

38.     DOL made clear that even state surveys would not be accepted if a valid CBA, SCA, DBA, or OES wage was available. As DOL explained, "the Department has determined that the OES survey with its standardized job descriptions, compensation data collection and analysis,

and DBA and SCA wage determinations provide a much more accurate portrayal of wage information than State surveys." *Id.* at 3482.

39.     The 2011 Wage Rule allowed the use of employer-provided surveys to set the prevailing wage in two circumstances only: (1) where "there is no data from which to determine an OES wage and where there are no applicable CBA, DBA or SCA wages," and (2) where the "job opportunity is not accurately represented within the job classification used in those surveys." *Id.* at 3467; *see also id.* at 3484.

40.     DOL delayed the effective date of the 2011 Wage Rule numerous times in response to employer lawsuits and congressional appropriations measures barring DOL from using appropriated funds to implement the rule. *See* 76 Fed. Reg. 59896 (Sept. 28, 2011); 76 Fed. Reg. 73508 (Nov. 29, 2011); 76 Fed. Reg. 82115 (Dec. 30, 2011), 77 Fed. Reg. 60040 (Oct. 2, 2012), 78 Fed. Reg. 19098 (Mar. 29, 2013).

41.     While implementation of the 2011 Wage Rule was being delayed, DOL continued to rely on the 2008 Rule struck down in *CATA I* to set prevailing wages, including the provision authorizing use of employer-provided surveys as an alternative to a valid OES wage.

**_CATA II_ and the Promulgation of the 2013 Interim Final Rule**

42.     Frustrated that the 2008 "skill-level" prevailing wage methodology was still in use more than two years after the *CATA I* Court found it to be invalid, the *CATA I* plaintiffs moved to vacate the 2008 "skill-level" definition of prevailing wages. Their motion was granted on March 21, 2013. *See Comité de Apoyo a los Trabajadores Agrícolas v. Solis* (*CATA II*), 933 F. Supp. 2d 700, 711–12 (E.D. Pa. 2013). The Court remanded the 2008 Rule to DOL and gave the agency thirty days to come into compliance with its Order. *Id.* at 716.

11

43. In response to the *CATA II* vacatur order, DOL and DHS promulgated a joint Interim Final Rule (IFR). DHS & DOL, Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, Part 2, 78 Fed. Reg. 24047 (Apr. 24, 2013) (2013 IFR). The 2013 IFR eliminated the "skill level" definition of prevailing wage in 20 C.F.R. § 655.10(b)(2) (2013), 78 Fed. Reg. at 24061, as required by the *CATA II* Court.

44. In other respects, the 2013 IFR returned to the policies set forth in the 2008 Rule rather than those in the 2011 Wage Rule. Among other things, the 2013 IFR reversed the 2011 requirement that employers pay the highest of any applicable CBA, OES, DBA, or SCA wage. Instead, the 2013 IFR returned to the policy of setting the prevailing wage at the applicable CBA wage or, in the absence of a CBA wage, the mean wage reported for the occupation by the OES survey. 20 C.F.R. § 655.10(b) (2013), 78 Fed. Reg. at 24053–54, 24061.

45. In addition, the 2013 IFR reversed the 2011 Wage Rule's prohibition on the use of employer-provided surveys when a valid CBA, OES, DBA, or SCA wage was available. 2013 IFR, 78 Fed. Reg. at 24054–55. Instead, the Departments returned to DOL's 2008 policy of giving employers the option of using employer-provided surveys as an alternative to a valid OES wage rate. 20 C.F.R. § 655.10(f) (2013), 78 Fed. Reg. at 24054–55, 24061. The 2013 IFR also continued the policy of evaluating employer-provided surveys using the 2009 Wage Guidance.

46. Because the 2013 IFR was published as an emergency rule pursuant to 5 U.S.C. § 553(b)(3)(B), 78 Fed. Reg. at 24055, the public was not afforded an opportunity to comment on the IFR or Defendants' decision to allow employers to use employer-provided surveys as an alternative to a valid OES survey wage.

47. Nor did the 2013 IFR explain why it endorsed the continued use of employer-provided surveys as an alternative to a valid OES prevailing wage despite DOL's 2011 rulemaking

findings that such surveys were unreliable and were being used by employers "to lower wages below the prevailing wage rate." 2011 Wage Rule, 76 Fed. Reg. 3465.

48.     Instead of explaining the policies adopted in the 2013 IFR, DOL and DHS invited the public to submit comments in response to several general questions about the use of employer-provided surveys:

> The Department would like to collect additional data on the accuracy and reliability of private surveys covering traditional H-2B occupations to allow for further factual findings on the sufficiency of private surveys for setting prevailing wage rates. Therefore, DOL and DHS invite comment on whether to permit the continued use of employer-submitted surveys, and especially seek input on the ways in which, if permitted, the validity and reliability of employer-submitted surveys can be strengthened. Are there methodological standards that can or should be included in the regulation that would ensure consistency, validity and reliability of employer-provided surveys? Are there industries in which employers historically and routinely rely on employer-submitted surveys that should be permitted to do so because of the well-developed, historical, industry-wide practice, or for other reasons? Are there state-developed wage surveys, such as state agricultural surveys, or surveys from other agencies, such as maritime agencies, that could provide data that would be useful in setting prevailing wages? Should employer surveys that include data based on wages paid to H-2B or other nonimmigrant workers be permitted in establishing a prevailing wage that does not adversely affect U.S. workers? If so, under what circumstances?

