**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MARY JANE WILLIAMS, *et al.*, | : | | |
| | : | | |
|     Plaintiffs, | : | Civil Action No.: | 21-1150 (RC) |
| | : | | |
|     v. | : | Re Document Nos.: | 18, 22, 31 |
| | : | | |
| MARTIN J. WALSH, *et al.*, | : | | |
| | : | | |
|     Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT,
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS, AND DENYING
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

Plaintiffs, workers in Louisiana's seasonal crawfish processing industry and a workers' rights organization, challenge a regulation that requires the Department of Labor ("DOL") to accept wage data from employers when setting the minimum wage an employer must offer in order to employ temporary foreign workers under the H-2B visa program. According to Plaintiffs, DOL's acceptance of employer wage data, as opposed to reliance on a federal government measure called the OES survey, depresses wages in the crawfish industry. And they say that the challenged regulation is invalid under the Administrative Procedure Act. 5 U.S.C. § 706. They seek vacatur of the regulation, as well as a preliminary injunction ordering DOL and the Department of Homeland Security ("DHS") to notify employers that the regulation is the subject of an ongoing lawsuit. In the alternative, Plaintiffs seek vacatur of past DOL wage determinations based on previous versions of a particular employer-submitted wage survey covering the Louisiana crawfish industry, because the survey allegedly is methodologically and statistically unsound in violation of DOL regulations and a related statute. Plaintiffs have also

moved for leave to file a supplemental complaint to add claims related to new wage determinations based on the 2021 version of the Louisiana survey.

The Court lacks subject matter jurisdiction over the claims alleged in the original Complaint. Even if the Court were to vacate the challenged regulation, a different statute—which Plaintiffs have not challenged—would still require DOL to accept the employer submissions that allegedly harm Plaintiffs instead of the OES survey. The Court therefore is unable to redress Plaintiffs' alleged injuries, and the plaintiffs do not have standing to challenge the regulation. As for the challenge to the past wage determinations, these have all expired, and cannot have any effect on Plaintiffs' wages. This component of Plaintiffs' lawsuit is therefore moot. The Court dismisses the claims in the original Complaint without prejudice for lack of subject matter jurisdiction, and denies Plaintiffs' motion for a preliminary injunction for the same reason. However, the Court grants Plaintiffs' motion to file a supplemental complaint alleging claims related to current wage determinations and concludes that it has subject matter jurisdiction over these claims.

## II.  BACKGROUND[1]

### A.  Regulatory Framework

Under the H-2B visa program, if a United States employer cannot find enough United States workers to perform temporary non-agricultural unskilled work, it may obtain visas for the admission of foreign workers to fill the gap. When Congress authorized this program, it was mindful of the risk that unfettered admission of foreign workers willing to work at lower rates

---

[1] Except where otherwise indicated, the Court draws factual material from the Complaint and construes it liberally in favor of Plaintiffs, as is appropriate on a Rule 12(b)(1) motion to dismiss. *See Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004); *see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (courts may consider record evidence beyond the Complaint when evaluating a motion to dismiss for lack of subject matter jurisdiction).

might harm United States workers by depressing wages in their fields.  Therefore, Congress

required employers seeking H-2B visas to show that their employment of foreign workers will

not adversely affect the wages and working conditions of United States workers.  *Comité de

Apoyo a los Trabajadores Agrícolas v. Perez*, 774 F.3d 173, 177 (3d Cir. 2014) ("*CATA III*")

(citing 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1182(a)(5)(A)(i)(I)–(II)); *see also* Compl. ¶ 24, ECF No.

1.

By delegation from the Department of Homeland Security, the Department of Labor

holds responsibility for evaluating employer applications for H-2B visas in order to determine

whether granting the requested employment of foreign workers will adversely affect United

States workers.  Compl. ¶ 25.  This involves making two determinations: "(1) [that] qualified

workers are not available in the United States to perform the employment for which foreign

workers are sought, and (2) [that the foreign workers'] employment will not adversely affect

wages and working conditions of similarly employed United States workers."  *CATA III*, 774

F.3d at 177 (citing 8 C.F.R. § 214.2(h)(6)(iii)(A), (iv)(A)).  The wage an H-2B employer offers

is central to this determination, both because the availability of United States workers will

depend on whether the work pays a satisfactory wage and because admitting foreign workers

willing to work for reduced wages may decrease the wages available to United States workers

looking to work in the same industry.  Thus, to be eligible to participate in the H-2B program, an

employer must obtain from DOL a determination that the employer offers at least the "prevailing

wage" for the relevant occupation.  Compl. ¶ 26 (citing 20 C.F.R. § 655.0(a)(2); *id.* § 655.10(a)).

Just how to calculate the prevailing wage for a particular occupation has been the subject

of dispute between employers and workers for some time, and Congress, DOL, DHS, and the

courts have all weighed in over the years.  At first, DOL enlisted state agencies to calculate a

prevailing wage for each occupation within their jurisdictions.  *CATA III*, 774 F.3d at 178.  In

2005, for occupations not subject to any collective bargaining agreement, DOL began to consider

both employer-submitted, private wage surveys and the Bureau of Labor Statistics Occupational

Employment Statistics ("OES")[2] survey.  *Id.*  According to Plaintiffs, surveys submitted by

employers tend to suffer from methodological defects not present in the OES survey, including

defining the relevant occupation too narrowly by using specific job duties as the determinative

criterion and failing to ensure that all relevant employers have submitted wage data.  Compl.

¶¶ 67–78.  Therefore, the Plaintiffs allege that employer-submitted surveys indicate that the

prevailing wage is lower than it is under the preferable OES method, and that DOL's

consideration of employer-submitted wage surveys systematically depresses wages in H-2B

industries.  *Id.* ¶¶ 85–89.

A 2008 rule formalized DOL's practice of making prevailing wage determinations based

either on employer-submitted surveys or the OES wage.  Compl. ¶ 33 (citing 73 Fed. Reg.

78020, 78056 (Dec. 19, 2008)).  Though the notice of proposed rulemaking solicited comments

generally, it did not permit comments on the specific topic of acceptance of employer-submitted

surveys.  *Id.* ¶ 29.  A district court held that a separate feature of the 2008 rule—its division of

OES data to identify OES wages for different "skill levels"—was arbitrary and capricious in

violation of the Administrative Procedure Act ("APA").  *Comité de Apoyo a los Trabajadores

Agrícolas v. Solis*, No. 09-240, 2010 WL 3431761, at *19 (E.D. Pa. Aug. 30, 2010) ("*CATA I*").

DOL responded with a notice of proposed rulemaking, and ultimately a final rule in 2011 that,

among other things, forbade employers from submitting their own surveys when an applicable

_____

[2] The OES recently changed its  name to the Occupational Employment and Wage
Statistics Survey, or OEWS, but the Court uses the term OES for consistency with the record and
briefing.  *See* Pls.' Mem. Supp. Mot. Prelim. Inj. at 1 n.2, ECF No. 22-1 ("Prelim. Inj. Mem.").

OES wage (or another approved federal wage measure) was available.  Compl. ¶ 37 (citing 76 Fed. Reg. 3452, 3465 (Jan. 19, 2011)).  DOL explained that the OES survey was "the most consistent, efficient, and accurate means of determining the prevailing wage rate for the H-2B program." *Id.* ¶ 2 (citing 76 Fed. Reg. at 3465).  But Congress refused to provide appropriations to implement this rule, so DOL continued to operate under the 2008 rule, including by differentiating among skill levels and by accepting employer-provided surveys. *Id.* ¶ 41.  Yet again, the Eastern District of Pennsylvania ordered DOL to cease its skill-level differentiation. *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, 933 F. Supp. 2d 700, 711–12 (E.D. Pa. 2013) ("*CATA II*").

In response, and without notice and comment, DOL and DHS published a joint Interim Final Rule, which, among other things, officially returned to the policy of requiring DOL to accept employer-provided surveys.  At the same time it announced this 2013 rule, DOL and DHS solicited post-rule public comments on "the accuracy and reliability of private surveys," including "state-developed" surveys.  Compl. ¶ 48 (quoting 78 Fed. Reg. 24047, 24055 (Apr. 24, 2013)).  But this rule, too, was quickly vacated; the Third Circuit concluded that DOL and DHS had not sufficiently explained their policy of approving employer survey submissions and held, based on the then-existing record, that the policy was arbitrary and capricious in violation of the APA. *CATA III*, 774 F.3d at 186–91.  The Third Circuit ordered "that private surveys no longer be used in determining the mean rate of wage for occupations except where an otherwise applicable OES survey does not provide any data for an occupation in a specific geographical location, or where the OES survey does not accurately represent the relevant job classification." *Id.* at 191.

Again without notice and comment, DOL and DHS jointly published a new rule in 2015 at 80 Fed. Reg. 24146 (Apr. 29, 2015) (codified at 20 C.F.R. pt. 655) ("2015 Wage Rule"). Compl. ¶ 56.  The 2015 Wage Rule requires DOL to accept prevailing wage surveys from employers who wish to participate in the H-2B program, so long as "the survey was independently conducted and issued by a state, including any state agency, state college, or state university."  20 C.F.R. § 655.10(f)(1)(i); 80 Fed. Reg. at 24184; *see also* Compl. ¶ 58.  DHS and DOL explained that they had "determined that it is appropriate to permit prevailing wage surveys that are conducted and issued by a state as a third, limited category of acceptable employer-provided surveys, even where the occupation is sufficiently represented in the OES."  *Id.* ¶ 59 (quoting 80 Fed. Reg. at 24169–70).

