**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MARY JANE WILLIAMS, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 21-1150 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 41, 46 |
| | : | | |
| MARTIN J. WALSH, *et al.*, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING PLAINTIFFS' MOTION FOR RECONSIDERATION AND DENYING PLAINTIFFS' SECOND
MOTION FOR A PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

In this challenge to regulations and administrative actions governing the minimum wage

an employer must offer in order to employ temporary foreign workers under the H-2B visa

program, the Court grants Plaintiffs' motion for reconsideration of its previous order dismissing

certain counts for lack of standing, because that order was premised on an incomplete picture of

the governing regulatory regime.  But the Court denies Plaintiffs' second request for a

preliminary injunction because Plaintiffs have not shown that they would suffer irreparable harm

in the absence of an injunction.

## II.  BACKGROUND

### A.  Regulatory Framework

Because it remains largely (though not entirely) unchanged, the Court repeats much of

the background discussion from its initial opinion in this case, adding updates where necessary.

Mem. Op. Granting Pls.' Mot. Leave to File a Suppl. Compl., Granting in Part and Denying in

Part Defs.' Mot. Dismiss, and Denying Pls.' Mot. Prelim. Inj., ECF No. 38, at 2–8 ("Mot.

Dismiss. Op.").  Under the H-2B visa program, if a United States employer cannot find enough United States workers to perform temporary non-agricultural unskilled work, it may obtain visas for the admission of foreign workers to fill the gap.  When Congress authorized this program, it was mindful of the risk that unfettered admission of foreign workers willing to work at lower rates might harm United States workers by depressing wages in their fields.  Therefore, Congress required employers seeking H-2B visas to show that their employment of foreign workers will not adversely affect the wages and working conditions of United States workers.  *Comité De Apoyo A Los Trabajadores Agrícolas v. Perez*, 774 F.3d 173, 177 (3d Cir. 2014) ("*CATA III*") (citing 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1182(a)(5)(A)(i)(I)–(II)); *see also* Compl. ¶ 24.

By delegation from the Department of Homeland Security ("DHS"), the Department of Labor ("DOL") holds responsibility for evaluating employer applications for H-2B visas in order to determine whether granting the requested employment of foreign workers will adversely affect United States workers.  Compl. ¶ 25.  This involves making two determinations: "(1) [that] qualified workers are not available in the United States to perform the employment for which foreign workers are sought, and (2) [that the foreign workers'] employment will not adversely affect wages and working conditions of similarly employed United States workers."  *CATA III*, 774 F.3d at 177 (citing 8 C.F.R. § 214.2(h)(6)(iii)(A), (iv)(A)).  The wage an H-2B employer offers is central to this determination, both because the availability of United States workers will depend on whether the work pays a satisfactory wage and because admitting foreign workers willing to work for reduced wages may decrease the wages available to United States workers looking to work in the same industry.  Thus, to be eligible to participate in the H-2B program, an employer must obtain from DOL a determination that the employer offers at least the "prevailing wage" for the relevant occupation.  Compl. ¶ 26 (citing 20 C.F.R.§ 655.0(a)(2); *id.* § 655.10(a)).

Just how to calculate the prevailing wage for a particular occupation has been the subject of dispute between employers and workers for some time, and Congress, DOL, DHS, and the courts have all weighed in over the years.  At first, DOL enlisted state agencies to calculate a prevailing wage for each occupation within their jurisdictions.  *CATA III*, 774 F.3d at 178.  In 2005, for occupations not subject to any collective bargaining agreement, DOL began to consider both employer-submitted, private wage surveys and the Bureau of Labor Statistics Occupational Employment Statistics ("OES")[1] survey.  *Id.*  According to Plaintiffs, surveys submitted by employers tend to suffer from methodological defects not present in the OES survey, including defining the relevant occupation too narrowly by using specific job duties as the determinative criterion and failing to ensure that all relevant employers have submitted wage data.  Compl.  ¶¶ 67–78.  Therefore, the Plaintiffs allege that employer-submitted surveys indicate that the prevailing wage is lower than it is under the preferable OES method, and that DOL's consideration of employer-submitted wage surveys systematically depresses wages in H-2B industries.  *Id.*  ¶¶ 85–89.

A 2008 rule formalized DOL's practice of making prevailing wage determinations based either on employer-submitted surveys or the OES wage.  *See* Compl. ¶ 33 (citing 73 Fed. Reg. 78020, 78056 (Dec. 19, 2008)).  Though the notice of proposed rulemaking solicited comments generally, it did not permit comments on the specific topic of acceptance of employer-submitted surveys.  *See id.* ¶ 29.  A district court held that a separate feature of the 2008 rule—its division of OES data to identify OES wages for different "skill levels"—was arbitrary and capricious in

---

[1] The OES recently changed its  name to the Occupational Employment and Wage Statistics Survey, or OEWS, but the Court uses the term OES for consistency with the record and briefing.  *See* Pls.' Mem. Supp. Mot. Prelim. Inj. at 1 n.2, ECF No. 22-1 ("First Prelim. Inj. Mem.").

violation of the Administrative Procedure Act ("APA").  *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, No. 09-240, 2010 WL 3431761, at *19 (E.D. Pa. Aug. 30, 2010) ("*CATA I*"). DOL responded with a notice of proposed rulemaking, and ultimately a final rule in 2011 that, among other things, forbade employers from submitting their own surveys when an applicable OES wage (or another approved federal wage measure) was available.  Compl. ¶ 37 (citing 76 Fed. Reg. 3452, 3465 (Jan. 19, 2011)).  DOL explained that the OES survey was "the most consistent, efficient, and accurate means of determining the prevailing wage rate for the H-2B program."  *Id.* ¶ 2 (citing 76 Fed. Reg. at 3465).  But Congress refused to provide appropriations to implement this rule, so DOL continued to operate under the 2008 rule, including by differentiating among skill levels and by accepting employer-provided surveys.  *Id.* ¶ 41.  Yet again, the Eastern District of Pennsylvania ordered DOL to cease its skill-level differentiation. *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, 933 F. Supp. 2d 700, 711–12 (E.D. Pa. 2013) ("*CATA II*").

        In response, and without notice and comment, DOL and DHS published a joint Interim Final Rule, which, among other things, officially returned to the policy of requiring DOL to accept employer-provided surveys.  Compl. ¶ 2.  At the same time it announced this 2013 rule, DOL and DHS solicited post-rule public comments on "the accuracy and reliability of private surveys," including "state-developed" surveys.  *Id.* ¶ 48 (quoting 78 Fed. Reg. 24047, 24055 (Apr. 24, 2013)).  But this rule, too, was quickly vacated; the Third Circuit concluded that DOL and DHS had not sufficiently explained their policy of approving employer survey submissions and held, based on the then-existing record, that the policy was arbitrary and capricious in violation of the APA.  *CATA III*, 774 F.3d at 186–91.  The Third Circuit ordered "that private surveys no longer be used in determining the mean rate of wage for occupations except where an

otherwise applicable OES survey does not provide any data for an occupation in a specific geographical location, or where the OES survey does not accurately represent the relevant job classification." *Id.* at 191.