2013 IFR, 78 Fed. Reg. at 24055.

49.     In publishing the 2013 IFR, the Departments did not alter or amend any of the findings set forth in the 2011 Wage Rule. DOL still intended to implement the 2011 Wage Rule as soon as the Congressional appropriations restriction on its implementation was lifted. *See* DOL, Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date, 78 Fed. Reg. 19098 (Mar. 29, 2013) (delaying the effective date of the 2011 Wage Rule to October 1, 2013). However, on August 30, 2013, DOL issued a notice indefinitely delaying the effective date of the 2011 Wage Rule and indicating that "[i]f Congress no longer prohibits implementation of the 2011 Wage Rule, the Department will publish a document in the Federal

Register within 45 days of that event apprising the public of the status of 20 CFR 655.10 and the effective date of the 2011 Wage Rule." DOL, Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date, 78 Fed. Reg. 53643, 53645 (Aug. 30, 2013).

50.     On January 17, 2014, the Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, was enacted, lifting the prohibition on enforcement of the 2011 Wage Rule.

51.     On March 14, 2014, DOL published a notice in the Federal Register stating that,

[w]ith the appropriations rider pertaining to the 2011 Wage Rule having been lifted, the Department has begun the process of determining how to implement that rule, keeping in mind the overlap between that rule and the comments submitted in connections with the 2013 IFR. DOL has determined that recent developments in the H-2B program require consideration of the comments submitted in connection with the 2013 IFR, *and that further notice and comment is appropriate.* . . .

Therefore, in light of the current regulatory landscape and in response to Congress's recent actions, as well as judicial decisions, DOL intends to publish a notice of proposed rulemaking on the proper wage methodology for the H-2B program, working off of the 2011 Wage Rule as a starting point.

DOL, Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, 79 Fed. Reg. 14450, 14453 (Mar. 14, 2014) (emphasis added). Pending a new NPRM and final rule, DOL continued to utilize the 2013 IFR to establish prevailing wages. *Id.*

### *CATA III* and the Promulgation of the 2015 Wage Rule

52.     After the 2013 IFR was promulgated in April 2013, the *CATA* plaintiffs immediately challenged the IFR's provisions permitting the use of employer-provided surveys as an alternative to a valid OES prevailing wage. In December 2014, the Third Circuit issued an opinion agreeing with the *CATA* plaintiffs that that policy was unlawful: "Section 655.10(f) is procedurally invalid because DOL has not explained why it has been allowing employers to use

private wage surveys in prevailing wage determinations when valid OES wage rates are available

for the same purpose." *CATA III*, 774 F.3d at 187.

53.     The Third Circuit also found that,

> [g]iven DOL's endorsement of the OES wage as "among the largest, most
> comprehensive, and continuous statistical programs of the Federal Government,"
> and its finding that the OES survey "is the most consistent, efficient, and accurate
> means of determining the prevailing wage rate for the H-2B program," we are
> satisfied that DOL acted arbitrarily and capriciously when it permitted—and by its
> policies, structurally encouraged—employers to rely on details of a private survey
> when there was a valid OES wage survey available for use in determining the
> prevailing wage for the implicated employment.

*Id.* at 189 (citations omitted).

54.     The *CATA III* Court also found § 655.10(f) to be substantively arbitrary because it

"permits employers who can afford private surveys to bring H-2B workers into the country for

employment at lower wages than employers who cannot afford such surveys and who therefore

must offer the higher OES prevailing wage." *Id.* at 190.

55.     The *CATA III* Court vacated 20 C.F.R. § 655.10(f) and directed that private surveys

no longer be used to set prevailing wages except in the two situations identified in the 2011 Wage

Rule—i.e., "where an otherwise applicable OES survey does not provide any data for an

occupation in a specific geographical location, or where the OES survey does not accurately

represent the relevant job classification." *Id.* at 191.

56.     On April 29, 2015, four months after the Third Circuit's *CATA III* decision, DOL

and DHS jointly issued the 2015 Wage Rule challenged in this case. 2015 Wage Rule, 80 Fed.

Reg. 24146.

57.     Despite DOL's promise in March 2014 that it would publish a proposed rule and

give the public an opportunity to comment, 79 Fed. Reg. at 14453, the Departments issued the

2015 Wage Rule as a Final Rule without affording the public an opportunity for notice and comment.

58.     The 2015 Wage Rule again authorized the use of employer-provided surveys as an alternative to valid OES prevailing wages as long as the survey was "independently conducted and issued by a state, including any state agency, state college, or state university." 80 Fed. Reg. at 24184, *codified at* 20 C.F.R. § 655.10(f)(1)(i).

59.     Despite the *CATA III* holding that DOL acted arbitrarily in failing to explain why employers should be permitted to use employer-provided surveys to undercut a valid OES prevailing wage, the 2015 Wage Rule still does not offer an explanation for that policy. The 2015 Wage Rule's preamble simply states, "we have determined that it is appropriate to permit prevailing wage surveys that are conducted and issued by a state as a third, limited category of acceptable employer-provided surveys, even where the occupation is sufficiently represented in the OES." 80 Fed. Reg. at 24169–70. As the Third Circuit said in *CATA III* in response to an almost identical "explanation" in the 2013 IFR, "[t]his 'explanation' is hardly sufficient for it merely explains what has been done, not why it was done." *CATA III*, 774 F.3d at 188.