When it submits such a survey to DOL as part of its application package, an employer must include "specific information about the survey methodology, including such items as sample size and source, sample selection procedures, and survey job descriptions, to allow a determination of the adequacy of the data provided and validity of the statistical methodology used in conducting the survey."  20 C.F.R. § 655.10(f)(4).  The employer must also attest via Form ETA-9165, that the survey was conducted by a third party (not an employer or its agents), that the surveyor either contacted a randomized sample of relevant employers or attempted to contact them all, and, among other things, that the "survey includes wage data from at least 30 workers and three employers."  *Id.* § 655.10(f)(4) (i)–(iii).  An employer-submitted "survey must be the most current edition of the survey and must be based on wages paid not more than 24 months before the date the survey is submitted for consideration."  *Id.* § 655.10(f)(5).  Despite these requirements, Plaintiffs allege that most employer-submitted "state surveys approved by DOL are not the result of an independent state decision to conduct a survey . . . but are the result

of H-2B employers or H-2B employer groups requesting state agencies, colleges, or universities

to conduct such surveys on their behalf."  Compl. ¶ 63.  In Plaintiffs' telling, employer groups

even participate directly in the process of identifying the set of employers to be surveyed.

Compl. ¶ 64.

Once DOL accepts an employer survey and relies on it to certify that the employer is

paying the prevailing wage and therefore eligible to participate in the H-2B program, it must

specify how long its survey-based determination of the prevailing wage in the industry remains

valid.  The maximum validity period for any prevailing wage determination is one year from the

date of the determination.  20 C.F.R. § 655.10(h).

Beginning in fiscal year 2016, Congress has attached a rider to each annual

appropriations act that takes the decision whether or not to accept employer-submitted surveys

out of DOL and DHS's hands:

> The determination of prevailing wage for the purposes of the H–2B program shall
> be the greater of—(1) the actual wage level paid by the employer to other
> employees with similar experience and qualifications for such position in the same
> location; or (2) the prevailing wage level for the occupational classification of the
> position in the geographic area in which the H–2B nonimmigrant will be employed,
> based on the best information available at the time of filing the petition.  **In the
> determination of prevailing wage for the purposes of the H–2B program, the
> Secretary shall accept private wage surveys even in instances where
> Occupational Employment Statistics survey data are available unless the
> Secretary determines that the methodology and data in the provided survey
> are not statistically supported.**

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 110, 134 Stat. 1182, 1564–65

(2020) (emphasis added) (the "Appropriations Rider"); *see also* Further Consolidated

Appropriations Act, 2020, Pub. L. No. 116-94, § 110, 133 Stat. 2534, 2554 (2019) (same);

Department of Defense and Labor, Health and Human Services, and Education Appropriations

Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 111, 132 Stat. 2981,

3065 (2018) (same); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 112, 132

Stat. 348, 712 (2018) (same); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 112, 131 Stat. 135, 518–19 (2017) (same); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 112, 129 Stat. 2242, 2599 (2015) (same).

Though fiscal year 2021 has ended, the Appropriations Rider remains in effect under a continuing resolution. *See* Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. No. 117-43, § 101(8), 135 Stat. 344, 344 (2021) (providing that DOL funding authorized in the 2021 Consolidated Appropriations Act shall continue "under the authority and conditions provided" therein); Further Extending Government Funding Act, Pub. L. No. 117-70, § 101(1), 135 Stat. 1499, 1499 (2021) (extending the relevant provision of the Extending Government Funding And Delivering Emergency Assistance Act until it is superseded by another appropriations act or February 18, 2022, whichever comes first). Thus, from 2016 through the present, DOL has been *required by statute* to accept all statistically valid employer-submitted surveys, regardless of what the DOL regulations, including the 2015 Wage Rule, say. Notably, the Appropriations Rider is broader than the DOL regulations; it does not limit private employer survey submissions to surveys conducted by a state or state university. 20 C.F.R. § 655.10(f)(1)(i).

### B.  Procedural History

Every crawfish season—from January at the earliest to July at the latest each year—crawfish processing plants in Louisiana hire both American and, under the H-2B program, foreign workers to peel crawfish. *See* Compl. ¶¶ 12, 89; Pls.' Mem. Opp'n Defs.' Mot. Dismiss Ex. 2 ¶ 4, ECF No. 21-2; Pls.' Mem. Opp'n Defs.' Mot. Dismiss Ex. 5 at 1–2, ECF No. 21-5. Like any other prospective H-2B employers, Louisiana crawfish processors must submit applications to DOL for approval to participate in the H-2B program, and as part of this process must obtain a determination that they offer the prevailing wage in the industry. Crawfish

processors typically apply for prevailing wage determinations well in advance of each year's

crawfish season kickoff, and they often submit their own wage surveys.  Compl. ¶ 89.

According to Plaintiffs, DOL's acceptance of employer-provided surveys depresses wages in the

crawfish industry.  For example, Plaintiffs allege that in 2020, "more than two dozen Louisiana

seafood companies provided DOL with surveys pursuant to 20 C.F.R. § 655.10(f)(1)(i) that

allowed them to pay their workers anywhere from $0.18 to $4.97 less per hour than would have

been required under the OES survey"; this amounted to wage losses of "up to 35% of the

applicable OES wage."  Pls.' Mem. Opp'n Defs.' Mot. Dismiss at 6, ECF No. 21 ("Mot. Dismiss

Opp'n") (citing Compl. ¶¶ 89–90).

DOL issues most of its prevailing wage determinations in August of each year.  Pls.'

Mem. Supp. Mot. Prelim. Inj. at 2, ECF No. 22-1 ("Prelim. Inj. Mem.") (citing Compl. ¶¶ 86–

89).  The same pattern held this year—DOL adjudicated most crawfish-processor H-2B

prevailing wage applications for the 2022 crawfish season in August 2021.  *See id.*  In 2018,

2019, and 2020, DOL issued at least some prevailing wage determinations to Louisiana crawfish

processers based on the employer-submitted Louisiana Crawfish Wage Study, a survey

conducted by the Louisiana State University Agricultural Center.  Compl. ¶¶ 90, 95.  Plaintiffs

charge that the editions of the Louisiana Crawfish Wage Study used in these years suffered from

several methodological defects.  They defined the relevant occupation too narrowly by

considering crawfish processors only and not similar jobs in the fish, meat, and poultry

industries; they did not explain whether the respondents constituted a representative sample of

industry employers; and they did not affirm that they were conducted independently and without

support from the crawfish processing industry—in fact, LSU worked with an industry group in

order to obtain employer responses.  *Id.* ¶¶ 90–95.  At least one processor, Crawfish Distributors,

Inc. of Breaux Bridge, Louisiana, submitted the 2021 version of the Louisiana Crawfish Wage Study (apparently renamed the Louisiana Crawfish Wage Survey) in support of its prevailing wage application for the 2022 crawfish season.  Defs.' Mem. Supp. Mot. Dismiss Ex. 1 at 3, ECF No. 18-3.

Plaintiffs Mary Jane Williams, Mary Hester Lewis, and Martin Johnson, Jr. are United States workers who have worked and plan to continue to work as seasonal crawfish peelers alongside Mexican H-2B workers at Crawfish Distributors.  Compl. ¶¶ 12–15; Mot. Dismiss Opp'n Ex. 3–5, ECF Nos. 21-3–21-5.  Plaintiff Danielle Lee has worked and intends to continue to work as a crawfish peeler at CJ's Seafood Restaurant, also in Breaux Bridge.  Compl. ¶ 16; Mot. Dismiss Opp'n Ex. 6, ECF No. 21-6.  Plaintiff Martha Icela Flores Gaxiola is a Mexican citizen who obtained H-2B visas to work at Louisiana crawfish plants in 2011, 2013, 2018, and 2020, and plans to do so again in 2022.  Compl. ¶ 18; Mot. Dismiss Opp'n Ex. 7, ECF No. 21-7.  The remaining plaintiff, New Orleans Workers' Center for Racial Justice ("NOWCRJ") is a New Orleans organization that "is dedicated to building workers' power and advocating for justice in the workplace"; its members include "U.S. workers who work or have worked in the Louisiana seafood industry as well as workers who come temporarily to work on H-2 visas in Louisiana seafood plants."  Compl. ¶ 17.