Again without notice and comment, DOL and DHS jointly published a new rule in 2015 at 80 Fed. Reg. 24146 (April 29, 2015) (codified at 20 C.F.R. Part 655) (the "2015 Wage Rule"). *See* Compl. ¶ 56. The agencies purported to be finalizing the 2013 interim final rule (even though it had been vacated); because that rule solicited (and the agencies had received) comments on the appropriate methodological requirements for and propriety of using employer-submitted surveys, the agencies concluded that further notice and comment was not necessary. *See* 80 Fed. Reg. at 24151, 24153 n.17. The 2015 Rule requires DOL to accept prevailing wage surveys from employers who wish to participate in the H-2B program, so long as the survey "was independently conducted and issued by a state, including any state agency, state college, or state university." 20 C.F.R. § 655.10(f)(1); 80 Fed. Reg. at 24184; *see also* Compl. ¶ 58. DHS and DOL explained that they had "determined that it is appropriate to permit prevailing wage surveys that are conducted and issued by a state as a third, limited category of acceptable employer-provided surveys, even where the occupation is sufficiently represented in the OES." *Compl.* ¶ 59 (quoting 80 Fed. Reg. at 24169–70).

When it submits such a survey to DOL as part of its application package, an employer must include "specific information about the survey methodology, including such items as sample size and source, sample selection procedures, and survey job descriptions, to allow a determination of the adequacy of the data provided and validity of the statistical methodology used in conducting the survey." 20 C.F.R. § 655.10(f)(4). The employer must also attest via Form ETA-9165 that the survey was conducted by a third party (not an employer or its agents),

that the surveyor either contacted a randomized sample of relevant employers or attempted to contact them all, and, among other things, that the "survey includes wage data from at least 30 workers and three employers."  *Id.* § 655.10(f)(4) (i)–(iii).  An employer-submitted survey "must be the most current edition of the survey and must be based on wages paid not more than 24 months before the date the survey is submitted for consideration."  *Id.* § 655.10(f)(5).  Despite these requirements, Plaintiffs allege that most employer-submitted "state surveys approved by DOL are not the result of an independent state decision to conduct a survey . . . but are the result of H-2B employers or H-2B employer groups requesting state agencies, colleges, or universities to conduct such surveys on their behalf."  Compl. ¶ 63.  In Plaintiffs' telling, at least some employer groups even participate directly in the process of identifying the set of employers to be surveyed.  Compl. ¶ 64.

Once DOL accepts an employer survey and relies on it to certify that the employer is paying the prevailing wage and therefore eligible to participate in the H-2B program, it must specify how long its survey-based determination of the prevailing wage in the industry remains valid.  20 C.F.R. § 655.10(h).  The maximum validity period for any prevailing wage determination is one year from the date of the determination.  *Id.*

Beginning in fiscal year 2016, Congress has attached a rider to each annual appropriations act that takes the decision whether or not to accept employer-submitted surveys out of DOL and DHS's hands:

> The determination of prevailing wage for the purposes of the H–2B program shall be the greater of—(1) the actual wage level paid by the employer to other employees with similar experience and qualifications for such position in the same location; or (2) the prevailing wage level for the occupational classification of the position in the geographic area in which the H–2B nonimmigrant will be employed, based on the best information available at the time of filing the petition.  **In the determination of prevailing wage for the purposes of the H–2B program, the Secretary shall accept private wage surveys even in instances where**

> **Occupational Employment Statistics survey data are available unless the Secretary determines that the methodology and data in the provided survey are not statistically supported.**

Consolidated Appropriations Act , 2022, Pub. L. No. 117-103, § 110, 136 Stat. 49, 439 (2022) (emphasis added) (the "Appropriations Rider"); *see also* Consolidated Appropriations Act , 2021, Pub. L. No. 116-260, § 110, 134 Stat. 1182, 1564–65 (2020) (same); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 110, 133 Stat. 2534, 2554 (2019) (same); Department of Defense, Labor, Health and Human Services, and Education Appropriations Act, 2019, and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 111, 132 Stat. 2981, 3065 (2018) (same); Consolidated Appropriations Act , 2018, Pub. L. No. 115-141, § 112, 132 Stat. 348, 712 (2018) (same); Consolidated Appropriations Act , 2017, Pub. L. No. 115-31, § 112, 1 131 Stat. 135, 518–19 (2017) (same); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 112, 129 Stat. 2242, 2599 (2015) (same).

Thus, from 2016 through the present, DOL has been *required by statute* to accept all statistically supported employer-submitted surveys, regardless of what the DOL regulations, including the 2015 Wage Rule, say.  Notably, the Appropriations Rider is broader than the DOL regulations; it does not limit private employer survey submissions to surveys conducted by a state or state university.  *See* 20 C.F.R. § 655.10(f)(1)(i).  In this way, the Appropriations Rider largely displaces the 2015 Wage Rule's provision for DOL acceptance of state-run employer surveys, 20 C.F.R. § 655.10(f)(1)(i), and, arguably, the 2015 Wage Rule's methodological requirements for state-run employer surveys, 20 C.F.R. § 655.10(f)(2), (f)(4).

### B.  Procedural History

Every crawfish season—from January at the earliest to July at the latest each year—crawfish processing plants in Louisiana hire both American and, under the H-2B program, foreign workers to peel crawfish.  *See* Compl. ¶¶ 12, 89; Pls.' Mem. Opp'n Defs.' Mot. Dismiss

Ex. 2 at 4, ECF No. 21-2; Pls.' Opp'n. Defs.' Mot. Dismiss Ex. 5 at 1–2, ECF No. 21-5.  Like

any other prospective H-2B employers, Louisiana crawfish processors must submit applications

to DOL for approval to participate in the H-2B program, and as part of this process must obtain a

determination that they offer the prevailing wage in the industry.  Crawfish processors typically

apply for prevailing wage determinations well in advance of each year's crawfish season kickoff,

and they often submit their own wage surveys.  *See* Suppl. Compl. ¶ 12.  According to Plaintiffs,

DOL's acceptance of employer-provided surveys depresses wages in the crawfish industry.  For

example, Plaintiffs allege that in 2020, "more than two dozen Louisiana seafood companies

provided DOL with surveys pursuant to 20 C.F.R. § 655.10(f)(1)(i) that allowed them to pay

their workers anywhere from $0.18 to $4.97 less per hour than would have been required under

the OES survey"; this amounted to wage losses of "up to 35% of the applicable OES wage."

Pls.' Mem. Opp'n. Defs.' Mot. Dismiss at 6, ECF No. 21 ("Mot. Dismiss Opp'n") (citing Compl.

¶¶ 89–90).

DOL issues most of its prevailing wage determinations in August of each year.  Pls.'

Mem. Supp. Mot. Prelim Inj. at 2, ECF No. 22-1 ("First Prelim. Inj. Mem.") (citing Compl. ¶¶

86–89).  The same pattern held this year—DOL adjudicated most crawfish-processor H-2B

prevailing wage applications for the 2022 crawfish season in August 2021.  *See id.*  For the 2022

crawfish season, DOL issued at least 20 prevailing wage determinations to Louisiana crawfish

processers based on the 2021 edition of the employer-submitted Louisiana Crawfish Wage

Survey, a survey conducted by the Louisiana State University Agricultural Center.  Mem. Supp.

Pls.' Second Mot. Prelim. Inj. at 9 ("Second Prelim. Inj. Mem."), ECF No. 46-1 (citing Suppl.

Decl. Arthur N. Read at 3, ECF No. 35-1).  One of these went to Crawfish Distributors, Inc. of

Breaux Bridge, Louisiana.  *Id.*  The 2021 Louisiana Crawfish Wage survey returned an average

hourly rate for crawfish pickers of $10.43, and Louisiana crawfish employers are currently offering positions at this rate.  *See id.* (citing Decl. Arthur N. Read Supp. Mot. Prelim. Inj. ¶ 8, ECF No. 46-3, 2-001–2-054).  Meanwhile, the OES survey hourly rates for these employers are significantly higher than $10.43; for Crawfish Distributors, the applicable OES wage is $13.51 per hour.  Suppl. Decl. Arthur N. Read at 2.