60.     Both DOL in 2011 and the Third Circuit in *CATA III* recognized that the policy of permitting employers to use surveys as an alternative to a valid OES wage "structurally encourage[s]" employers to undercut the OES wage and "perpetuate[s] a system by which employers are benefitted financially by submitting private surveys to justify wages lower than the OES wages." *CATA III*, 774 F.3d at 189; *see also* 2011 Wage Rule, 76 Fed. Reg. at 3465. The 2015 Wage Rule does not acknowledge, let alone address, that obvious problem with the policy of allowing use of employer-provided surveys.

61.     The 2015 Wage Rule states that wage surveys conducted by state agencies, including state colleges and universities, are generally reliable and an adequate substitute for OES surveys, "so long as they are conducted using the survey standards we adopt here." 80 Fed. Reg. at 24170.

62.     In reaching this conclusion, the Departments assert that state agencies "elect[]" to conduct wage surveys and as a result are "independent of employer influence." *Id.* The Departments offer no evidence in support of that conclusion.

63.     Upon information and belief, most state surveys approved by DOL are not the result of an independent state decision to conduct a survey, as the 2015 Wage Rule assumes, but are the result of H-2B employers or H-2B employer groups requesting state agencies, colleges, or universities to conduct such surveys on their behalf.

64.     Upon information and belief, at least some state agency, college, or university surveys involve significant direct participation by H-2B employer groups in the identification of employers to be surveyed.

65.     The "survey standards" adopted by 2015 Wage Rule are for most part the same as those adopted without opportunity for public comment in the 2008 Rule and the 2009 Wage Guidance. *Compare* 20 C.F.R. § 655.10(f)(4) (2015), 2015 Wage Rule, 80 Fed. Reg. at 24184 ("[T]he employer must submit . . . specific information about the survey methodology, including such items as sample size and source, sample selection procedures, and survey job descriptions, to allow a determination of the adequacy of the data provided and validity of the statistical methodology used in conducting the survey.") *with* 20 C.F.R. § 655.10(f)(2) (2008), 2008 Rule, 73 Fed. Reg. at 78056 ("[T]he employer must provide specific information about the survey methodology, including such items as sample size and source, sample selection procedures, and

survey job descriptions, to allow a determination of the adequacy of the data provided and validity of the statistical methodology used in conducting the survey in accordance with guidance issued by [DOL].”); *see also* 2015 Wage Rule, 80 Fed. Reg. at 24172 (admitting that 2015 methodological standards are essentially the same as under the 2008 Rule).

66.     In at least two respects the 2009 Wage Guidance issued by DOL pursuant to the 2008 Rule set a higher standard than that set by the 2015 Wage Rule in that it (1) required that “the survey must identify a statistically valid methodology that was used to collect the data,” and (2) required documentation sufficient to determine whether the methodology used in the survey “is reasonable and consistent with recognized statistical standards and principles in producing a prevailing wage.” 2009 Wage Guidance, App’x F at 2–3. Neither of these requirements exists in the 2015 Wage Rule.

67.     The 2015 Wage Rule states that an employer seeking approval of a survey must submit a completed Form ETA-9165 “to allow a determination of the adequacy of the data provided and the validity of the statistical methodology used in conducting the survey.” 20 C.F.R. § 655.10(f)(4), 80 Fed. Reg at 24184. The Form ETA-9165 as initially promulgated by the Departments was published in 80 Fed. Reg. at 24185–90.[5]

68.     The 2015 Rule does not explain how the information required by the Form ETA-9165 is sufficient “to allow a determination of the adequacy of the data provided and the validity

---

[5] Current DOL ETA forms are available under the prevailing wage section at https://www.dol.gov/agencies/eta/foreign-labor/forms. Although OMB has approved usage of the ETA-9165 through May 31, 2022, the posted Form ETA-9165, available at https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/Form_ETA-9165_rev_DOL_Appropriations_Act.pdf, shows an expiration date of February 28, 2019. Instructions for completing Form ETA-9165 are posted at https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/Form_ETA-9165_Instructions_rev_DOL_Appropriations_Act.pdf.

of the statistical methodology used in conducting the survey," and, in fact, it is not sufficient to allow such a determination.

69.     For example, the 2015 Wage Rule requires that a survey be based on either random sampling *or* a good faith attempt to contact all employers employing workers in the occupation and area surveyed. 80 Fed. Reg. at 24184. The preamble to the 2015 Wage Rule says that a good faith effort to contact all employers "means, for example, that the surveyor might send the survey through mail or other appropriate means to all employers in the geographic area and then follow-up by telephone with all non-respondents." *Id.* at 24173.

70.     However, nothing in 20 C.F.R. § 655.10(f) or Form ETA-9165 requires the employer or the surveyor to certify that any follow-up efforts were made, nor does it require the responses used in the survey to have been obtained in a statistically reliable method.

71.     The form only asks whether there was an attempt to contact all employers (question E.3) and the number of employers whose data is used in the survey (question E.9).

72.     Unlike the 2009 Wage Guidance, the 2015 Wage Rule and Form ETA-9165 do not require any documentation that the employers whose data are used were selected using a statistically valid methodology.

73.     In 2011 DOL found that employer-provided surveys that met the higher 2009 methodological standards "are not consistently reliable" and that "employers typically provide private surveys when the result is to lower wages below the prevailing wage rate." 2011 Wage Rule, 76 Fed. Reg. at 3465. Nowhere in the preamble to the 2015 Wage Rule do DOL and DHS explain why the less strict methodological standards adopted as part of the 2015 Wage Rule should lead to more reliable results than in the surveys condemned in the 2011 Wage Rule.