On April 27, 2021—in the middle of Louisiana crawfish season 2021—Plaintiffs filed a four-count complaint against DOL, DOL Secretary Martin J. Walsh in his official capacity, DHS, and DHS Secretary Alejandro Mayorkas in his official capacity ("Defendants") in the United States District Court for the District of Columbia.  Compl.  Counts I–III each claim that the portions of the 2015 Wage Rule that provide for the acceptance and evaluation of employer-submitted state wage surveys (20 C.F.R. §§ 655.10(f)(1)(i), (f)(4)) violate the APA: because they

are legislative rules promulgated without sufficient notice and comment (Count I), *see* 5 U.S.C. § 706(2)(D), because they are arbitrary and capricious (Count II), *see* 5 U.S.C. § 706(2)(A); and because they conflict with the judgment in *CATA III* and are therefore contrary to law (Count III), *see id.* Compl. ¶¶ 102–09. For relief, Counts I–III each seek a declaration that the challenged portions of the 2015 Wage Rule are unlawful and an order vacating them. *Id.* ¶¶ 104, 107, 109; *see also id.* at 32. Count IV is pleaded in the alternative. It alleges that DOL has "repeatedly approv[ed] the Louisiana Crawfish Wage Study without observing the safeguards required by 20 C.F.R. § 655.10(f)" or the Appropriations Rider's requirement to ensure that the study was "statistically supported." *Id.* ¶¶ 110–13. Thus, the Plaintiffs ask this Court, in the event it concludes that the challenged 2015 Wage Rule is valid under the APA, to vacate and set aside DOL approvals based on this survey because they are contrary to law, *see* 5 U.S.C. § 706(2)(A). *Id.* ¶¶ 113–14; *see also id.* at 32.

Invoking standing, mootness, and various APA justiciability doctrines, Defendants moved to dismiss all claims for lack of subject matter jurisdiction and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defs.' Mot. Dismiss, ECF No. 18. While this motion was pending, on August 12, 2021, Plaintiffs moved for a limited preliminary injunction with respect to Counts I–III only. Pls.' Mot. Prelim. Inj., ECF No. 22; Prelim. Inj. Mem. at 10 n.6. Specifically, Plaintiffs ask this Court to order DOL and DHS to post on their websites and include in any communications to employers a warning that Plaintiffs' challenge to the 2015 Wage Rule is pending before this Court and that if it succeeds, employers who have received prevailing wage determinations based on their own surveys might be liable for back pay at the OES wage rate. Pls.' Mot. Prelim. Inj.

After both the motion to dismiss and the preliminary injunction motions were fully briefed, on November 8, 2021 Plaintiffs moved for leave to file a supplemental complaint in order to "set forth . . . new facts regarding the approval of the 2021 Louisiana Crawfish Wage Survey and to challenge the legality of Defendants' issuance of prevailing wage determinations in reliance on that survey."  Pls.' Mot. Leave to File Suppl. Compl. ¶ 7, ECF No. 31. Specifically, the proposed Supplemental Complaint alleges (and attaches exhibits to show) that DOL data released on November 1, 2021 show that since July, DOL has "issued 21 prevailing wage determinations granting Louisiana H-2B employers permission to pay their 2022 H-2B workers (and U.S. workers in corresponding employment) $10.43 per hour, the rate from the 2021 Louisiana Crawfish Wage Survey, rather than requiring those employers to pay the higher OES wage rates applicable to their jobs."  Suppl. Compl. ¶ 12, ECF No. 32-2.  A contemporaneously filed "Notice of New Facts" declares that among these employers was "Crawfish Wage Distributors, Inc., the long-time employer of Plaintiffs Williams, Lewis and Johnson and the employer they expect to return to for the 2022 season."  Pls.' Notice of New Facts in Opp'n to Mot. Dismiss and Supp. Mot. Prelim. Inj. ¶ 3, ECF No. 30 ("Pls.' Notice of New Facts").  Plaintiffs claim that the 2021 Louisiana Crawfish Wage Survey wage is uniformly lower than the OES wage for each employer who submitted it; in many cases it is up to 30 or 40 percent lower.  Suppl. Compl. ¶ 16.  Just like previous years' editions, according to Plaintiffs, the 2021 Louisiana Crawfish Wage Survey is methodologically defective in a number of ways.  For example, it does not provide sufficient information to reveal whether it was independently conducted, it rested on submissions from only four employers, and it "did not survey workers across industries that employ workers in the applicable occupational classifications, nor did it

survey all, or even a random sample, of similarly employed workers within the relevant OES occupational classifications." *Id.* ¶¶ 17–19, 21.

Accordingly, the Plaintiffs seek to add a Count V, which alleges that prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey are contrary to the statutory mandate to ensure that H-2B workers will not adversely affect U.S. workers, are "contrary to the Third Circuit's mandate in *CATA III*, 774 F.3d 173, contrary to the Consolidated Appropriations Act of 2021, and contrary to . . . regulations governing the approval of employer-provided surveys at 20 C.F.R. § 655.10(f)." *Id.* ¶ 30. "Among other things," Count V continues, "with each such prevailing wage determination, DOL failed to ensure that the 2021 Louisiana Crawfish Wage Survey (1) was independently conducted; (2) was based on a reasonable, good-faith attempt to contact all employers; (3) involved reasonable, good faith-efforts to follow up with non-responding employers; (4) was statistically supported and statistically significant; and (5) did not adversely affect the wages of U.S. workers." *Id.* ¶ 31. In other words, Count V is more or less "the same as" Count IV except that it is based on DOL's use of the 2021 Louisiana Crawfish Wage Survey instead of previous years' editions. Pls.' Mot. Leave to File Suppl. Compl. ¶ 11.

Plaintiffs therefore ask the Court to declare that DOL's issuance of prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey was arbitrary and capricious and contrary to law and to vacate and set aside all prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey. Suppl. Compl. at 8. Count V also includes a request for "preliminary and permanent relief" that is, in some ways, narrower than the preliminary injunction Plaintiffs previously moved for at ECF No. 22: an order "requiring Defendants to inform employers who have been approved to use the 2021 Louisiana Crawfish Wage Survey

wage during the 2022 season that that survey wage rate is subject to litigation and that, if Plaintiffs are successful in this suit, the employers will be required to pay the OES prevailing wage applicable to their jobs from the date of the final judgment in this case and will be required to provide proof that they have paid their workers the OES prevailing wage retroactively to the date they receive the notice from DOL that their wage rate is in litigation prior to receiving any further H-2B certifications." *Id.* at 8–9.  Unlike this Louisiana-crawfish-specific notification, the motion for a preliminary injunction at ECF No. 22 asks that DOL and DHS be required to provide notice of this litigation to *all* H-2B employers in *any industry* who rely on an employer-submitted wage survey.  Pls.' Mot. Prelim. Inj.

Defendants oppose granting leave to file a supplemental complaint.  Defs.' Opp'n Pls.' Mot. Leave to File Suppl. Compl., ECF No. 33 ("Opp'n Leave Suppl.").

### III.  LEGAL STANDARDS

#### A.  Legal Standards for Supplementing a Complaint

Rule 15(d) of the Federal Rules of Civil Procedure authorizes a court, "on . . . reasonable notice" and "on just terms," to permit a party to file a supplemental complaint setting forth any "occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  Supplemental complaints are thus used "to set forth new facts that update the original pleading or provide the basis for additional relief; to put forward new claims or defenses based on events that took place after the original complaint or answer was filed; [and] to include new parties where subsequent events have made it necessary to do so."  *United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002) (citing 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1504 (3d ed. 2010)).  By allowing this flexibility, Rule 15(d) operates "to make pleadings a means to achieve an orderly and fair administration of

justice." *Gomez v. Wilson*, 477 F.2d 411, 417 n.34 (D.C. Cir. 1973) (quoting *Griffin v. Cnty. Sch. Bd.*, 377 U.S. 218, 227 (1964)).

A court "has broad discretion in determining whether to allow supplemental pleadings." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, No. 11-CV-1623, 2015 WL 13691541, at *2 (D.D.C. Feb. 3, 2015).  Supplemental pleadings are "to be freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action."  *Hall v. CIA*, 437 F.3d 94, 101 (D.C. Cir. 2006) (internal quotation marks omitted).  Supplementation is allowed even in situations where "the original pleading is defective in stating a claim," such as due to mootness or a lack of standing.  Fed. R. Civ. P. 15(d); *see Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018).  A court may, however, deny a motion to file a supplemental complaint as futile "if the proposed claim[s] would not survive a motion to dismiss."  *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (affirming denial of leave to file a supplemental complaint); *Oladokun v. Corr. Treatment Facility*, 5 F. Supp. 3d 7, 13 (D.D.C. 2013) (explaining that when a party argues that a claim is futile because it would not survive a motion to dismiss, the claim is analyzed "under the same standard as would be applied to a motion to dismiss" pursuant to Rule 12(b)).  Consequently, "in deciding whether to grant or deny a motion to supplement, the Court may consider the merits of the proposed new pleading."  *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 12 (D.D.C. 2017) (citing *Burka v. Aetna Life Ins. Co.*, 945 F. Supp. 313, 317 (D.D.C. 1996)).

### B.  Legal Standards for Motions to Dismiss for Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack of subject matter jurisdiction.  Federal courts are courts of limited jurisdiction, and the law

presumes that "a cause lies outside this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. E.P.A.*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  It is generally the plaintiff's burden to establish that the court has subject matter jurisdiction, including that the plaintiff has standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), although a defendant asking for Rule 12(b)(1) dismissal on the ground that the case has become moot bears the burden of establishing mootness. *Zukerman v. United States Postal Serv.*, 961 F.3d 431, 441 (D.C. Cir. 2020).