Plaintiffs Mary Jane Williams, Mary Hester Lewis, and Martin Johnson, Jr. are United States workers who have worked, plan to continue to work, and presumably are currently working as seasonal crawfish peelers alongside foreign H-2B workers at Crawfish Distributors. Compl. ¶¶ 12–15; Opp'n Ex. 3–5, ECF Nos. 21-321-5.  Plaintiff Danielle Lee has worked and intends to continue to work as a crawfish peeler at CJ's Seafood Restaurant, also in Breaux Bridge, which apparently does not hire foreign H-2B workers.  Compl. ¶ 16; Decl. Danielle Lee; ECF No. 21-6.  Plaintiff Martha Icela Flores Gaxiola is a Mexican citizen who obtained H-2B visas to work at Louisiana crawfish plants in 2011, 2013, 2018, and 2020, and plans to do so again in 2022.  Compl. ¶ 18; Decl. Marthe Icela Flores Gaxiola, ECF No. 21-7.  The remaining plaintiff, New Orleans Workers' Center for Racial Justice ("NOWCRJ") is a New Orleans organization that "is dedicated to building workers' power and advocating for justice in the workplace"; its members include "U.S. workers who work or have worked in the Louisiana seafood industry as well as workers who come temporarily to work on H-2 visas in Louisiana seafood plants."  Compl. ¶ 17.

On April 27, 2021—in the middle of Louisiana crawfish season 2021—Plaintiffs filed a four-count complaint against DOL, DOL Secretary Martin J. Walsh in his official capacity, DHS, and DHS Secretary Alejandro Mayorkas in his official capacity (the "Defendants") in the United States District Court for the District of Columbia.  Compl.  Counts I–III each claimed that

the portions of the 2015 Wage Rule that provide for the acceptance and evaluation of employer-submitted state wage surveys (20 C.F.R. §§ 655.10(f)(1)(i), (f)(4)) violated the APA. *Id.* ¶¶ 102–09.  For relief, Counts I–III each sought a declaration that the challenged portions of the 2015 Wage Rule were unlawful and an order vacating them.  *Id.*  ¶¶ 104, 107, 109; *see also id.* at 32.  Count IV was pleaded in the alternative; it alleged that DOL had "repeatedly approv[ed]" past versions of the Louisiana Crawfish Wage Survey "without observing the safeguards required by 20 C.F.R. § 655.10(f)" or the Appropriations Rider's requirement to ensure that the study was "statistically supported."  *Id.* ¶¶ 110–13.

On January 26, 2022, this Court dismissed all claims in the original Complaint.  The Court held that Plaintiffs lacked standing to bring Counts I–III because their injuries—depressed wages due to DOL's reliance on the employer-submitted Louisiana Crawfish Wage Survey rather than the OES wage—were not redressable.  Even were the Court to grant Plaintiffs their requested relief and vacate 20 C.F.R. §§ 655.10(f)(1)(i), (f)(4), the Appropriations Rider would still control and require DOL to accept any employer survey it deemed statistically supported.  Mot. Dismiss Op. at 20.  The Court further held that Count IV was moot because the challenged prevailing wage determinations based on past versions of the Louisiana Crawfish Wage Survey governed only previously concluded crawfish seasons.  *Id.* at 31.

However, the Court granted Plaintiffs leave to file a Supplemental Complaint to add a new Count V.  *Id.* at 18.  Count V claims that DOL prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey must be vacated under the APA, *see* 5 U.S.C. § 706(2)(A), because they are arbitrary and capricious and because they are contrary to the Appropriations Rider, *CATA III*, 20 C.F.R. § 655.10(f), and DOL's "statutory mandate to ensure that H-2B workers are admitted only at wages that will not adversely affect similarly employed

U.S. workers and only if qualified U.S. workers are not available to fill the jobs."  Supplemental Complaint ¶¶ 30, 32; *id.* at 8.

Shortly after the Court granted the motions to dismiss and supplement, Plaintiffs moved for partial reconsideration of the Court's dismissal of Counts I–III.  Pls.' Mot. Reconsideration, ECF No. 41.  About a month after the Court's opinion granting the motion to supplement, Plaintiffs moved for a preliminary injunction in relation to their Count V claims.  The motion asks the Court to "vacat[e] all H-2B prevailing wage determinations issued in reliance on the 2021 Louisiana Crawfish Wage Survey," to order the DOL to issue revised prevailing wage determinations "based on the 'best information available,'" and to notify affected employers of their duty to offer a wage commensurate with the prevailing rate.  Pls.' Second Mot. Prelim. Inj. at 1, ECF No. 46 (quoting the 2021 edition of the Appropriations Rider, Pub. L. No. 116-260, § 110, 134 Stat. at 1565)).

### III.  MOTION FOR RECONSIDERATION

The Court grants Plaintiffs' motion for partial reconsideration of the January 26, 2022 dismissal opinion and order.  Federal Rule of Civil Procedure 54(b) imbues a district court with "broad discretion" to reconsider and revise its own rulings prior to final judgment, though this discretion "is 'limited by the law of the case doctrine and subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'"  *Lyles v. District of Columbia*, 65 F. Supp. 3d 181, 188 (D.D.C. 2014) (quoting *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005)).  Thus, "'motions for reconsideration,' whatever their procedural basis, cannot be used an 'an opportunity to reargue facts and theories upon which a count has already ruled, or as a vehicle for presenting theories or arguments that could have been advanced earlier.'"  *Estate of*

*Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (quoting *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010)).

Even so, a court will grant a Rule 54(b) motion "as justice requires." *Lyles*, 65 F.Supp.3d at 188. The standard is flexible, and a host of considerations—for example, whether the court "'patently' misunderstood the parties" or "made a decision beyond the adversarial issues presented"—inform the inquiry. *Id.* (quoting *Williams v. Johanns*, 555 F. Supp. 2d 162, 164 (D.D.C. 2008)). Typically, the moving party must demonstrate "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order" to justify reconsideration. *Id.* (quoting *Stewart v. Panetta*, 826 F.Supp.2d 176, 177 (D.D.C. 2011)). The movant also "bears the burden of proving that some harm would accompany a denial of the motion to reconsider . . . [and] that some sort of injustice will result if reconsideration is refused." *Id.* (alterations in original) (quoting *Isse v. Am. Univ.*, 544 F.Supp.2d 25, 29 (D.D.C. 2008)).