74.     The 2015 Wage Rule rejected allowing employers to use SCA or DBA wages as an alternative to an applicable OES wage because the narrower occupational definitions used in those surveys gave employers "an economic incentive to tailor their job descriptions on the Form 9141 to fit within the lower-paid [DBA or SCA] occupational title." 80 Fed. Reg. at 24163.

75.     At the same time, the 2015 Wage Rule allows employers to use state surveys with occupational definitions based on the employer's job duties—definitions that are far narrower than the occupational definition used in the applicable OES survey. 80 Fed. Reg. at 24170–71.

76.     Allowing employers to use state surveys that define occupations more narrowly than the OES survey gives employers precisely the same incentive to undercut the applicable OES prevailing wages as permitting use of narrower SCA and DBA occupational definitions. The Departments fail to explain why such "tailoring" of occupational definitions requires them to reject the use of DBA and SCA wages but is not a problem with respect to employer-provided surveys.

77.     Moreover, by permitting employer surveys to utilize occupational definitions that are far narrower than the applicable OES definitions, the Departments permit employers to survey only those jobs within an OES classification that have historically been heavily dependent on H-2B workers. Surveys of narrowly defined jobs dependent on H-2B workers are likely to reflect local wage stagnation or depression, particularly where DOL wage methodologies prior to 2015 permitted those H-2B employers to pay depressed wage rates.

78.     For example, the crab-picking industry in Maryland is extremely dependent on H-2B labor. Under the OES survey, Maryland crab picking falls within the OES occupational category for "Meat, Poultry, and Fish Cutters and Trimmers." 2011 Wage Rule, 76 Fed. Reg. at 3466. DOL has endorsed this classification as appropriate, *id.*, and it is clearly a broader category than just crab pickers. As a result, the OES surveys a larger number of businesses and employees

other than just crab pickers. That greater coverage ensures that the OES survey more accurately measures wages in the relevant "occupation" (i.e., jobs where transfer of skills is reasonably feasible) and avoids the adverse effect of allowing employers to import foreign workers at rates reflecting localized wage depression or stagnation in jobs that are heavily dependent on H-2B workers.

79.    DOL's discussion of this issue in the 2011 rulemaking included the following agency findings:

> Several commenters suggested that some jobs in some industries are so unique that they are not represented by any SOC classification or are so remotely located that OES wage data is too broad to produce a realistic wage rate. These commenters suggested that surveys other than OES are necessary to accurately assess prevailing wages for these unique or remote jobs. The Department believes, however, that almost every job opportunity is effectively captured in the OES or the SCA or DBA wage determination rates and remote locations are effectively incorporated into the areas of intended employment reported in these wage sources.
>
> The crab processing industry's crab picker occupation was cited by many commenters, including the Chief Counsel for Advocacy, SBA, for instance, as an example of the mismatched job in OES. Others cited the ski instructor for a mismatched job classification. Under the OES, crab pickers are classified as Meat, Poultry, and Fish Cutters and Trimmers. The selection of this category when setting up the SOC was not inadvertent as evidenced by the crosswalk from the predecessor categorization, the Dictionary of Occupational Titles (DOT) from the job occupation of "crab meat processor" (DOT title 525.687-126) to the O*NET job classification of Meat Cutters. While specific duties of a crab picker are not included in the OES classification, a crab picker is an appropriate fit within that classification, since removing the meat from cooked crabs and sorting into categories (backfin, claw, etc.) for packaging and sale, as the job is described by many employers in that industry, could be easily encompassed by the duties outlined in the O*NET job classification of the meat cutter. The existence of a job in the DOT, and its mapping to an SOC code as evidenced in the crosswalk from DOT to SOC, is an objective demonstration that the Department deliberately considered and aligned that job to an SOC code, making the SOC code now in use equivalent for these purposes to the former job description in the DOT.

76 Fed. Reg. at 3466.

80.    The 2015 Wage Rule recognizes that permitting an employer to use a narrow definition of "occupation" in a survey "may result in a reported wage that is below the SOC-based

OES mean," but concludes that such lower wages "will not have adverse effect on the wages of U.S. workers because it is an accurate representation of the wages paid to other workers performing the same duties, given the alternate, non-SOC-based taxonomy." 80 Fed. Reg. at 24171. However, as DOL well knows, the fact that a survey wage is accurate says nothing about whether that wage is depressed or stagnant. In activities and geographic areas that are heavily dependent on H-2B workers, the Department has long recognized that dependence on foreign workers tends to have a stagnating and depressive effect on wages. 2011 Wage Rule, 76 Fed. Reg. at 3467. The 2015 Wage Rule does not address this important aspect of the problem with § 655.10(f).

81.    The adverse effects that result from the Departments' decision to permit employer-provided surveys to use occupational definitions narrower than the applicable OES definition is compounded by the decision in the 2015 Wage Rule to require employers to include the wages of H-2B workers in employer-provided surveys. 80 Fed. Reg. at 24172.

82.    DOL had determined in the 2011 Wage Rule that under the limited circumstances where it would accept employer provided wage surveys,

> any survey instrument submitted *cannot include the wages of H–2B workers or other nonimmigrant workers in calculating the wages*. The Department has added this requirement to ensure that wages of H–2B workers do not establish the parameters by which the wages of all workers would be measured, as this could have the net effect of creating a permanent subset of lower wages in that occupation or area of employment.