    In evaluating a Rule 12(b)(1) motion, a court must accept "the allegations of the complaint as true," *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), and "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged[,]" *Barr*, 370 F.3d at 1199 (internal quotation marks omitted).  But because subject matter jurisdiction goes to the court's power to hear a claim, the court must subject the plaintiff's factual allegations to closer scrutiny than it would on a Rule 12(b)(6) motion for failure to state a claim.  *See Grand Lodge of the Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001).  Thus, the Court's review is not limited to the allegations contained in the complaint. *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987).  Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert*, 974 F.2d at 197 (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

# IV.  ANALYSIS

As explained below, the Court grants Plaintiffs leave to file their proposed Supplemental Complaint.  However, even considering the supplement, Plaintiffs lack standing to bring Counts I–III, and Count IV is moot.  The Court grants Defendants' motion to dismiss Counts I–IV for lack of subject matter jurisdiction and denies Plaintiffs' motion for a preliminary injunction requiring DOL and DHS to notify all employers who have relied on employer-submitted wage surveys about this lawsuit, ECF No. 22.  The Court holds that Plaintiffs have standing to bring Count V, and therefore will not dismiss it at this time.  The Court denies Plaintiffs' Count V request for a preliminary injunction until Plaintiffs apply for one "in a document separate from the complaint," should they choose to do so.  D.D.C. Local Rule 65.1(c).

## A.  The Court Grants Plaintiffs Leave to File a Supplemental Complaint

Defendants raise two points in opposition to leave to supplement, but neither persuades the Court that leave should be denied.  They note that Plaintiffs filed their original Complaint "two days before the six-year statute of limitations to file a facial challenge against the 2015 Wage Rule expired."  Opp'n Leave Suppl. at 1–2.  They then argue that the new facts alleged in the Supplemental Complaint, including those related to some of the plaintiffs' plans to work in the Louisiana crawfish industry in 2022, arose after the statute of limitations expired and do not "relate back" to the original filing.  *Id.* at 6–8.  Therefore, Defendants claim that Counts I–III, as supplemented, would be futile, because they would be dismissed as time-barred.  *Id.* at 8.  Plaintiffs reply that the supplement would not present any statute-of-limitations issue regarding Counts I–III because the new allegations relating to their employment plans do not add any new challenged conduct or new legal theory to those counts.  Rather, they simply serve to confirm that Plaintiffs had standing when the complaint was originally filed because there was a non-speculative possibility that they would continue to work in the crawfish industry.  Pls.' Reply

Supp. Mot. for Leave to File Suppl. Compl. at 1–4, ECF No. 34.  The Court does not resolve this dispute because as explained below, it concludes that Counts I–III, even as supplemented, must be dismissed for lack of standing.  Count V, the new count in the Supplemental Complaint, relates to specific prevailing wage determinations issued in 2021 and therefore does not present any statute of limitations issue.

Defendants next assert that the Supplemental Complaint exceeds the scope of the additions Plaintiffs described when soliciting Defendants' consent to the filing.  Opp'n Leave Suppl. at 8.  But the only prejudice they identify from the allegedly expanded supplement is the obligation to engage in "further motions practice over the statute-of-limitations defense described above."  *Id.*  But as just explained, any need for briefing on the statute-of-limitations defense, which by Defendants' own admission relates only to Counts I–III, *id.* will be obviated by the Court's dismissal of Counts I–III as supplemented for lack of standing.

In order to fully inform its decision on the standing and other issues presented by Counts I–V, and to "promote the economic and speedy disposition of the entire controversy between the parties"  *Hall*, 437 F.3d at 101 (D.C. Cir. 2006) (citation omitted), the Court grants Plaintiffs' motion for leave to file the Supplemental Complaint attached to their motion and considers the allegations therein in the course of the following analysis.  The Court will proceed to evaluate Defendants' pending motion to dismiss the original Complaint, which they have reiterated insofar as it raises arguments that overlap with issues presented by the Complaint as supplemented.  Joint Status Report, ECF No. 32 ("Even if the Court were to grant Plaintiffs' motion for leave to file a supplemental complaint, however, Defendants' motion to dismiss (ECF No. 18) and opposition to Plaintiffs' motion for a preliminary injunction (ECF No. 26) still present viable defenses that should be ruled upon by this Court."); *see Lannan Found. v.*

*Gingold*, 300 F. Supp. 3d 1, 14 (D.D.C. 2017); *McTech Corp. v. United States*, 105 Fed. Cl. 726, 730 (2012).

**B.  Plaintiffs Lack Standing to Bring Counts I–III Because Vacatur of the 2015 Wage Rule Would Not Redress Their Injuries**

The United States Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2; *see Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014)  ("Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" (citation omitted)).  Courts employ the doctrine of standing to determine whether a plaintiff's claims present a case or controversy.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  It is by now familiar "that the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at  560–61 (cleaned up).  Plaintiffs bear the burden of establishing each of these elements for each form of relief they seek.  *Cato Inst. v. SEC*, 4 F.4th 91, 94 (D.C. Cir. 2021) (per curiam).  They must show that they had standing based on the facts as they existed at the time of the complaint (in this case, the complaint as supplemented).  *See Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 977 (D.C. Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 180, (2000)); *Scahill*, 909 F.3d at 1184.

For one fundamental reason, Plaintiffs fail to meet their burden of establishing the third element of standing, redressability, for their claims seeking vacatur of the 2015 Wage Rule, Counts I–III.[3]  Even if the Court were to grant the requested vacatur of the 2015 Rule's provision for acceptance of employer-submitted surveys instead of the OES wage, the Appropriations Rider would still govern and require DOL to accept employer-submitted surveys instead of the OES wage.

To explain, "[r]edressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.  The key word is 'likely.'" . . . When conjecture is necessary, redressability is lacking." *West v. Lynch*, 845 F.3d 1228, 1235, 1237 (D.C. Cir. 2017) (cleaned up).  Thus, Plaintiffs must demonstrate a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation omitted).  For their injuries in fact, Plaintiffs allege that DOL's practice of relying on employer-submitted state surveys rather than the OES wage has caused and will cause them to suffer depressed wages and lost opportunities to find work at higher rates.  Mot. Dismiss Opp'n at 11, 14.  But even if the Court were to vacate the employer survey components of the 2015 Rule—the only relief Plaintiffs request for Counts I–III—these alleged harms would continue unabated.  In this scenario, even were this Court to vacate the 2015 Wage Rule, the Appropriations Rider would still control and require DOL to accept all statistically valid employer-submitted surveys (state or otherwise).  *See* Consolidated Appropriations Act, 2021, § 110, 134 Stat. at 1564–65 ("In the

---

[3] Because the absence of redressability is independently fatal to each plaintiff's attempt to establish standing for Counts I–III and mandates dismissal of Counts I–III, the Court does not decide whether any of the plaintiffs have established the other elements of standing with respect to Counts I–III.

determination of prevailing wage for the purposes of the H–2B program, the [DOL] Secretary

shall accept private wage surveys even in instances where Occupational Employment Statistics

survey data are available unless the Secretary determines that the methodology and data in the

provided survey are not statistically supported"); Extending Government Funding And

Delivering Emergency Assistance Act, §§ 101(8), 106, 135 Stat. at 344, 346 (continuing this

provision in effect until it is superseded by another appropriations act or December 3, 2021,

whichever comes first); Further Extending Government Funding Act, § 101(1), 135 Stat. at 1499

(further extending this provision in effect until it is superseded by another appropriations act or

February 18, 2022, whichever comes first).

   Thus, the Plaintiffs are wrong to say that their injuries are redressable because vacatur of

"the challenged employer-provided survey regulations . . . would leave in place the requirement

in 20 C.F.R. § 655.10(b)(2) that employers offer the OES prevailing wage where one is

available, thereby ensuring that Plaintiffs are no longer harmed by . . . lost wages or competitive

injuries." Mot. Dismiss Opp'n at 17. Sure, the text of 20 C.F.R. § 655.10(b)(2) would remain on

the books and state that DOL should rely on the OES wage whenever it is available for a given

occupation. 20 C.F.R. § 655.10(b)(2) (providing that when no collective bargaining agreement

exists, "the prevailing wage for labor certification purposes shall be the arithmetic mean of the

wages of workers similarly employed in the area of intended employment using the wage

component of the" OES unless an employer provides a state survey under the challenged  2015

Wage Rule provisions). But this language would not have any real-world effect, for Congress's

Appropriations Rider requirement that DOL accept statistically valid employer-submitted

surveys even when an OES wage is available would supersede it.