Plaintiffs have demonstrated that the Court's conclusion that they lacked standing to pursue Counts I–III, *insofar as these Counts challenge 20 C.F.R. § 655.10(f)(2) and 20 C.F.R. § 655.10(f)(4)*, was clearly erroneous.[2] This error was the result of the parties' failure to present the Court with a complete picture of the governing regulatory scheme. By its terms, the Appropriations Rider raises the question of how DOL is to determine whether "the methodology and data in" a particular employer survey are "statistically supported." Pub. L. No. 117-103, § 110, 136 Stat. at 439. A few months after Congress passed the initial rider in 2015, DOL

---

[2] Plaintiffs do not seek reconsideration of the Court's holding that they lack standing to challenge other portions of the 2015 Wage Rule, namely those permitting DOL to accept certain private surveys even when an OES wage is available. Mem. Supp. Pls.' Mot. Recons. at 1 n.1, ECF No. 41-1. Nor do they seek reconsideration of the Court's dismissal of Count IV as moot. *Id.*

released a guidance document interpreting this phrase to mean the same thing as "those

methodological criteria for surveys set out in the 2015 Wage Rule."  Emp't & Training Admin.,

Effects of the 2015 DOL Appropriations Act at 4 (Dec. 29, 2015),

https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2B_Prevailing_Wage_FAQs_

DOL_Appropriations_Act.pdf (herein after "DOL Appropriations FAQ" or the "FAQ").  Neither

party cited to this interpretive document until Plaintiffs filed the instant motion for

reconsideration.  The guidance document goes on to list specific requirements, many of which

match the 2015 Wage Rule requirements for state-institution-run employer surveys codified at 20

C.F.R. § 655.10(f)(4).[3]  *Id.* at 4–6 (requiring that the employer submit a form ETA-9165 listing

information on sample selection procedures, etc., *see* 20 C.F.R. § 655.10(f)(4), and attesting that

the surveyor made a reasonable, good-faith attempt to contact all relevant employers or randomly

sampled them, *see* 20 C.F.R. § 655.10(f)(4)(i), that the survey includes wage data from at least

---

[3] The DOL Appropriations FAQ also borrows from other parts of the 2015 Wage Rule, such as the 20 C.F.R. § 655.10(f)(5) requirement that the survey be based on recently collected data.  DOL Appropriations FAQ at 5.  Because Counts I–III, insofar as Plaintiffs seek to resurrect them, challenge 20 C.F.R. § 655.10(f) *(2), (4)*, the Court focuses on the overlap between subsections (f)(2) and (f)(4) and the FAQ document.  One further word on this focus: Unlike 20 C.F.R. § 655.10(f)(4), the Complaint does not expressly ask for vacatur of 20 C.F.R. § 655.10(f)(2), the source of the FAQ's requirement that employer surveys include wages paid to H-2B foreign workers (as opposed to surveying only U.S. workers).  *See* DOL Appropriations FAQ at 6, 80 Fed. Reg. at 24172.  However, Count III, after asserting that this requirement is contrary to law, asks for vacatur of the 2015 Wage Rule, which 20 C.F.R. § 655.10(f)(2) partially codified.  Compl. ¶ 108–09.  Thus, a challenge to this aspect of 20 C.F.R. § 655.10(f)(2) is encompassed within the claims Plaintiffs seek to resurrect.

Additionally, the DOL Appropriations FAQ does not always track 20 C.F.R. § 655.10(f)(4) precisely.  For example, 20 C.F.R. § 655.10(f)(4)(iv) requires an attestation that "[t]he survey was conducted across industries that employ workers in the occupation"; the FAQ repeats this requirement and adds the clarification that "the 'occupation'" shall be "determined based on the job descriptions in the survey."  DOL Appropriations FAQ at 5.  Still, it is clear that the FAQ document, if it does not simply re-issue the methodological requirements of 20 C.F.R. § 655.10(f)(4), is at least closely intertwined with them; indeed, the FAQ expressly says that DOL interprets the Appropriations Rider to require compliance with "those methodological criteria for surveys set out in the 2015 Wage Rule."  DOL Appropriations FAQ at 4, 6.

30 workers and three employers, *see* 20 C.F.R. § 655.10(f)(4)(ii), that the collection was administered by a bona fide third party, *see* 20 C.F.R. § 655.10(f)(4)(iii), that "[t]he survey was conducted across industries that employ workers in the occupation," *see* 20 C.F.R. § 655.10(f)(4)(iv), and that the wage reported includes all types of pay, *see* 20 C.F.R. § 655.10(f)(4)(v)).  The FAQ also incorporates the 2015 Wage Rule's requirement, codified at 20 C.F.R. § 655.10(f)(2), that employer surveys include wages paid to foreign H-2B workers (as opposed to surveying only U.S. workers).  DOL Appropriations FAQ at 6.

In other words, the FAQ made clear that even under the Appropriations Rider, a portion of the 2015 Wage Rule's narrower regime permitting acceptance of state-run employer surveys—including the methodological requirements found at 20 C.F.R. § 655.10 (f)(2), (f)(4)— still effectively governs prevailing wage determinations. The relief sought in connection with Counts I–III of the original Complaint, namely vacatur of  20 C.F.R. § 655.10(f)(2), (f)(4) on the ground that these provisions are procedurally invalid, and/or arbitrary and capricious, and/or contrary to law, *see* Compl. ¶¶ 102–09; *id.* at 32, would likely redress the injuries Plaintiffs claim in connection with those counts: "that DOL's practice of relying on employer-submitted . . . surveys . . . has caused and will cause them to suffer depressed wages and lost opportunities to find work at higher rates."  Mot. Dismiss Op. at 20.  Specifically, Plaintiffs allege that 20 C.F.R. § 655.10(f)(2) and that 20 C.F.R. § 655.10(f)(4) permit employer surveys that report artificially low wages because they allow employer-provided surveys to define the relevant occupation narrowly (in terms of the job requirements for the particular employer) rather than broadly (in terms of a grouping of similar jobs such as seafood peelers and meat and poultry cutters, as the OES does); (2) do not require sufficient statistical and methodological safeguards to ensure that employer surveys accurately report the wage; and (3) require  employer surveys  to include

wages paid to foreign H-2B workers.  Mem. Supp. Pls.' Mot. Recons. at 4–5 (citing Compl. ¶¶ 103(c)–(d), 106(b)–(d), 108(b)).

If 20 C.F.R. § 655.10(f)(2), (f)(4) were vacated, the portions of the FAQ that incorporate them would likely be invalid as well, and so would prevailing wage determinations issued under the auspices of the FAQ's interpretation of the Appropriations Rider.  A vacated 20 C.F.R. § 655.10(f)(2), (4) would be "of no legal force or effect," *see Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 396 (D.C. Cir. 2018); it follows that the FAQ could no longer validly incorporate it or require compliance with it.  *Cf. Solite Corp. v. EPA*, 952 F.2d 473, 493–94 (D.C. Cir. 1991) (holding that the D.C. Circuit's previous vacatur of a rule on a procedural ground required the court to vacate a subsequent rule that was based in part on, and extended to a new context, the initial rule); *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017) (holding that a rule was unlawful because it conflicted with a statute, and, accordingly, vacating an FCC order that "interpreted and applied" the rule).

Thus, vacatur of the methodological requirements of the 2015 Wage Rule, 20 C.F.R. § 655.10(f)(2), (f)(4), would provide redress in connection with Count I, Plaintiffs' procedural notice-and-comment challenge to these provisions.  Claims of injury to procedural rights are subject to "a relaxed redressability requirement [that] is met when correcting the alleged procedural violation *could* still change the substantive outcome in the petitioner's favor; the petitioner need not go further and show that it *would* effect such a change."  *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (emphases in original); *see also Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021).  With the FAQ and the challenged portions of the 2015 Wage Rule out of the picture, DOL would likely issue a new interpretation of the Appropriations Rider's "statistically supported" requirement that would

not be guided by the allegedly methodologically defective requirements of the 2015 Wage Rule.

Such an interpretation could well benefit Plaintiffs by implementing more stringent

methodological requirements that result in surveys that report higher wages.