76 Fed. Reg. at 3467 (emphasis added).

83.    In publishing the 2015 Wage Rule the Departments were clearly aware that in some activities H-2B workers would "establish the parameters by which the wages of all workers would be measured," *id.*, because they justified their policy of requiring H-2B worker wages to be included in surveys precisely based on their conclusion that "the exclusion of nonimmigrant workers would effectively bar employers from using . . . wage surveys." 2015 Wage Rule, 80 Fed.

Reg. at 24172. The 2015 Wage Rule fails to explain why its 2011 findings regarding the adverse effects of measuring H-2B workers are no longer of concern in 2015.

84.     Following the passage of the 2015 Wage Rule, Congress began to include a rider in its annual appropriations bills instructing that, "[i]n the determination of prevailing wage for the purposes of the H-2B program, the Secretary [of Labor] shall accept private wage surveys even in instances where Occupational Employment Statistics survey data are available unless the Secretary determines that the methodology and data in the provided survey are not statistically supported." Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 112, 129 Stat. 2242. Identical language is found in the 2021 appropriations act. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 110, 134 Stat. 1182.

**Impacts of Employer-Provided Surveys Under the 2015 Wage Rule**

85.     The 2015 Wage Rule continues to operate to the detriment of both H-2B and U.S. workers.

86.     For example, the following chart compares wages that DOL approved last year based on employer-provided surveys in the Maryland crab industry with the wage rates that would have been required under the OES survey for the SOC codes listed in the job orders[6]:

| Employer Legal Business Name | DOL Wage Approval | Employer-Provided Survey Wage | OES Wage | Hourly Under-payment | SOC Code |
|---|---|---|---|---|---|
| A.E. Phillips & Son, Inc. | Dec 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |
| Russell Hall Seafood, Inc. | Aug 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |

---

[6] DOL has approved several different SOC codes for seafood processing work based on information employers submit to DOL as to the job description and duties to be performed. The following charts calculate underpayments based on the SOC codes identified by DOL as applicable to the jobs for which the employers sought H-2B certification, without commenting on which of the various codes might be appropriate for any given job.

| Employer Legal Business Name | DOL Wage Approval | Employer-Provided Survey Wage | OES Wage | Hourly Under-payment | SOC Code |
|---|---|---|---|---|---|
| Rippons Bros Seafood, Inc. | Aug 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |
| Simmon's Chesapeake Bay Seafood, Inc. | Aug 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |
| Old Salty's Seafood, Inc. | Aug 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |
| Lindy's Seafood, Inc. | Aug 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |
| W. T. Ruark & Co., Inc. | Aug 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |
| The J. M. Clayton Company, Inc. | Aug 2020 | $10.98 | $15.58 | $4.60 | 51-3022 |
| G. W. Hall & Son LLC | Aug 2020 | $10.98 | $14.26 | $3.28 | 51-3093 |

87.     A review of DOL-approved orders in the North Carolina crab industry reflects a similar depressive impact on wages for employers permitted to provide wage surveys:

| Employer Legal Business Name | DOL Wage Approval | Employer-Provided Survey Wage | OES Wage | Hourly Under-payment | SOC Code |
|---|---|---|---|---|---|
| Bay City Crab, Inc. | Aug 2020 | $9.21 | $13.36 | $4.15 | 51-3022 |
| County Road Seafood LLC | Oct 2020 | $10.18 | $13.36 | $3.18 | 51-3022 |
| B & J Seafood Co., Inc. | Aug 2020 | $9.21 | $14.74 | $5.53 | 53-7062 |
| Mattamuskeet Crab Company, Inc. | Aug 2020 | $9.22 | $12.15 | $2.93 | 51-3022 |
| Quality Seafood Co., Inc. | Aug 2020 | $9.21 | $12.15 | $2.94 | 51-3022 |
| Capt. Neill's Seafood, Inc. | Aug 2020 | $9.89 | $12.15 | $2.26 | 51-3022 |
| Capt. Charlie's Seafood, Inc. | Aug 2020 | $9.22 | $12.15 | $2.93 | 51-3022 |
| Coastal Heritage Seafood, Inc. | Oct 2020 | $10.18 | $12.39 | $2.21 | 53-7062 |

88.     The same pattern repeats in Virginia's seafood industry:

| Employer Legal Business Name | DOL Wage Approval | Employer-Provided Survey Wage | OES Wage | Hourly Under-payment | SOC Code |
|---|---|---|---|---|---|
| Shells Unlimited Crab Division LLC | Oct 2020 | $11.44 | $13.26 | $1.82 | 51-3022 |
| Graham & Rollins, Inc. | Aug 2020 | $11.41 | $14.86 | $3.45 | 53-7062 |
| Pride of Virginia Bait & Oyster, Inc. | Nov 2020 | $12.03 | $13.16 | $1.13 | 51-3022 |
| J & W Seafood of Virginia, Inc. | Oct 2020 | $11.44 | $16.73 | $5.29 | 51-3092 |
| Lake Packing Co., Inc. | Nov 2020 | $12.03 | $13.16 | $1.13 | 51-3022 |
| Lake Packing Co., Inc. | Nov 2020 | $12.33 | $13.16 | $0.83 | 51-3022 |
| Little River Seafood, Inc. | Dec 2020 | $11.44 | $14.11 | $2.67 | 51-3093 |
| Bevans Oyster Company, Inc. | Nov 2020 | $12.33 | $13.16 | $0.83 | 51-3022 |