When, as here, an unchallenged superseding law means that a plaintiff's injury would continue even if the court were to grant the requested relief, redressability is absent.  *See Coastal Outdoor Advert. Grp., LLC v. Twp. of E. Hanover, New Jersey*, 397 F. App'x 794, 795 (3d Cir. 2010), *as amended* (Nov. 16, 2010) (invalidation of a challenged regulation that prohibited billboards could not redress plaintiff's injury—denial of an application to erect a billboard— because other, unchallenged municipal code restrictions on height, use, and setback would continue to bar plaintiff from erecting its proposed billboard); *Nat'l Cap. Presbytery v. Mayorkas*, No. 18-CV-2681, 2021 WL 4860621, at *5 (D.D.C. Oct. 19, 2021) (plaintiffs lacked standing to challenge a decision of the Director of the USCIS California Service Center denying a petition to renew a visa because this decision had been superseded by a USCIS Administrative Appeals Office determination that the visa should not be renewed); *NYC C.L.A.S.H., Inc. v. Carson*, No. 18-CV-1711, 2019 WL 2357534, at *2 (D.D.C. June 4, 2019) (holding that a plaintiff's injuries were not redressable where even if the court vacated the challenged HUD rule banning smoking in housing units, an unchallenged local rule would still govern and ban smoking); *cf. Lujan*, 504 U.S. at 568 (holding that a court order requiring the Secretary of the Interior to revise a regulation so that federal agencies would be required to engage in environmental consultations for overseas projects could not redress plaintiff animal enthusiasts' alleged injury—a decline in the availability of opportunities to observe endangered species allegedly caused by agencies' failure to engage in environmental consultations before undertaking projects—in part because it was an "open question" whether the project agencies would be bound by a revised regulation); *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 395–96 (D.C. Cir. 2018) (declaratory judgment that a DOL guidance letter was substantively invalid could not provide redress where the same guidance letter had already been vacated as

procedurally invalid); *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 845 F. Supp. 2d 288, 303 (D.D.C. 2012) (redressability was absent where the plaintiff's requested court order that the National Archives and Records Administration obtain custody and control over certain records would not bind the former president who held the records to produce them).

Plaintiffs claim that "there is no way to know whether [the Appropriations Rider] will be in effect when Plaintiffs" accept peeler positions during the 2022 crawfish season.  Pls.' Reply Supp. Mot. Prelim. Inj. at 4, ECF No. 29 ("Prelim. Inj. Reply").  Not so—Congress has provided that unless superseded by other legislation, this provision will remain in effect through February 18, 2022.  Further Extending Government Funding Act, § 101(1), 135 Stat. at 1499.  And in any event, this kind of agnosticism about the future of the Appropriations Rider cannot help the Plaintiffs, who bear the burden of establishing that their injuries were redressable when they filed their Supplemental Complaint.  *See Hardaway*, 843 F.3d at 977; *Scahill*, 909 F.3d at 1184.  This means they must show that on November 8, 2021, when they filed their proposed Supplemental Complaint, it was "substantial[ly] likel[y]" that the requested vacatur of the 2015 Wage Rule would remedy their injuries.  *Vermont Agency of Nat. Res.*, 529 U.S. at 765.  But then, as now, the Appropriations Rider language had governed the past six fiscal years; it lasts (at least) well into the current one.  *Cf. Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990) (holding, in the distinct but analogous context of the capable-of-repetition-yet-evading-review exception to the mootness doctrine, that "[i]n estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past").  Standing doctrine does not allow Plaintiffs to keep the Court on retainer for months after the filing of their Supplemental Complaint in case Congress fails to reenact an annual provision it has enacted each year for the past six fiscal years.  *Compare N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir.

2020) (holding that because the standing inquiry focuses on the outset of the litigation, post-complaint developments were not relevant) *with United States v. Mejia*, No. 10-CR-00256-3, 2021 WL 2143574, at *5 (D.D.C. May 26, 2021) (suggesting that while the capable-of-repetition-yet-evading-review exception to the mootness doctrine may allow a plaintiff with standing who later loses it due to a cessation of injury to nevertheless continue the suit, no similar doctrine would allow a plaintiff who lacks standing but may some day acquire it to commence the suit in the first place) (citing *Laidlaw*, 528 U.S. at 190; Richard H. Fallon, Jr. et al., *The Federal Courts and the Federal System* 200 (7th ed. 2015)).

Congress's repeated extension of the Appropriations Rider past the end of fiscal year 2021 only underscores how speculative Plaintiffs' case for redressability is. *See West*, 845 F.3d at 1237 (D.C. Cir. 2017) ("When conjecture is necessary, redressability is lacking.").  The Court cannot speculate as to what will happen to the Appropriations Rider in future congressional funding measures.  Today, the law precludes Plaintiffs' requested vacatur of the 2015 Wage Rule from redressing their alleged injuries.  The legislative status quo continues the Appropriations Rider until February 18, 2022; the Court is at best in equipoise about how much longer it will or will not govern, and equipoise does not meet Plaintiffs' burden to establish standing.[4]

Plaintiffs' other principal argument against this conclusion is an interpretive one; they contend that the Appropriations Rider does not actually require DOL to accept statistically valid employer-submitted surveys in all circumstances.  Prelim. Inj. Reply at 4–9.  The Court is not persuaded.  Once again, the Appropriations Rider reads:

---

[4] In a footnote, Plaintiffs object that "[i]f a rider rendered a regulatory challenge non-justiciable, then any regulation could be insulated from all judicial review merely by passing approving appropriations riders for six years," the statute of limitations for APA claims.  Prelim. Inj. Reply at 9 n.5.  Whatever the merit of this policy concern, the Court may not rely on it to ignore the jurisdictional limitations of Article III.

> The determination of prevailing wage for the purposes of the H–2B program shall be the greater of—(1) the actual wage level paid by the employer to other employees with similar experience and qualifications for such position in the same location; or (2) the prevailing wage level for the occupational classification of the position in the geographic area in which the H–2B nonimmigrant will be employed, based on the best information available at the time of filing the petition. In the determination of prevailing wage for the purposes of the H–2B program, the Secretary shall accept private wage surveys even in instances where Occupational Employment Statistics survey data are available unless the Secretary determines that the methodology and data in the provided survey are not statistically supported.

Consolidated Appropriations Act, 2021, § 110, 134 Stat. at 1564–65. As Plaintiffs aptly note, the first sentence of this provision "is clear; the prevailing wage shall be the higher of (1) the actual wage or (2) the 'prevailing wage level for the occupational classification' based on 'the best information available.'" Prelim. Inj. Reply at 5. The next sentence provides further color on what the first sentence means when it directs DOL to rest the prevailing wage determination "on the best information available": DOL must rely on[5] statistically supported private (that is,

---

[5] Underlying the Court's—and, as we shall see, Plaintiffs'—interpretations is the premise that for DOL to "accept" a statistically valid employer survey means that DOL will in fact adopt the survey's average wage when it issues a prevailing wage determination to the employer applicant. *See* Prelim. Inj. Reply at 5, 8. This is consistent with both the plain meaning of the word "accept, *see Accept*, Oxford English Dictionary, https://www.oed.com/view/ Entry/1006?rskey=63WTYA&result=2#eid (last visited Nov. 5, 2021) (one definition of "accept" is "to take as authentic, valid, or adequate"); *Accept*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/accept (last visited Nov. 5, 2021) (one definition of "accept" is "to make an affirmative or favorable response to"), and with the use of similar terms in the H-2B regulatory scheme, *see* 20 C.F.R. § 655.10(b)(2) (providing that the prevailing wage shall be the OES wage "unless the employer provides a survey *acceptable* to [DOL] under paragraph (f)," the paragraph that sets forth the methodological requirements for employer-submitted surveys) (emphasis added); *id.* § 655.10(g)(1) (providing that "[i]f [DOL] finds an employer-provided survey not to be *acceptable*, [DOL] shall inform the employer in writing of the reasons the survey was not *accepted*") (emphases added). Incidentally, Plaintiffs' theory of harm also depends on reading "accept" in the 2015 Wage Rule to mean "approve" or "adopt." They argue that the challenged provisions—which provide that the OES wage will govern unless an employer submits a methodologically "acceptable" state survey, 20 C.F.R. §§ 655.10(b)(2), (f)(1), (f)(4)—"allow employers to opt out of paying the OES prevailing wage [which] result[s] in lower wages." Mot. Dismiss Opp'n at 2; *see also id.* at 4 (arguing that the 2015 Wage Rule permits employers to submit their own surveys *as replacements for the OES survey*" so long as the submission is an independently conducted state survey) (emphasis added). If "accept" instead merely means that DOL will consider a

employer-submitted)[6] surveys, even when an OES wage is available.  In other words, the second

sentence instructs DOL on how to apply the term "best information" to a particular set of

circumstances: an employer survey is preferable to the OES survey when both are available.

Plaintiffs read the statute differently.  They agree that the "second sentence clarifies" how

to determine the prevailing wage, but assert that it means that when an OES wage is available,

DOL must accept an employer survey if, and may accept an employer survey only if, the

employer survey is "likely to be more accurate than the OES survey" and therefore the "best

information."  *Id.* at 5, 8.  Read in whole, according to Plaintiffs, the Appropriations Rider

directs DOL, when confronted with a situation in which there is both a private-employer-

submitted survey and an OES survey, to evaluate which of the two presents the "best

information" in terms of accuracy and set the prevailing wage according to the winning survey.