Vacatur of the methodological requirements of the 2015 Wage Rule, 20 C.F.R. §

655.10(f)(2), (f)(4), would, on the current record, likely also provide redress to at least some[4]

plaintiffs in connection with the substantive claims brought in Counts II and III.  *See Lujan v.*

*Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (Under the traditional redressability standard, "it

must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." (cleaned up)).  Count II seeks vacatur of certain methodological requirements of the

2015 Wage Rule on the ground that DOL and DHS failed to sufficiently explain how the ETA-

9165 attestations ensure statistical validity, why surveys must include H-2B foreign workers,

and/or why surveys may use narrower definitions of occupations than OES definitions.  *See*

Compl. ¶ 106(b)–(d).  Count III seeks vacatur of certain methodological requirements of the

2015 Wage Rule on the ground that accepting the narrower "occupation" definitions is contrary

to law.  *See* Compl. ¶ 108(b).  Any of these holdings would likely require DOL to issue new

guidance governing acceptance of employer surveys under the Appropriations Rider—i.e., a

replacement "FAQ" document—that eliminated one or more of these challenged features.

According to Plaintiffs, elimination of these features in employer surveys would mitigate the

extent to which employer surveys depress wages in future crawfish seasons.  *See* Decl. of Heidi

Shierholz ¶¶ 10–29, ECF No. 46-4.  Plaintiffs Williams, Lewis, and Johnson have worked in this

industry for many years and plan to do so in the future, so the relief requested in connection with

---

[4] Because the Court will conclude that plaintiffs Williams, Lewis, and Johnson have standing, the Court need not analyze whether other plaintiffs have standing.  *See Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 10 (D.D.C. 2015).

Counts II and III would likely redress, and indeed prevent, future injuries in the form of depressed wages these plaintiffs sustain as a result of employer survey methodologies that are acceptable under current rules.  *See* Pls.' Notice of New Facts in Opp'n to Mot. Dismiss and Supp. Mot. Prelim Inj. ¶ 3, ECF No. 30 ("Pls.' Notice of New Facts"); *see generally* Mem. Supp. Pls.' Mot. Recons. at 6.

The foregoing discussion demonstrates that the absence the FAQ interpretive document from the record caused the Court to make a redressability decision based on an incomplete understanding of the governing regulatory regime.  Plaintiffs' initial redressability briefing presented a binary between DOL's acceptance of employer surveys under the challenged 2015 Wage Rule, or the requested vacatur of the 2015 Wage Rule, which would eliminate employer surveys by "leav[ing] in place the requirement in 20 C.F.R. § 655.10(b)(2) that employers offer the OES prevailing wage where one is available."  Mot. Dismiss Opp'n at 17.  As Plaintiffs now seem to acknowledge, the Appropriations Rider's requirement that DOL accept statistically supported employer surveys means that vacatur of the 2015 Wage Rule would not have the effect of banning employer surveys and instead requiring employers to always offer an available OES wage.  *See* Pls.' Mot. Recons. at 1 n.1.  But the DOL Appropriations FAQ clarifies that the methodological requirements of the 2015 Wage Rule, 20 C.F.R. § 655.10(f)(2), (f)(4) still play a role in setting wages in the Louisiana crawfish industry, and that vacating them would accordingly have a remedial impact.

As the Appropriations Rider does not in fact on the current record render Plaintiffs' challenges to the methodological requirements of the 2015 Wage Rule non-redressable, it would work an injustice and harm them to bar them from presenting these challenges based on a purported absence of redressability.  *See Atl. States Legal Found., Inc. v. Karg Bros.*, 841 F.

Supp. 51, 55 (N.D.N.Y. 1993) (holding that reconsideration was warranted where a party had demonstrated that the court's previous conclusion that a plaintiff lacked standing "was premised upon a misunderstanding of a relevant regulatory scheme").  Plaintiffs could have cited the December 29, 2015 FAQ earlier, but the Court is inclined to excuse this failure given the fact that Defendants did not argue in their opening motion-to-dismiss brief that the Appropriations Rider deprived Plaintiffs of standing.

To summarize, in its previous opinion, the Court concluded that because the Appropriations Rider had displaced the 2015 Wage Rule's provisions governing DOL acceptance of employer-provided wage surveys, the injuries Plaintiffs asserted in connection with Counts I–III were not redressable.  Upon reconsideration, the Court now concludes that this decision was incorrect to the extent that Counts I–III challenge 20 C.F.R. § 655.10(f)(2) and 20 C.F.R. § 655.10(f)(4), because the FAQ makes clear that these portions of the 2015 Wage Rule continue to operate as a means of interpreting and implementing the Appropriations Rider. Therefore, the Court reinstates Counts I–III to the extent (and only to the extent) that they challenge 20 C.F.R. § 655.10(f)(2) and 20 C.F.R. § 655.10(f)(4).  Defendants remain free to raise any additional arguments about standing, and even about redressability, at the summary judgment stage.

## IV.  MOTION FOR PRELIMINARY INJUNCTION

After they moved for reconsideration of the Court's order dismissing Counts I–III of the original complaint, Plaintiffs turned their attention to Count V, then the only operative count.  As a reminder, Count V claims that DOL prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey must be vacated under the APA, *see* 5 U.S.C. § 706(2)(A), because they are arbitrary and capricious and because they are contrary to several sources of law:

the Appropriations Rider, *CATA III*, 20 C.F.R. § 655.10(f), and DOL's "statutory mandate to ensure that H-2B workers are admitted only at wages that will not adversely affect similarly employed U.S. workers and only if qualified U.S. workers are not available to fill the jobs." Supplemental Complaint ¶¶ 30, 32; *id.* at 8.  In connection with these claims, Plaintiffs move for a preliminary injunction that "vacate[es] all H-2B prevailing wage determinations issued in reliance on the 2021 Louisiana Crawfish Wage Survey," orders DOL to issue revised prevailing wage determinations "based on the 'best information available,'" and orders DOL to notify affected employers of their duty to offer a wage commensurate with the prevailing rate.  Pls.' Second Prelim. Inj. Mem. at 1, ECF No. 46 (quoting the 2021 edition of the Appropriations Rider, Pub. L. No. 116-260, § 110, 134 Stat. at 1565)).  Because Plaintiffs have not carried their burden of demonstrating that they face irreparable harm in the absence of this preliminary injunction, the Court will not issue it.

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258.

Of the four factors, likelihood of success on the merits and irreparable harm are particularly crucial, and a court "may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or a likelihood of success on the merits." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (emphasis in original).  To put a finer point on it, "[t]he requirement of showing irreparable harm is an independent requirement: if a plaintiff does not demonstrate that it is likely to suffer irreparable harm in the absence of preliminary relief, the Court may deny the motion without considering the other factors." *Fla. EB5 Invs., LLC*, 443 F. Supp. 3d at 11; *see also Acosta v. D.C. Gov't*, No. CV 20-1189 (RC), 2020 WL 2934820, at *2 (D.D.C. June 3, 2020).[5]

"The standard for irreparable harm is particularly high in the D.C. Circuit.  Plaintiffs have the considerable burden of proving that their purported injuries are certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (internal quotation marks and citations omitted).  "In addition, the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is beyond remediation."

---

[5] In the past, courts in this Circuit have sometimes weighed the four preliminary injunction factors using a "sliding-scale" analysis, under which "a strong showing on one factor could make up for a weaker showing on another." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).  But the D.C. Circuit has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe*, 205 F. Supp. 3d at 26 (citing *Sherley*, 644 F.3d at 392–93; *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)); *see Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).  In any event, "regardless of whether the sliding scale approach applies," a party may not obtain a preliminary injunction without showing that irreparable injury is likely. *California Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018).