89.     And, finally, Louisiana's crawfish industry shows the same wage depression:

| Employer Legal Business Name | DOL Wage Approval | Employer-Provided Survey Wage | OES Wage | Hourly Under-payment | SOC Code |
|---|---|---|---|---|---|
| Aqua Farms Crawfish, Inc. | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |
| Bocage Crawfish, LLC | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |
| D & G Frey Crawfish, LLC | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |
| Acadia Processors, LLC | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |
| Acadia Crawfish Company, L.L.C. | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |
| J. Bernard Seafood Processing, Inc. | Aug 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |
| Crawfish Processing, LLC | Aug 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |
| Shirley's Crawfish Pad, LLC | Aug 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |

| Employer Legal Business Name | DOL Wage Approval | Employer-Provided Survey Wage | OES Wage | Hourly Under-payment | SOC Code |
|---|---|---|---|---|---|
| Shane's Crawfish, LLC | Aug 2020 | $9.28 | $11.07 | $1.79 | 51-3022 |
| Toups Crawfish L.L.C. | Aug 2020 | $9.28 | $11.07 | $1.79 | 51-3022 |
| Mamou Seafood LLC | Aug 2020 | $9.28 | $11.07 | $1.79 | 51-3022 |
| Miller & LaHaye, LLC | Sep 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |
| Toups Crawfish, L.L.C. | Aug 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |
| Beiber Farms Crawfish, Inc. | Aug 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |
| Cajun Central, Inc. | Aug 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |
| West Farms Crawfish, LLC | Aug 2020 | $9.28 | $14.25 | $4.97 | 53-7062 |
| Mabile's Trucking, Inc. | Aug 2020 | $9.28 | $13.98 | $4.70 | 53-7062 |
| Atchafalaya Crawfish Processing, LLC. | Aug 2020 | $9.28 | $13.98 | $4.70 | 53-7062 |
| Andre' Oran Leger, Inc. | Aug 2020 | $9.28 | $10.44 | $1.16 | 51-3022 |
| Randol, Inc. | Nov 2020 | $10.26 | $13.24 | $2.98 | 53-7062 |
| Beaucoup Crawfish of Eunice | Aug 2020 | $9.28 | $12.95 | $3.67 | 53-7062 |
| Bayou Land Seafood, LLC. | Aug 2020 | $9.28 | $10.44 | $1.16 | 51-3022 |
| Crawfish Distributors, Inc. | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |
| Pontchartrain Blue Crab, Inc. | Nov 2020 | $10.26 | $14.28 | $4.02 | 53-7062 |
| Louisiana Blue Crab, LLC | Dec 2020 | $10.26 | $10.44 | $0.18 | 51-3022 |
| D&T Crawfish, LLC | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |
| D&T Crawfish, LLC | Aug 2020 | $9.28 | $13.24 | $3.96 | 53-7062 |

90.     In 2018, 2019, and 2020, DOL approved requests from employers in Louisiana's crawfish industry to set wages according to the "Louisiana Crawfish Wage Study" conducted by the Louisiana State University Agricultural Center. (Ex. 1).

91.     In each of those three years, the surveyor confirmed that there were more than 70 possible licensed employers in Louisiana who hired workers in the narrowly defined job of crawfish processer. *Id.* Each year, the surveyor attested that "[a]ttempts were made" to contact all 70 employers —and each year, only four of those employers responded. *Id.*

92.     The Louisiana Crawfish Wage Study makes no attempt to explain why entities employing the broader universe of "Meat, Poultry, and Fish Cutters and Trimmers" or "Laborers and Freight, Stock, and Material Movers, Hand" (the two SOC codes that DOL approved for the Louisiana crawfish industry) were omitted from the survey. It does not state what percentage of employees in the survey were H-2B workers. And it does not make any attempt to explain whether the four employers whose data was used in the survey were obtained using a statistically valid methodology or whether their data is statistically representative of the narrowly defined "occupation" of Louisiana crawfish processors.

93.     The Louisiana Crawfish Wage Study contains no information affirming that the survey was conducted independently. The surveyor does not state whether he was contacted by crawfish employers, collaborated with the crawfish industry in conducting the survey or selecting respondents, or received direct or indirect financial support from the crawfish industry.

94.     Upon information and belief, the surveyor conducting the Louisiana Crawfish Wage Study worked with a crawfish industry group to obtain the cooperation of employers who submitted responses, thereby giving employer advocates the opportunity to influence the sample of workers surveyed.

95.     Nonetheless, since at least 2018, DOL has approved employer requests to set wages according to the Louisiana Crawfish Wage Study: for 2018 to 2019, $8.33 per hour; in 2019 to 2020, $9.75; and in 2020 to 2021, $9.28.

96.     These employer-provided survey wages undercut the applicable OES prevailing wage for either cutters and trimmers or freight movers.

97.     For example, in central Louisiana, where Plaintiff Flores Gaxiola has been employed, the applicable OES prevailing wages for SOC Code 51-3022 (for cutters and trimmers) in 2018 to 2019, 2019 to 2020, and 2020 to 2021 were, respectively, $10.78, $10.56, and $11.07. The applicable OES prevailing wages for SOC Code 53-7062 (for freight movers) were, respectively, $13.22, $13.22, and $14.25.