But this interpretation—accept an employer-survey wage *only* when the OES wage is not

somehow more accurate—is at odds with the unequivocal, mandatory terms of the

Appropriations Rider: "In the determination of prevailing wage for the purposes of the H–2B

program, the Secretary *shall* accept private wage surveys *even in instances where Occupational

Employment Statistics survey data are available* unless the Secretary determines that the

methodology and data in the provided survey are not statistically supported."  Consolidated

Appropriations Act, 2021, § 110, 134 Stat. at 1564–65 (emphases added).  There is one "unless

---

methodologically sound employer survey, but still may use the OES wage as the prevailing
wage, *see Accept*, Merriam-Webster's Unabridged Dictionary, *supra* (one meaning of "accept" is
"to receive . . . officially"), Plaintiffs' case that the 2015 Wage Rule causes them harm weakens
significantly.

[6] Throughout their complaint, Plaintiffs use (or quote others who use) the term "private"
surveys to refer to all types of employer-submitted surveys, including the state-conducted
surveys the 2015 Wage Rule permits.  *See* Compl. ¶¶ 48, 105.  Indeed, Plaintiffs expressly argue
that a distinction between "private" surveys and employer-submitted surveys conducted by state
entities is "not logical."  Prelim. Inj. Mem. at 20–22.

clause," which ensures statistical validity, but there is no second "unless the Secretary determines that the OES data presents the best or most accurate information" clause.  It is not for the Court to hypothesize about or pass judgment upon Congress's policy reasons for implementing a preference for employer surveys, or to read Plaintiffs' accuracy requirement—which they do not define and which could be defined in different ways—into the statute.

Another tell that Plaintiffs' reading is infirm is that it commits the very sin Plaintiffs ascribe to Defendants' reading: it fails to "give effect  to every clause and word" of the statute. *Setser v. United States*, 566 U.S. 231, 239 (2012).  If, as Plaintiffs insist, the Appropriations Rider permits DOL to accept an employer survey in the face of an applicable OES wage if and only if DOL makes a determination that the employer survey is more accurate and therefore the "best information," it is unclear what the second sentence of the Rider accomplishes.  The first sentence, as Plaintiffs understand it, does all of the work by providing that "the prevailing wage level . . . [shall be] based on the best information available at the time of filing the petition." Consolidated Appropriations Act, 2021, § 110, 134 Stat. at 1564.  If Plaintiffs are correct, and the Rider commands DOL to choose between an employer survey and an OES wage based on a determination of which one is more accurate and therefore the "best information," this sentence tells DOL everything it needs to know.  Choose the most accurate information, whatever the source.  On this reading, there is nothing left for the second sentence—which instructs DOL to accept an employer survey even when an OES wage applies—to do.  Plaintiffs say that the second sentence "indicat[es] that if the best information available is a statistically supported private survey, it must be accepted even if there is an available OES wage."  Prelim. Inj. Reply at 5.  But the first sentence already does that, according to Plaintiffs, so their reading renders the second sentence superfluous.  Moreover, if "best information" refers only to accuracy, one

wonders why Congress felt the need to add the second sentence's "statistically supported" requirement.  The most accurate information, surely, would at least be statistically supported. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons is that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (cleaned up)).

In contrast, the Court's reading gives effect to both sentences.  The first sentence instructs the DOL to rely on the best information available, and the second provides further instruction by clarifying how to apply the "best information" requirement in a particular recurring case, namely when a statistically supported employer submission competes with an OES wage: accept the employer-submitted wage.  It expresses to DOL the judgment of Congress that a statistically valid employer survey is the "best information" upon which to ground a prevailing wage determination even when an OES wage is available.  When there is no employer submission, the first sentence's "best information" requirement (whatever that may mean outside the employer-submission context) guides DOL's prevailing wage determination.

Plaintiffs also argue that the Appropriations Rider's reference to "the prevailing wage level for the occupational classification of the position in the geographic area in which the H–2B nonimmigrant will be employed," Consolidated Appropriations Act, 2021, § 110, 134 Stat. at 1564, means that the Rider cannot be read to mandate the use of all statistically supported employer surveys.  Prelim. Inj. Reply at 6.  According to Plaintiffs, "occupational classification" necessarily refers to "broad occupational categories that encompass multiple jobs utilizing the same kinds of skills."  *Id.*  For support, Plaintiffs note that the 2015 Wage Rule uses the term "occupational classification" to refer to broad classification categories such as those found in the Standard Occupational Classification ("SOC") system used by the OES.  Congress, per

Plaintiffs, cannot have meant to mandate acceptance of all statistically valid employer surveys, many of which rely on narrower classifications of the relevant occupation.  It is true, for instance, that the 2015 Wage Rule allows for employer surveys when "[t]he job opportunity is not included within an occupational classification *of the SOC system*" or when "[t]he job opportunity is within an occupational classification *of the SOC system* designated as an 'all other' classification."  20 C.F.R. § 655.10 (f)(1)(iii)(A)–(B) (emphases added).  But as the text makes clear, these references to the broad SOC system do not *define* the term "occupational classification"; they *modify* it.  "Occupational classification" can refer to a broad grouping that groups seafood peelers with meat, poultry, and fish cutters, Prelim. Inj. Reply at 6, but Plaintiffs have not explained why the term cannot also refer to a narrower grouping, such as seafood peelers only.  Thus, the mere use of the term "occupational classification" cannot implicitly limit the clear, mandatory preference for employer-submitted surveys expressed in the second sentence of the Rider.

As a last-ditch effort, Plaintiffs claim that the Court's reading of the Appropriations Rider would work an "implied repeal" of the statute authorizing the H-2B program, the Immigration and Nationality Act, which requires DOL to certify that the employment of foreign workers will not "adversely affect the wages and working conditions of workers in the United States[.]"  8 U.S.C. § 1182(a)(5)(A)(i)(II); *see* Prelim. Inj. Reply at 7 (citing *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020)).  It does no such thing.  Identification of the prevailing wage for an occupation is a central part of determining whether employment of foreign workers will "adversely affect the wages in the industry"; for years, Congress has delegated to DOL the responsibility to determine the best method for pinpointing the prevailing wage.  *See CATA III*, 774 F.3d at 177.  DOL has tried various methods over the years, from

relying on state governments, to relying on employer-submitted wages in addition to the OES, to relying on the OES only, to accepting employer submitted surveys conducted by state entities. *Id.* at 178–81.  Since 2016, Congress has weighed in via the Appropriations Rider and identical predecessor provisions on the side of accepting employer surveys.  The Appropriations Rider is not a repeal of the "adversely affect" provision, but rather a determination by Congress of how best to implement it.  Plaintiffs offer no persuasive support for their suggestion that acceptance of employer surveys necessarily conflicts with the "adversely affect" provision," and such an interpretation would be at odds with years of practice under the Immigration and Nationality Act.

The long and short of it is that even if the Court granted Plaintiffs' request to vacate the 2015 Wage Rule's provision for DOL's acceptance of employer-submitted state wage surveys, the Appropriations Rider would remain and require DOL to accept employer-submitted state wage surveys anyway.  The Court cannot redress Plaintiffs' injuries as the law currently stands, so Plaintiffs lack standing to bring Counts I–III.  The Court grants Defendants' motion to dismiss Counts I–III for lack of subject matter jurisdiction, without prejudice.

Because Plaintiffs' requested preliminary injunction, ECF No. 22, relates only to the relief they seek in Counts I–III, Pls.' Prelim. Inj. Mem. at 10 n.6, it necessarily follows that the Court lacks subject matter jurisdiction to grant the requested injunction.  Accordingly, the Court denies Plaintiffs' motion for a preliminary injunction, ECF No. 22.

### C.  Plaintiffs' Count IV Claims Are Moot

Count IV alleges that the 2018, 2019, and 2020 editions of the Louisiana Crawfish Wage Study failed to meet the methodological criteria of 20 C.F.R. § 655.10(f)(1) and the Appropriations Rider's requirement that an employer-submitted survey be "statistically supported."  Compl. ¶¶ 90, 110–13.  For relief, Count IV asks that the Court "vacate and set

aside DOL's approval of the Louisiana Crawfish Wage Study as not in accordance with law."

Compl. at 32, ¶ 114.

Unlike Counts I–III, at least some of the plaintiffs likely had standing to bring at least

part of their Count IV claim back when the complaint was filed in April.  Vacatur of prevailing

wage determinations issued to employers based on the 2020 Louisiana Crawfish Wage Study

may have set the wages paid to some of the individual plaintiffs during the 2021 crawfish season,

and vacatur of these prevailing wage determinations could have required their employers to

obtain new approvals based on the higher OES wage.  This would have meant more money in

these plaintiffs' pockets during the 2021 crawfish season.

But things have changed.  The 2021 crawfish season has ended.  Prevailing wage

determinations based on the 2018, 2019, and 2020 crawfish studies are mere pieces of paper with

no continuing effect, legal or otherwise.  Defendants have met their burden of establishing that

Plaintiffs' Count IV claims are moot.  *See Zukerman*, 961 F.3d at 441 (a party seeking a Rule

12(b)(1) dismissal on mootness grounds "bears the 'heavy burden' of establishing that the case is

moot" (citation omitted)).