*Id.* (internal quotation marks and citations omitted).  Plaintiffs must "substantiate" their claim of irreparable harm with "proof."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

In this case, those plaintiffs that are currently working for H-2B employers in the Louisiana crawfish industry claim they are injured by missing out on greater wages they say would be paid during the 2022 crawfish season in the absence of the allegedly invalid prevailing wage determinations premised on the 2021 Louisiana Crawfish Wage Survey.  *See* Second Prelim. Inj. Mem. at 1, 30 ("Unless the prevailing wage determinations made in reliance on the 2021 Survey are vacated, Plaintiffs may never receive the wages they should be entitled to if they prevail in this action.").  Other plaintiffs, who do not work for H-2B employers, say they are injured by the industry-wide wage-lowering impact of the lower wages paid by H-2B employers.  *Id.* at 11 ("[A]ll of DOL's prevailing wage determinations based on the 2021 Survey will cause competitive harm to all Plaintiffs, who are regularly employed in the crawfish industry, because approval of a substandard wage rate for any Louisiana crawfish processors necessarily impacts both the wages that their non-H-2B competitors will pay and the workers' opportunity to apply for those jobs *at higher wages*." (emphasis added)).  Plaintiffs assume that if the challenged prevailing wage determinations were vacated, DOL would have to issue new ones based on the OES wage.  *See id.* at 31 ("Plaintiffs will suffer irreparable economic harm unless the wage determinations are vacated.  Under the disputed wage determinations, Plaintiffs stand to earn up to 42% percent less than the average wage for their occupation in central Louisiana, as measured by the OES survey."); Pls.' Reply Supp. Second Mot. Prelim. Inj. at 16, ECF No. 52 ("If the Court vacates prevailing wage determinations based on the 2021 Survey, as Plaintiffs request, those determinations will need to be replaced.  The data source available for such a replacement is the OES survey, the results of which are universally higher than the 2021 Survey results.").

The Court accepts this premise for the purpose of the following analysis; after all, "the record does not suggest there are any other available surveys of wages in the Louisiana crawfish industry." Mot. Dismiss Op. at 39.

Plaintiffs' reliance on this form of harm—depressed wages—for their irreparable injuries would seem to run headlong into the "well[-]settled" principle "that economic loss does not, in and of itself, constitute irreparable harm" because "the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674 (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 367 (D.C. Cir. 1999) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (alteration in original))). Indeed, Plaintiffs have previously represented that this "harm should be remedied through an order requiring employers to pay restitution in the form of back wages," First Prelim. Inj. Mem. at 22, presumably to be obtained via separate follow-on lawsuits against crawfish processing employers in the event Plaintiffs obtain the declaratory, vacatur, and injunctive relief sought against DHS and DOL in Count V (the employers are not parties to this action and neither the original nor supplemental complaints request backpay), *see Hisp. Affs. Project v. Perez*, 141 F. Supp. 3d 60, 70 (D.D.C. 2015) ("*Hisp. Affs. Project I*"). It appears that, if Plaintiffs were to prevail on the merits, at least some of them[6] would have potentially viable claims for backpay: in

---

[6] In explaining their theory of irreparable harm, Plaintiffs do not clearly differentiate between those plaintiffs who work for an H-2B employer and therefore directly lose wages under the current prevailing wage determinations, and those who work for crawfish employers who do not participate in the H-2B program. For the latter group, which includes at least Lee and possibly some members of plaintiff NOWCRJ, Plaintiffs rely on a theory of "competitive" harm,

*Frederick County Fruit Growers Association, Inc. v. Martin* ("*Frederick County II*"), the D.C.

Circuit affirmed a district court's award of backpay to workers who had received lower wages

set under am H-2-program[7] regulation that the D.C. Circuit would later set aside as inadequately

reasoned.  968 F.2d 1265, 1267 –68, 1272–76 (D.C. Cir. 1992); *see Hisp. Affs. Project I*, 141 F.

Supp. 3d at 70–71 (describing the posture in *Frederick County II*).

     Plaintiffs present two arguments for why their economic injuries are irreparable in spite

of the possibility of a backpay remedy, but neither persuades.  First, they note that the plaintiffs

who work as crawfish pickers earn "extremely modest" wages; the crawfish season runs for only

part of the year and the current Louisiana Crawfish Wage Survey Wage is only $10.43 per hour,

which even if it lasted the entire year would provide income below the federal poverty line for a

---

which holds that if H-2B employers' wages are lower than they should be, non-H-2B employers
in the industry will also pay lower wages. *See* Second Prelim Inj. Mem. at 3, 11.  Plaintiffs do
not discuss whether these workers, whose wages are not directly set by the challenged prevailing
wage determinations, would have claims for backpay.  In any event, non-H-2B plaintiffs'
competitive depressed wage injuries are economic, and therefore subject to the "presumption"
that they are not irreparable because "adequate compensatory or other corrective relief will be
available at a later date."  *Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794, at *1
(D.C. Cir. Aug. 10, 2018) (quoting *Robertson v. Cartinhour*, 429 Fed. App'x 1, 3 (D.C. Cir.
2011)).  By declining to address whether these plaintiffs in particular have a prospect of future
recovery, Plaintiffs have failed to rebut this presumption.  And as discussed below, Plaintiffs
have failed to show that these plaintiffs fall into the limited category of individuals for whom
dire economic circumstances render economic losses irreparable.  Moreover, in the irreparable
harm sections of their briefs, Plaintiffs refer only to depressed wages available to crawfish
pickers; they have not made any showing that an injunction is necessary to prevent non-H-2B
plaintiffs from entirely losing the ability to obtain or retain positions as crawfish pickers. *See*
Second Prelim Inj. Mem. at 30–32; Pls.' Reply Supp. Second Mot. Prelim. Inj. at 16; *see also*
*United Farm Workers v. United States Dep't of Lab.*, 509 F. Supp. 3d 1225, 1249 (E.D. Cal.
2020) ("*United Farm Workers I*") (concluding that U.S. workers in an H-2A industry had shown
irreparable harm based on evidence that the challenged rule would cause employers to hire
foreign instead of U.S. workers, and that "barriers to accessing legal resources" prevented back
wages from presenting a satisfactory remedy).

    [7] At the time, H-2 was the program for foreign agricultural works analogous to the
current H-2B program for non-agricultural workers.  The foreign agricultural worker program is
now known as the H-2A program.  *See Frederick Cnty. II*, 968 F.2d at 1267.

family of three.  Second Prelim. Inj. Mem. at 32.  Thus, they argue that this case falls under the rule that "when 'the plaintiff is so poor that he would be harmed in the interim by the loss of the monetary benefits,' those economic losses are enough to establish irreparable harm."  *Id.* (quoting *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31 (D.D.C. 2001)); *but cf. Sampson*, 415 U.S. at 92 n.68 ("We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual.").  Though the court is sympathetic to Plaintiffs' likely economic difficulties, Plaintiffs' cited cases finding irreparable harm present in the preliminary relief context differ from this case in one or both of two critical respects.  They generally involve plaintiffs who, save for an injunction, stood to *lose* wages or public benefits on which they presently depended or which they previously enjoyed; here, an injunction would *increase* the wages Plaintiffs currently receive.  *See Lee*, 160 F. Supp. 2d at 31 ("In this case, the four remaining hourly plaintiffs have demonstrated that because they are so poor, the loss of their jobs would rise to the level of irreparable harm."); *Maldonado v. Houstoun*, 177 F.R.D. 311, 333 (E.D. Pa. 1997) ("[P]laintiffs will be irreparably harmed due to the loss of much of their cash assistance benefits.")[8]; *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) (challenged rule could render plaintiffs, who each "receive[d] $194 monthly in SNAP benefits," ineligible to receive

---

[8] Though the *Maldonado* court's discussion seemed to assume that the plaintiffs faced a reduction in the benefits they were currently receiving, *see* 177 F.R.D. at 333 ("[C]ourts have also recognized that a *reduction in subsistence benefits* constitutes irreparable harm to persons on the 'margin of subsistence.'" (citation omitted)); it is unclear from the opinion whether the plaintiffs faced a reduction in benefits they already received or simply would have received greater benefits were the injunction granted.

these benefits); *cf. Paxton v. Sec'y of Health & Human Servs.*, 856 F.2d 1352, 1354 (9th Cir. 1988) ("When a family is living at subsistence level, the subtraction of any benefit can make a significant difference to its budget and to its ability to survive."); *but see United Farm Workers I*, 509 F. Supp. 3d at 1248–52 (E.D. Cal. 2020) (holding that H-2A foreign workers challenging a regulation that would depress their wages had demonstrated irreparable harm in part because they depended on subsistence incomes).