98.     In St. Martin Parish, where Plaintiffs Williams, Lewis, Johnson, and Lee have been employed, the applicable OES prevailing wages for SOC Code 51-3022 (for cutters and trimmers) in 2018 to 2019, 2019 to 2020, and 2020 to 2021 were, respectively, $9.65, $9.88, and $10.44. The applicable OES prevailing wages for SOC Code 53-7062 (for freight movers) were, respectively, $13.14, $13.13, and $13.24.

99.     Having found a formula that consistently allows them to pay less than the OES prevailing wages, Louisiana employers are likely to continue submitting the Louisiana Crawfish Wage Study or its functional equivalent going forward. Under current regulations, crawfish employers may continue to rely upon the most recent Louisiana Crawfish Wage Study, dated June 1, 2020, until 2022.

100.     Plaintiffs NOWCRJ and Flores Gaxiola have been and will continue to be adversely affected by DOL's approval of the Louisiana Crawfish Wage Study and similar surveys as those surveys allow their employers to pay H-2B workers at depressed and stagnated wages in violation of the statutory requirements governing the H-2B program as well as the Departments' own regulations.

101.    Plaintiffs NOWCRJ, Williams, Lewis, Johnson, and Lee have been and will continue to be adversely affected by DOL's approval of the Louisiana Crawfish Wage Study and similar surveys as those surveys have the effect of allowing H-2B workers to be imported at depressed and stagnated wages which has the effect of depressing and stagnating the wages of U.S. crawfish workers generally, whether they are employed by H-2B employers or non-H-2B employers who must compete against H-2B employers. Approval of such surveys effectively denies them the chance to compete for Louisiana crawfish jobs at the applicable OES prevailing wage. If they demand more than $10 per hour for their labor, as the OES survey indicates is the norm in the area, crawfish employers can reject their applications and hire foreign workers at the depressed wages reflected on the Louisiana Crawfish Wage Study. Thus, DOL's approval of that survey and similar surveys is contrary to the statutory requirements governing the H-2B program as well as the Departments' regulations.

## CAUSES OF ACTION

**I.      5 U.S.C. § 706(2)(D) – Failure to Observe Procedures Required by Law**

102.    20 C.F.R. § 655.10(f) and Form ETA-9165 are legislative rules, and thus the Departments were required to comply with the notice and comment requirements of the APA, 5 U.S.C. § 553(b)–(c), before adopting the 2015 Wage Rule and Form ETA-9165.

103.    The Departments violated 5 U.S.C. § 553(b)–(c) by failing to provide interested parties a meaningful opportunity to comment on 20 C.F.R. §§ 655.10(f)(1) and 655.10(f)(4) and Form ETA-9165 prior to the adoption of those provisions as a final rule. The failure to comply with notice and comment requirements deprived interested parties of an opportunity to comment on, *inter alia*, the Departments' decision to:

> a.  accept employer-provided surveys issued by a state or state agency when a valid OES wage is applicable to the job opportunity as set forth in 20 C.F.R. § 655.10(f)(1);

b.  treat surveys conducted by state colleges and universities, including such surveys funded by employers or employer groups, to be "state surveys" acceptable under § 655.10(f)(1)(i);

c.  permit employer-provided surveys to define the relevant "occupation" for purposes of the survey as the job requirements of the employer rather than the broader definition of the occupation contained in the applicable OES category; and

d.  evaluate the adequacy of the data provided and the statistical methodology used in conducting employer surveys based on the information contained in Form ETA-9165, § 655.10(f)(4), and their decision to eliminate the stricter requirements set forth in the 2009 Prevailing Wage Guidance.

104.    Plaintiffs are entitled to relief for Defendants' violation of 5 U.S.C. § 553 pursuant to 5 U.S.C. § 706(2)(D), including vacatur of 20 C.F.R. § 655.10(f)(1) and § 655.10(f)(4).

## II.     5 U.S.C. § 706(2)(A) – Arbitrary and Capricious Agency Action

105.    Prior to the 2015 Wage Rule, DOL's policy, as expressed in the 2011 Wage Rule, was to disallow employer provided surveys where a valid OES wage existed because the OES wage survey "is the most consistent, efficient, and accurate means of determining the prevailing wage rate for the H-2B program," and "employers typically provide private surveys when the result is to lower wages below the prevailing wage rate." 76 Fed. Reg. at 3465. The challenged 2015 Wage Rule reverses that policy without offering any explanation as to why such a substitution should be permitted or why that policy is rational or appropriate.

106.    The 2015 Wage Rule and Form ETA-9165 are also arbitrary and capricious in that the Departments fail to rationally explain:

a.  why surveys provided by state colleges, universities, and other state entities, which DOL found to be unreliable in its 2011 Wage Rule, should now be considered appropriate substitutes for an applicable OES wage;

b.  how the information on Form ETA-9165 is sufficient to determine the adequacy of the data provided and the validity of the statistical methodology used in conducting the survey;

     c. why employers should be permitted to use employer-provided wage surveys that define the "occupation" surveyed more narrowly than the applicable OES survey definition of the occupation; and

     d. why employer-provided surveys submitted pursuant to § 655.10(f) must include the wages of H-2B workers.

107.   Plaintiffs are entitled to relief for these violations pursuant to 5 U.S.C. § 706(2)(A), including vacatur of 20 C.F.R. §§ 655.10(f)(1)(i) and 655.10(f)(4).