The same Article III case-or-controversy requirement that underpins the standing doctrine

means that federal courts lack jurisdiction to decide moot cases.  *Noble v. Nat'l Ass'n of Letter*

*Carriers, AFL-CIO*, 285 F. Supp. 3d 128, 132 (D.D.C. 2018).  "A case or claim is moot 'when

the issues presented are no longer live or the parties lack a legally cognizable interest in the

outcome.'"  *Id.* (quoting *Schmidt v. United States*, 749 F.3d 1064, 1068 (D.C. Cir. 2014)).  Thus,

mootness deprives the court of jurisdiction and requires dismissal when "intervening events

make it impossible to grant the prevailing party effective relief or when the [c]ourt's decision

will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Id.* (cleaned up).

Vacatur of prevailing wage determinations based on the 2018, 2019, and 2020 versions of the Louisiana Crawfish Wage Study would not provide Plaintiffs with any effective relief. To understand why, we must account for two timing provisions in the prevailing wage regulations. First, a prevailing wage regulation is valid for a maximum of one year. 20 C.F.R. § 655.10(h); *see also Grass Works Lawn Care v. Acosta*, No. 18-CV-1581, 2019 WL 1981087, at *4 (D.D.C. May 3, 2019) ("DOL [H-2B] certificates may only be used in a single fiscal year . . . ."). For the seasonal Louisiana crawfish industry, this means that a prevailing wage determination can only set the wage an employer offers for a single crawfish season. The employer must obtain a new prevailing wage determination as part of its H-2B application process before each annual crawfish season. Second, to ground a prevailing wage determination, an employer-submitted survey "must be the most current edition of the survey and must be based on wages paid not more than 24 months before the date the survey is submitted for consideration." 20 C.F.R. § 655.10(f)(5).

Together and independently, these regulations mean that the last possible time any of the 2018, 2019, or 2020 Louisiana Crawfish Wage Study editions could have affected any of Plaintiffs' wages was the last day of crawfish season 2021, which was some time in the summer of 2021. "[T]he most current edition[,]" *id.*, of the Louisiana Crawfish Wage Survey was published on June 30, 2021, Pls.' Opp'n Mot. Dismiss Ex. 1, ECF No. 21-1. So, prevailing wage determinations issued in advance of the 2022 crawfish season could not have relied on the 2018,

2019, or 2020 surveys challenged in Count IV.[7]  Moreover, most employers seek and receive

prevailing wage determinations in late summer, Prelim. Inj. Mem. at 2 (citing Compl. ¶¶ 86–89),

and the latest any employer could have received a prevailing wage determination to cover the

2021 crawfish season was in late 2020.  Thus, even if DOL granted them the maximum one-year

validity span, all prevailing wage determinations based on the 2020 Louisiana Crawfish Wage

Study that covered the 2021 crawfish season will have expired by the time the 2022 crawfish

season starts in the early months of 2022.  Plaintiffs do not ask for damages or back pay with

respect to Count IV, they ask only for vacatur of past DOL approvals based on past studies.

Vacatur of these approvals would do nothing to help Plaintiffs with respect to their wages during

upcoming crawfish seasons or otherwise, so Count IV is moot.  In this respect, this case is just

like *Garcia v. Acosta*, 393 F. Supp. 3d 93 (D.D.C. 2019), in which workers asked a court in this

district to set aside certifications issued to employers for the 2018 season under the H-2A visa

program—which is similar to the H-2B program but deals with agricultural occupations—

because the employers were offering less than the prevailing wage.  The court held that the

challenges to the past certifications were moot because the certifications had expired and could

not affect future employment seasons.  *Id.* at 103; *cf. G.H. Daniels III & Assocs., Inc. v. Perez*,

626 F. App'x 205, 214 (10th Cir. 2015), *as amended* (Nov. 5, 2015) (employer's challenge to

---

[7] Thus, Plaintiffs' allegation that employers could rely on the 2020 Louisiana Crawfish Wage Study until 2022 has been overtaken by events, namely the publication of the 2021 edition of the study.  Compl. ¶ 99.  Additionally, the April 2021 Complaint's past-tense allegation that "DOL has violated law and regulations by repeatedly approving the Louisiana Crawfish Wage Study" could not possibly have referred to any prevailing wage determinations based on the 2021 edition of the Louisiana Crawfish Wage Study, because that edition did not yet exist when the original Complaint was filed in April.  *Id.* ¶ 110.  The original Complaint could not have plausibly alleged that the 2021 survey was methodologically deficient, because it had not yet been conducted.

DOL's denial of application for H-2B visas was moot because the employment season at issue had passed).  So too here.

Plaintiffs attempt to get out of this bind by framing their claims quite differently than they did in their Complaint.  In their brief opposing the motion to dismiss, they tell us that "[t]he thrust of Claim IV is that the challenged regulations and implementing Form ETA-9165 fail to establish that employer-provided wage surveys, including the various iterations of the Louisiana Crawfish Wage [Study], are statistically valid. . . . The fact that a new iteration of the survey awaits DOL's approval" and presents similar methodological defects "demonstrates that the controversy is live and continuing."  Mot. Dismiss Opp'n at 19–20.  This makes it sound as if Count IV challenges an ongoing DOL practice of accepting various versions of the Louisiana Crawfish Wage Study and that Plaintiffs are claiming the kind of continuing injury that might be redressed by prospective relief, such as an injunction.  *See id.* at 24 ("Plaintiffs . . . request . . . an injunction against continued approval of the Louisiana Crawfish Wage Study.").

But Plaintiffs did not ask for "such extensive relief" in their original Complaint (or, for that matter, in their Supplemental Complaint), "and the Court is not obliged to keep the case afloat both by ignoring their own prayer and by envisaging what relief they might have sought— but did not—in their Complaint."  *Cierco v. Lew*, 190 F. Supp. 3d 16, 26 (D.D.C. 2016), *aff'd on other grounds sub nom. Cierco v. Mnuchin*, 857 F.3d 407 (D.C. Cir. 2017); *see J. T. v. District of Columbia*, 983 F.3d 516, 527 (D.C. Cir. 2020) ("Our precedent mandates that the assertion of broader injuries than those alleged in a complaint meet with skepticism in evaluating mootness, if they are considered at all."); *Savantage Fin. Servs., Inc. v. United States*, 118 Fed. Cl. 487, 491–92 (2014) ("[P]laintiff asserts that the court, in determining whether the protest is moot, is not constrained by the contents of its complaint.  Plaintiff does not provide any legal support for

this assertion, and the court is unaware of any precedent permitting it to provide relief for a claim

not described in a complaint."); *see also Statewide Bonding, Inc. v. United States Dep't of*

*Homeland Sec.*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020) ("[I]t 'is axiomatic that a complaint may

not be amended by the briefs in opposition to a motion to dismiss.'" (citation omitted)).  Though

the original Complaint is entitled "Complaint for Declaratory and Injunctive Relief," it does not

again refer to an injunction and does not request one in connection with Count IV or otherwise.

Compl. at 2, 32.  The mootness inquiry turns on the specific form of relief sought, *see Louie v.*

*Dickson*, 964 F.3d 50, 54 (D.C. Cir. 2020), and there is no live controversy with respect to the

only requested relief for Count IV: vacatur of expired prevailing wage determinations that

governed only past crawfish seasons.  Compl. at 32, ¶ 114.

       Given the seasonal nature of prevailing wage determinations in the crawfish industry, this

case at first glance seems like it might fit "within the capable-of-repetition-yet-evading-review

exception to the mootness doctrine[,]" which "applies when '(1) the challenged action is in its

duration too short to be fully litigated prior to cessation or expiration, and (2) there is a

reasonable expectation that the same complaining party will be subject to the same action

again.'"  *Garcia*, 393 F. Supp. 3d at 103–04 (citation omitted).  Plaintiffs do not invoke this

exception, and in any event, "[t]he case law in this Circuit is clear.  A plaintiff seeking to invoke

[this] exception must 'make a full attempt to prevent his case from becoming moot, an obligation

that includes filing for preliminary injunctions and appealing denials of preliminary

injunctions.'"  *Id.* at 104 (quoting *Newdow v. Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010)).

Plaintiffs might have moved, but did not, for a preliminary injunction in time to obtain higher

wages during the 2021 crawfish season.  They therefore have not met their burden of establishing

that the capable-of-repetition-yet-evading review exception applies.  *See id.* at 103 (a party

seeking to avoid mootness dismissal based on the capable-of-repetition-yet-evading review

exception bears the burden of establishing that the exception applies).

The Court grants Defendants' motion to dismiss Count IV as moot.[8]

### D.  The Court Does Not Dismiss Count V

#### 1.  Standing

Perhaps realizing Count IV cannot proceed, Plaintiffs use their Supplemental Complaint

to add a new Count V to challenge prevailing wage determinations issued based on this year's

2021 Louisiana Crawfish Wage Survey.  Because Defendants' motion-to-dismiss arguments

about the injury and traceability elements of standing apply with at least some force to Count V,

and because the Court is obliged to resolve any doubts about standing *sua sponte*, *Lee's Summit*

*v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000), the Court will analyze whether any

plaintiffs have standing to bring Count V.  "To establish jurisdiction, the [C]ourt need only find

one plaintiff who has standing."  *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014);

*Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 10 (D.C. Cir. 2015) (same); *In re Navy*

*Chaplaincy*, 697 F.3d 1171, 1180 (D.C. Cir. 2012) (same).  Plaintiffs Williams, Lewis and

Johnson, at least, have standing to bring Count V, so the Court will not dismiss Count V for lack

of standing.