More importantly, the cases Plaintiffs rely on involved substantial evidentiary showings that established how the plaintiffs' circumstances meant that later monetary relief could not compensate for their lost wages or benefits.  *See id.* at 1248–49 (plaintiff, an organization representing H-2A farmworkers, presented an affidavit demonstrating that "many" of the organization's members "suffer[ed] with food insecurity and must rely on emergency food programs"); *Lee*, 160 F. Supp. 2d at 32–33 (plaintiffs presented affidavits demonstrating a substantial risk of loss of housing, inability to receive timely food stamps, difficulty paying bills and likely difficulty paying rent, inability to pay for a commute, inability to feed and clothe children and to support a grandchild, and the possibility of needing to draw down on limited lifetime eligibility for receipt of benefits from the Temporary Assistance for Needy Families program); *Maldonado*, 177 F.R.D. at 333–34 (plaintiffs could not work due to disability and testified that reduced public benefits would harm them in light of incoming utility bills and the upcoming need to provide winter clothing for six children.); *District of Columbia*, 444 F. Supp. 3d at 42–43 (plaintiffs presented affidavits detailing difficulty finding work and the substantial possibility that they would go without food if they did not receive SNAP benefits, which the court concluded would cause psychological and physical harm that "back payments [could] not erase" (citation omitted)); *cf. Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th Cir. 2003) (plaintiffs

had alleged "subsistence on General Assistance and food stamps, lack of medical insurance, and homelessness").

In contrast, movants here present statements from *only two* of the plaintiffs; these statements are somewhat dated and do not identify specific impending irreparable harms such as food insecurity, loss of housing, inability to support children, or inability to obtain other wages (i.e., during the crawfish offseason). Second Prelim Inj. Mem. at 32. Specifically, in July 2021, Williams declared "[i]t's tough to earn a living on the low wages the company pays" and that "[i]f the wages at my seafood job were to get lower, I don't know how I'd be able to get by." Decl. Mary Jane Williams ¶¶ 8–9, ECF No. 21-3. And in April 2021, Lee declared, "I would really like to see the wages increase, because the amount I make is barely enough for me to make ends meet, and the job is only open for less than half the year." Decl. Danielle Lee ¶ 7, ECF No. 21-6. These statements about vague difficulties, conditions, and preferences under past years' wages do not demonstrate that backpay would not compensate these two plaintiffs (much less the others) for any harms they are suffering in the form of depressed wages based on the 2021 Louisiana Crawfish Wage Survey. Nor do they demonstrate that they suffer any tangible, imminent, and irreparable harm as a result of their allegedly depressed wage rates. "Given the uncertainty of the declarants' statements and the indefinite language in which those sentiments are presented, the court cannot hold that these declarants are likely to suffer" irreparable harm. *Cf. United Farm Workers v. Chao*, 593 F. Supp. 2d 166, 170 (D.D.C. 2009).

Plaintiffs next argue that the harm from their allegedly depressed wages is irreparable even though theoretically compensable by means of a monetary backpay remedy because of difficulties they would face in pursuing backpay claims. In particular, they say that employers have avoided backpay liability in similar cases by successfully arguing that they reasonably

relied on governing regulations when setting the challenged wages.  *See* Second Prelim Inj. Mem. at 30–31.  To break this down a bit, Plaintiffs cite cases involving similar challenges to H-2A wages in which courts have analyzed a backpay remedy in the form of equitable restitution.[9]  *Id.* (first citing *Morrison v. U.S. Dep't of Lab.*, 713 F. Supp. 664, 673–76 (S.D.N.Y. 1989)), and then citing *Frederick Cnty. Fruit Growers Ass'n v. McLaughlin*, 703 F. Supp. 1021, 1029 (D.D.C. 1989) ("*Frederick County I*")).  One factor in a court's analysis of whether to exercise its discretion to grant the equitable remedy of restitution in such cases is whether employers reasonably relied on then-valid regulations in offering the challenged wages.  *See, e.g.*, *Frederick County II*, 968 F.3d at 1274; *Morrison*, 713 F. Supp. at 672–73.  Plaintiffs fear that in the absence of a preliminary injunction invalidating the prevailing wage determinations, their employers will be able to prevail on reasonable reliance grounds in future backpay actions.  *See* Second Prelim Inj. Mem. at 30–31.

Thus, a district court in California recently held that H-2A employers reasonably relied on a regulation to set wages until a district court preliminarily enjoined enforcement of the regulation and ordered DOL to set wages based on an older regulation and to notify employers of potential backpay claims.  *United Farm Workers v. United States Dep't of Lab.*, No. 120CV01690DADJLT, 2021 WL 1946696, at *2, 5 (E.D. Cal. May 14, 2021) ("*United Farm Workers II*").  The court reasoned that until the issuance of the preliminary injunction, even though the plaintiffs had filed a lawsuit challenging the regulation and moved for preliminary

---

[9] Though it affirmed an award of backpay under an equitable restitution framework in *Frederick County II*, the D.C. Circuit suggested that the "remedial question" should instead have been addressed as "a problem of quasi-contract."  968 F.2d at 1272.  In any event, the same or similar reasonable reliance considerations guide the Court's analysis of the instant motion regardless of whether Plaintiffs' planned suits for backpay would be governed under an equitable restitution or a quasi-contract framework.  *See Hisp. Affs. Project v. Perez*, 206 F. Supp. 3d 348, 365 (D.D.C. 2016) ("*Hisp. Affs. Project II*").

injunctive relief, "there were potentially meritorious arguments being advanced by both sides," so the challenged rule "was not so obviously invalid that [employers] should have expected to prepare for . . . rates calculated under the . . . [challenged] rule." *Id.* at *5. The court therefore refused to award backpay for the period preceding the preliminary injunction. *Id.* at *5, *8.