## III.    5 U.S.C. § 706(2)(A) – Agency Action Contrary to Law

108.   The 2015 Wage Rule, 20 C.F.R. §§ 655.10(f)(1)(i) and 655.10(f)(4), and Form ETA-9165 are contrary to law in that:

     a. by permitting employers to use employer-provided surveys where a valid OES wage is available, they are contrary to the judgment in *CATA III*; and

     b. by granting labor certifications to H-2B employers based on employer-provided wage determinations that use a narrower definition of "occupation" than the applicable OES definition, and that require the wages of H-2B workers to be included, the Departments are permitting the importation of H-2B workers at depressed or stagnating wages that adversely affect the wages of similarly employed US and H-2B workers in direct contravention of the requirements of 8 U.S.C. § 1101(a)(15)(H)(ii)(b) and 8 C.F.R. § 214.2.

109.   Plaintiffs are entitled to relief for these violations pursuant to 5 U.S.C. § 706(2)(A), including vacatur of the challenged Rule.

## IV.    5 U.S.C. § 706(2)(A) – Agency Action Contrary to Law

110.   Alternatively, if the 2015 Wage Rule is found to be valid, DOL has violated law and regulations by repeatedly approving the Louisiana Crawfish Wage Study without observing the safeguards required by 20 C.F.R. § 655.10(f) and the Consolidated Appropriations Act, 2021.

111.   DOL failed to ensure that the Louisiana Crawfish Wage Study was (1) "independently conducted," rather than privately funded, as required by 20 C.F.R.

§ 655.10(f)(1)(i), and that it (2) "made a reasonable, good faith attempt to contact all employers," as required by 20 C.F.R. § 655.10(f)(4)(i).

112.    DOL failed to ensure that the methodology and data in the Louisiana Crawfish Wage Study were "statistically supported," as required by the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 110, 134 Stat. 1182, and prior comparable appropriations acts.

113.    DOL's approval of the Louisiana Crawfish Wage Study is thus not in accordance with law.

114.    Plaintiffs are entitled to relief for these violations, including vacatur of the challenged approvals pursuant to 5 U.S.C. § 706(2)(A).

<b>PRAYER FOR RELIEF</b>

Wherefore, Plaintiffs respectfully request that this Court:

A.    Declare 20 C.F.R. § 655.10(f)(1)(i) and § 655.10(f)(4) are unlawful because they were promulgated without observance of procedure required by law;

B.    Declare 20 C.F.R. §§ 655.10(f)(1)(i) and 655.10(f)(4) arbitrary and capricious;

C.    Declare 20 C.F.R. §§ 655.10(f)(1)(i) and 655.10(f)(4) contrary to law;

D.    Vacate and set aside 20 C.F.R. §§ 655.10(f)(1)(i) and 655.10(f)(4);

E.    In the event that the 2015 Wage Rule is deemed in accordance with law, vacate and set aside DOL's approval of the Louisiana Crawfish Wage Study as not in accordance with law;

F.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorney's fees; and

G.    Grant other such relief as this Court may deem proper.

Dated: April 27, 2021                          Respectfully submitted,

                                               **/s/ Elizabeth T. Leiserson**
Edward Tuddenham                               Elizabeth T. Leiserson
(*Pro Hac Vice* pursuant to LCvR 83.2(g))      D.D.C. Bar No. TN0020
N.Y. Bar No. 2155810                           David Huang
23 Rue du Laos                                 (*Pro Hac Vice* pursuant to LCvR 83.2(g))
75015 Paris                                    Tennessee Bar No. 038530
France                                         SOUTHERN MIGRANT LEGAL SERVICES
+33 6 84 79 89 30                              A Project of Texas RioGrande Legal Aid, Inc.
etudden@prismnet.com                           311 Plus Park Blvd., Ste. 135
                                               Nashville, TN 37217
*Counsel for All Plaintiffs*                   (615) 538-0725
                                               eleiserson@trla.org
Clermont F. Ripley                             dhuang@trla.org
(*Pro Hac Vice* pursuant to LCvR 83.2(g))
North Carolina Bar No. 36761Carol Brooke       *Counsel for Plaintiff Flores Gaxiola*
(*Pro Hac Vice* pursuant to LCvR 83.2(g))
North Carolina Bar No. 29126                   Gregory S. Schell
NORTH CAROLINA JUSTICE CENTER                  (*Pro Hac Vice* pursuant to LCvR 83.2(g))
P.O. Box 28068                                 Florida Bar No. 287199
Raleigh, NC 27611                              SOUTHERN MIGRANT LEGAL SERVICES
(919) 856-2154                                 A Project of Texas RioGrande Legal Aid, Inc.
clermont@ncjustice.org                         9851 Daphne Ave.
carol@ncjustice.org                            Palm Beach Gardens, FL 33410-4734
                                               (561) 627-2108
*Counsel for Plaintiffs NOWCRJ, Williams, Lewis,*    gschell@trla.org
*Johnson, and Lee*
                                               *Counsel for Plaintiff Flores Gaxiola*

                                               Douglas L. Stevick
                                               (*Pro Hac Vice* pursuant to LCvR 83.2(g))
                                               Texas Bar No. 00797498
                                               TEXAS RIOGRANDE LEGAL AID, INC.
                                               5439 Lindenwood Ave.
                                               Saint Louis, MO 63109
                                               (314) 449-5161
                                               dstevick@trla.org

                                               *Counsel for Plaintiff Flores Gaxiola*