Once again, "the irreducible constitutional minimum of standing contains three elements.

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest

which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical.  Second, there must be a causal connection between the injury and the conduct

---

[8] Because the Court has concluded that it lacks subject matter jurisdiction over Counts I–IV for the reasons discussed in this opinion, it does not opine on the remaining issues raised in the parties' motion to dismiss or preliminary injunction briefing with respect to Counts I–IV.

complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (cleaned up).  In their motion to dismiss, Defendants argue that the first and second elements, concrete injury and traceability, are lacking.  Defs.' Mem. Supp. Mot. Dismiss at 15–21, ECF No. 18-1.

   *Concrete injury.*  Count V alleges that the 2021 Louisiana Crawfish Wage Survey was statistically invalid and methodologically defective, and that DOL's reliance on it to issue prevailing wage determinations to Louisiana crawfish employers therefore violates, among other things, the Appropriations Rider and 20 C.F.R. § 655.10(f).  Suppl. Compl. ¶¶ 30–32. Accordingly, Plaintiffs seek vacatur of these prevailing wage determinations and declarations that it was unlawful for DOL to issue them.  *Id.* at 8.  The 2021 Louisiana Crawfish Wage Survey "assigns a wage of $10.43 per hour to all crawfish processors in the State of Louisiana." Pls.' Notice of New Facts ¶ 4.  DOL relied on the survey to issue prevailing wage determinations at this rate to "Crawfish Distributors, Inc., the long-time employer of Plaintiffs Williams, Lewis and Johnson and the employer they expect to return to for the 2022 season." *Id.* ¶ 3.  Plaintiffs claim that they are instead entitled to be paid at the applicable OES wage, which for each plaintiff is greater than $10.43.  *Id.* ¶ 4.  Thus, by virtue of their depressed wages during the 2022 crawfish season, Williams, Lewis, and Johnson will suffer "a classic form of concrete and particularized harm: actual economic loss." *Humane Soc'y of the U.S.*, 797 F.3d at 9.

   To be sure, for a future injury to confer standing, it must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up).  Thus, Defendants argue that Plaintiffs' theory of injury "is entirely speculative" because they have not established that they

will work in the Louisiana crawfish injury in competition with H-2B workers.  Defs.' Mem. Supp. Mot. Dismiss at 16–17.  Rather, according to Defendants, Plaintiffs present only "'some day' intentions."  *Id.* at 16 (quoting *Lujan*, 504 U.S. at 564).  But Williams's, Lewis's, and Johnson's declarations are not nearly as speculative as those the Supreme Court rejected in *Lujan*, which merely stated that the plaintiffs had previously visited environments threatened by a challenged regulation and that they intended to do so again.  Williams has worked at the Crawfish Distributors plant (including, apparently, when it was run by predecessor entities) for ten years; her application to return for 2022 is "already on file."  Decl. Mary Jane Williams ¶¶ 4, 10, ECF No. 21-3.  Lewis has worked at the same plant for "five or ten" years; she expects to do so again during the 2022 season, which is only a few months away.  Decl. Mary Hester Lewis ¶ 6, ECF No. 21-4; Pls.' Notice of New Facts ¶ 3.  Johnson has worked at the same plant "for the past seven or eight" crawfish seasons and plans to return for the 2022 season.  Decl. Martin Johnson, Jr. ¶¶ 3, 9, ECF No. 21-5.  In *Lujan*, the insufficient affidavits lacked "any description of concrete plans, or indeed even any specification of *when* the some day will be."  *Lujan*, 504 U.S. at 565.  Not so here.

*Traceability.*  Events alleged in the supplemental complaint have largely overtaken Defendants' motion-to-dismiss traceability argument, which asserted that to attribute any "pocketbook injury" to challenged DOL actions required an attenuated chain of speculative events, including that plaintiffs would receive jobs in the Louisiana crawfish injury, that their employers would receive prevailing wage determinations based on private surveys, and that they would therefore offer wages below the OES rate.  Defs.' Mem. Supp. Mot. Dismiss at 20–21.  But with the benefit of the Supplemental Complaint and associated filings, we now know that Williams's, Lewis's and Johnson's repeat employer has indeed obtained prevailing wage

determinations based on the 2021 Louisiana Crawfish Wage Survey permitting them to offer

wages lower than the otherwise applicable OES wage.  Pls.' Notice of New Facts ¶¶ 3–4.  If the

Court were to grant the relief requested in Count V and vacate Crawfish Distributors' prevailing

wage determinations, Crawfish Distributors would presumably have to reapply for a prevailing

wage determination based on the OES wage (the record does not suggest there are any other

available surveys of wages in the Louisiana crawfish industry) or otherwise have to pay the OES

wage as the default wage.  The causal chain between DOL's issuance of prevailing wage

determinations based on the 2021 Louisiana Crawfish Wage Survey and Williams's, Lewis's and

Johnson's pocketbook injuries is quite direct.  *Cf. Comité de Apoyo a los Trabajadores Agrícolas

(CATA) v. U.S. Dep't of Lab.*, 995 F.2d 510, 513 (4th Cir. 1993) ("[P]laintiffs allege that DOL

allowed the orchards to pay them reduced . . . wages by applying the new wage-correlation

methodology; plaintiffs thus meet the injury and causation requirements for standing.").

      Because plaintiffs Williams, Lewis, and Johnson have standing, the Court need not and

does not reach the parties' arguments with respect to the other plaintiffs' standing.  *Humane

Soc'y of the U.S.*, 797 F.3d at 10.  Similarly, Defendants' other motion-to-dismiss arguments,

including about prudential ripeness and finality of administrative action, do not seem relevant to

the case as it currently stands: Counts I–IV have been dismissed, and all that remains is Count

V's challenge to specific prevailing wage determinations.

### 2.  Preliminary Relief

      The Supplemental Complaint, in connection with Count V, also includes a new request

for preliminary injunctive relief.  Suppl. Compl. at 8–9 (requesting that the Court "[g]rant

Plaintiffs preliminary and permanent relief requiring Defendants to inform employers who have

been approved to use the 2021 Louisiana Crawfish Wage Survey wage during the 2022 season

that that survey wage rate is subject to litigation and that, if Plaintiffs are successful in this suit,

the employers will be required to pay the OES prevailing wage applicable to their jobs from the date of the final judgment in this case and will be required to provide proof that they have paid their workers the OES prevailing wage retroactively to the date they receive the notice from DOL that their wage rate is in litigation prior to receiving any further H-2B certifications."). The Court understands this request for a preliminary injunction to be distinct from the request in the previous motion for a preliminary injunction, ECF No. 22, which requested a broader notification of *all* H-2B employers nationwide (not just those Louisiana crawfish employers who have relied on the 2021 Louisiana Crawfish Wage Survey) and which related only to Counts I–III. Pls.' Mot. Prelim. Inj., ECF No. 22; Prelim. Inj. Mem. at 10 n.6. Accordingly, the Court will not address Plaintiffs' new request for preliminary relief until it appears "in a document separate from the complaint" as required by D.D.C. Local Rule 65.1(c).[9]

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to File a Supplemental Complaint (ECF No. 31) is **GRANTED**. Defendants' Motion to Dismiss (ECF No. 18) is **GRANTED**

---

[9] Though it does not evaluate any motion for a preliminary injunction with respect to Count V because none has been properly presented, the Court notes that it is skeptical of one irreparable harm theory on which any such motion might rely. In connection with their initial motion for a preliminary injunction with respect to Counts I–III—which sought an injunction similar to the one requested in the Supplemental Complaint—Plaintiffs suggested that if they prevailed on Counts I–III, they would bring separate actions for back pay against their employers. Prelim. Inj. Mem. at 22. However, according to Plaintiffs, courts in similar cases have refused to order back pay against employers on the equitable ground that the employers lacked notice that the regulations they relied upon to set wages might later be invalidated. *Id.* at 22–23. Thus, Plaintiffs argued that absent the requested injunction requiring Defendants to notify employers of the instant suit, employers would have a defense against future back pay actions. *Id.* It is not immediately clear to the Court, however, why Plaintiffs need to enlist the help of this Court and Defendants in order to head off a lack-of-notice defense to any future back pay actions. Even assuming for the sake of argument that notice of a pending lawsuit is sufficient to negate a future lack-of-notice defense to back pay, it is not clear why plaintiffs could not accomplish their goals simply by taking it upon themselves to notify employers directly, without the assistance of a preliminary injunction.

insofar as it relates to Counts I–IV, and otherwise **DENIED**.  Plaintiffs' Motion for Preliminary

Injunction (ECF No. 22) is **DENIED**.  An order consistent with this Memorandum Opinion is

separately and contemporaneously issued.

Dated:  01/26/2022                                                RUDOLPH CONTRERAS
                                                                          United States District Judge