On the other hand, D.C. Circuit authority is more equivocal about whether an injunction is *necessary* to defeat an employer claim of reasonable reliance in a future backpay action.[10] In *Frederick County II*, the D.C. Circuit upheld a backpay award, in part because it rejected the employers' argument that they had reasonably relied on a regulation ("the 1983 regulation") in setting wages for the 1983 harvest (the 1983 regulation was ultimately invalidated, which meant that the 1983 harvest was governed instead by the "1978 regulation," which entitled workers to greater wages). 968 F.2d at 1269–70, 1273–74. The D.C. Circuit upheld the district court's rejection of the reasonable reliance argument for the period after the district court had issued a preliminary injunction against the 1983 regulation, because at that point, the employers "knew full well that the 1983 regulation was, if not flatly invalid, of at least dubious validity." *Frederick County II*, 968 F.2d at 1274 (quoting *Frederick County I*, 703 F. Supp. at 1029) (cleaned up). But the D.C. Circuit also noted that the employers had not reasonably relied on the 1983 regulation *before* the preliminary injunction, when they made plans for the season's harvest, because even then there was "at . . . least a significant possibility" that the 1978 regulation would govern the 1983 harvest: employers had obtained an injunction from another court requiring DOL to issue a new regulation governing wages for the 1983 harvest, and there

---

[10] Of course, Plaintiffs might file a future backpay action in another circuit. But this uncertainty regarding governing circuit law only underscores the uncertainty regarding whether the requested preliminary injunction is indeed necessary to preserve a monetary remedy for Plaintiffs' allegedly depressed wages.

was no guarantee that the rule would be favorable to employers.  *Id.* at 1273–74.  "In other words, [the] D.C. Circuit's reason for upholding the backpay award for the 1983 harvest was not solely due to the injunction."  *Hisp. Affs. Proj. I*, 141 F. Supp. 3d at 73.  The injunction sealed the fate of the employers' reasonable reliance argument, but it is not at all clear that this argument would have defeated backpay in the absence of an injunction.  Because an injunction had issued, the court had no occasion to discuss how a reasonable reliance argument would have fared without one.

The Court cannot say for certain whether or not Plaintiffs would be able to defeat a hypothetical reasonable reliance argument in a hypothetical future action for back wages in the absence of the requested injunction vacating prevailing wage determinations, requiring the issuance of new ones, and notifying employers.  Arguably, employers were on notice (or Plaintiffs could have informed them) that the regulations underlying their current prevailing wage determinations were subject to litigation as far back as April 2021, when Plaintiffs filed their original Complaint.  Though it dismissed these claims on January 26, 2022, the Court simultaneously granted leave to bring Count V, the direct challenge to the current prevailing wage determinations.  It is true that the Eastern District of California held in *United Farm Workers II* that the fact of pending litigation was not sufficient to defeat a reasonable reliance argument.  2021 WL 1946696, at *5.  But in another case on which Plaintiffs rely, the Southern District of New York seemed to accept that the mere filing of a lawsuit might constitute notice sufficient to defeat a reasonable reliance argument so long as the lawsuit came early enough to allow employers to adjust their hiring plans for the forthcoming season.  *See Morrison*, 713 F. Supp. at 673–74, 676 (finding reliance reasonable despite a pending lawsuit where plaintiffs filed suit "just days prior to the commencement of the harvest season," by which time employers

"were foreclosed from any feasible economic option" for adjusting to a higher rate); *see also id.* at 671 (expressly rejecting the argument that an injunction is a prerequisite to an equitable restitution award, but noting that the absence of an injunction was "influential" regarding "which way" the reasonable reliance factor weighed).

Indeed, Plaintiffs previously represented to this Court that a narrower injunction—which would have required DHS and DOL to notify employers that this litigation was pending and that if plaintiffs were to prevail, employers "may . . . be required to pay back wages"—would provide employers with "timely notice" sufficient to preserve Plaintiffs' equitable restitution claims. First Prelim. Inj. Mem. at 3, 22–23.  Plaintiffs cannot now shift gears and claim that an injunction vacating the prevailing wage determinations is necessary to preserve a backpay action by heading off a reasonable reliance argument because merely notifying employers of the pendency of the challenge is insufficient.

This uncertainty, together with the attenuated chain of future-lawsuit events that would have to occur before the absence of an injunction became relevant to a backpay claim, defeats Plaintiffs' claim of irreparable harm, and therefore their request for a preliminary injunction. There are simply too many questions about whether the absence of the requested injunction would render Plaintiffs' allegedly depressed wages "beyond remediation," *Fisheries Survival Fund*, 236 F. Supp. 3d at 336 (citation omitted), by dooming a potential backpay claim to wither on the vine.  *Cf. Hisp. Affairs Project I*, 141 F. Supp. 3d. at 70–71, 74 (holding, based on similar readings of *Frederick Cnty. II* and *Morrison*, that there were "significant questions" about whether a similar requested preliminary injunction would "remedy the harm of lost backpay wages" and that Plaintiffs had not demonstrated that their "monetary loss would be irremediable at a later date").  Plaintiffs have not carried their "considerable burden" of persuading the court

that there is a "clear and present need for extraordinary equitable relief to prevent" irreparable harm. *Fisheries Survival Fund*, 236 F. Supp. 3d at 336 (citation omitted).

***

"Because the Court finds that Plaintiff[s] ha[ve] not demonstrated irreparable harm, the Court denies the motion for preliminary injunction without consideration of the other factors relevant to preliminary injunctive relief." *E.g.*, *Acosta*, 2020 WL 2934820, at *2. Still, the Court concludes with a few observations regarding the merits in order to guide further proceedings. First, a word on the scope of Plaintiffs' claims. In their opposition to Plaintiffs' second preliminary injunction motion, Defendants complain that Count V is only "an as-applied claim" alleging "that the 2021 Louisiana Crawfish Wage Survey was statistically invalid and methodologically defective," and that Plaintiffs therefore should not be making notice-and-comment or arbitrary-and-capricious arguments against the 2015 Wage Rule in connection with Count V. *See* Defs.' Opp'n Pls.' Second Mot. Prelim. Inj. at 11, ECF No. 50. Whether or not Plaintiffs' arguments about the procedural and substantive validity of the 2015 Wage Rule are fairly encompassed within Count V, the Court's reinstatement of Counts I–III makes the procedural and substantive validity of portions of the 2015 Wage Rule (those codified at 20 C.F.R. § 655.10(f)(2) and 20 C.F.R. § 655.10(f)(4)) a live issue in this litigation. Moreover, Count V requests vacatur of all prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey, and to the extent these prevailing wage determinations were based on the DOL Appropriations FAQ, which in turn was based on the challenged portions of the 2015 Wage Rule, the 2015 Wage Rule's invalidity would likely require vacatur of the prevailing wage determinations. *Cf. Bais Yaakov of Spring Valley v. FCC*, 852 F.3d at 1083.

Next, the Court notes that Plaintiffs have presented a serious challenge to the procedural validity of the 2015 Wage Rule.  Upon an initial review, the Court is sympathetic to the argument that because it had been vacated by *CATA III*, 774 F.3d at 186–91, the 2013 interim final rule could not serve as valid notice for the 2015 Wage Rule.  Or put another way, could the 2015 Wage Rule properly "finaliz[e]," 80 Fed. Reg. at 24151, something that had been vacated, the 2013 interim final rule?  Upon initial review, the Court finds persuasive Judge Bates's analysis in *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 82–88 (D.D.C. 2007), which suggests that it could not, and that the logical outgrowth doctrine would not apply to the 2015 Wage Rule.  The Defendants have twice been confronted with an argument based on *AFL-CIO v. Chao*, First Prelim. Inj. Mem. at 11; Second Prelim. Inj. Mem. at 19, but have not engaged with it.  They would do well to do so, and to address the appropriate remedy were this Court to agree with Plaintiffs on these points, as this case moves into the summary judgment stage.

Finally, the Court observes that the current Administrative Record, ECF No. 48, contains documents relating to particular prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey, but does not include all documents that might be relevant to Plaintiffs' procedural and substantive challenges to the 2015 Wage Rule.  Now that it is clear that these challenges remain relevant to this litigation, Defendants should supplement the Administrative Record as appropriate.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Reconsideration (ECF No. 41) is **GRANTED**.  Plaintiffs' Second Motion for Preliminary Injunction (ECF No. 46) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  7/18/2022                                               RUDOLPH CONTRERAS
                                                                United States District Judge