**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| MARY JANE WILLIAMS, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 21-1150 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 59, 62, 63 |
| | : | | |
| MARTIN J. WALSH, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**DENYING DEFENDANTS' MOTION TO DISMISS; GRANTING IN PART AND DENYING IN PART**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiffs, seasonal crawfish processing workers in Louisiana, together with a nonprofit workers' organization, bring suit against the Department of Labor ("DOL"), DOL Secretary Martin J. Walsh in his official capacity, the Department of Homeland Security ("DHS"), and DHS Secretary Alejandro Mayorkas in his official capacity (collectively, the "Defendants"). Plaintiffs allege that Defendants' rule concerning prevailing wage determinations in the H2-B visa program—the 2015 Wage Rule—is procedurally and substantively deficient under the Administrative Procedure Act ("APA").

As described in more detail below, the Court finds that Plaintiffs have standing to challenge the 2015 Wage Rule. The Court holds that the rule is procedurally invalid under the APA, and that its lack of notice and comment prejudiced Plaintiffs. As a result of this procedural defect, the Court has no occasion at this moment to rule on Plaintiffs' facial APA challenges. As for Plaintiffs' as-applied APA challenge, the Court concludes that Defendants' application of the 2015 Wage Rule to prevailing wage determinations based on a 2021 survey was unlawful. As a

result of Defendants' unlawful actions, the Court elects to remand the case (without vacatur) to the agencies for further consideration consistent with this ruling. Accordingly, the Court will deny Defendants' motion to dismiss, grant in part and deny in part Plaintiffs' motion for summary judgment, and grant in part and deny in part Defendants' cross-motion for summary judgment.

## II.  BACKGROUND

### A.  Regulatory Framework

This is the Court's third opinion in this case. *See Williams v. Walsh ("Williams I")*, 581 F. Supp. 3d 237 (D.D.C. 2022); *Williams v. Walsh ("Williams II")*, No. 21-cv-1150, 2022 WL 2802354 (D.D.C. July 18, 2022). The Court repeats much of the background discussion from its prior opinions in this case, adding updates where necessary. Under the H-2B visa program, if a United States employer cannot find enough United States workers to perform temporary non-agricultural unskilled work, it may obtain visas for the admission of foreign workers to fill the gap. When Congress authorized this program, it was mindful of the risk that unfettered admission of foreign workers willing to work at lower rates might harm United States workers by depressing wages in their fields. Therefore, Congress required employers seeking H-2B visas to show that their employment of foreign workers will not adversely affect the wages and working conditions of United States workers. *Comité De Apoyo A Los Trabajadores Agrícolas v. Perez ("CATA III")*, 774 F.3d 173, 177 (3d Cir. 2014) (citing 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1182(a)(5)(A)(i)(I)–(II)).

By delegation from DHS, DOL holds responsibility for evaluating employer applications for H-2B visas in order to determine whether granting the requested employment of foreign workers will adversely affect United States workers. *Williams II*, 2022 WL 2802354, at *1. This involves making two determinations: "(1) [that] qualified workers are not available in the United

States to perform the employment for which foreign workers are sought, and (2) [that the foreign workers'] employment will not adversely affect wages and working conditions of similarly employed United States workers." *CATA III*, 774 F.3d at 177 (citing 8 C.F.R. §§ 214.2(h)(6)(iii)(A), (iv)(A)). The wage an H-2B employer offers is central to this determination, both because the availability of United States workers will depend on whether the work pays a satisfactory wage and because admitting foreign workers willing to work for reduced wages may decrease the wages available to United States workers looking to work in the same industry. Thus, to be eligible to participate in the H-2B program, an employer must obtain from DOL a determination that the employer offers at least the "prevailing wage" for the relevant occupation. *Williams II*, 2022 WL 2802354, at *1; 20 C.F.R. § 655.0(a)(2); *id.* § 655.10(a).

Just how to calculate the prevailing wage for a particular occupation has been the subject of dispute between employers and workers for some time, and Congress, DOL, DHS, and the courts have all weighed in over the years. At first, DOL enlisted state agencies to calculate a prevailing wage for each occupation within their jurisdictions. *CATA III*, 774 F.3d at 178. In 2005, for occupations not subject to any collective bargaining agreement, DOL began to consider both employer-submitted, private wage surveys and the Bureau of Labor Statistics Occupational Employment Statistics ("OES")[1] survey. *Id.* According to Plaintiffs, surveys submitted by employers tend to suffer from methodological defects not present in the OES survey, including defining the relevant occupation too narrowly by using specific job duties as the determinative criterion and failing to ensure that all relevant employers have submitted wage data. *Williams II*,

---

[1] The OES recently changed its name to the Occupational Employment and Wage Statistics Survey, or OEWS, but the Court uses the term OES for consistency with the record and briefing.

2022 WL 2802354, at *2.  Therefore, Plaintiffs allege that employer-submitted surveys indicate

that the prevailing wage is lower than it is under the preferable OES method, and that DOL's

consideration of employer-submitted wage surveys systematically depresses wages in H-2B

industries.  *Id.*

       A 2008 rule formalized DOL's practice of making prevailing wage determinations based

either on employer-submitted surveys or the OES wage.  *See* Labor Certification Process and

Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered

Nursing in the United States (H-2B Workers), and Other Technical Changes ("2008 Rule"), 73

Fed. Reg. 78020, 78056 (Dec. 19, 2008).  And a 2009 guidance document set out the standards

by which DOL would determine the adequacy and validity of the survey methodology.  *See*

DOL, Prevailing Wage Determination Policy Guidance (Nov. 2009) ("2009 Wage Guidance"),

https://dol.gov/sites/dolgov/files/ETA/oflc/pdfs/NPWHC_Guidance_Revised_11_2009.pdf.

Though the notice of proposed rulemaking in the 2008 Rule solicited comments generally, it did

not permit comments on the specific topic of acceptance of employer-submitted surveys.  *See*

*Williams II*, 2022 WL 2802354, at *2.  A district court held that a separate feature of the 2008

rule—its division of OES data to identify OES wages for different "skill levels"—was arbitrary

and capricious in violation of the APA.  *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*

("*CATA I*"), No. 09-240, 2010 WL 3431761, at *19 (E.D. Pa. Aug. 30, 2010).  DOL responded

with a notice of proposed rulemaking, and ultimately a final rule in 2011 that, among other

things, forbade employers from submitting their own surveys when an applicable OES wage (or

another approved federal wage measure) was available.  *See* Wage Methodology for the

Temporary Non-agricultural Employment H-2B Program ("2011 Wage Rule"), 76 Fed. Reg.

3452, 3465–67 (Jan. 19, 2011).  The 2011 Wage Rule created two narrow exceptions to this ban:

employer surveys could still be used in situations where the OES does not provide data in the geographic area or where the OES does not accurately represent the relevant job classification. *Id.* at 3466–67.  In support of its change in policy, DOL explained that the OES survey was "the most consistent, efficient, and accurate means of determining the prevailing wage rate for the H-2B program."  *Id.* at 3465.  But Congress refused to provide appropriations to implement the 2011 Wage Rule,[2] so DOL continued to operate under the 2008 Rule, including by differentiating among skill levels and by accepting employer-provided surveys.  *Williams II*, 2022 WL 2802354, at *2.  Yet again, the Eastern District of Pennsylvania ordered DOL to cease its skill-level differentiation.  *Comité de Apoyo a los Trabajadores Agrícolas v. Solis* ("*CATA II*"), 933 F. Supp. 2d 700, 711–12 (E.D. Pa. 2013).

In response, and without notice and comment, DOL and DHS published a joint Interim Final Rule in 2013, which, among other things, officially returned to the policy of requiring DOL to accept employer-provided surveys.  *Williams II*, 2022 WL 2802354, at *2; Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, Part 2 ("2013 IFR"), 78 Fed. Reg. 24047, 24054–55 (Apr. 24, 2013).  The 2013 IFR responded to *CATA II* by removing skill-level differentiation from the calculation of OES wages, *see* 2013 IFR at 24053, but left untouched the 2008 Rule's provisions governing survey methodology, *see id.* at 24054–55 (stating that the 2013 IFR does "not revise or amend" 20 C.F.R. § 655.10(f) "of the 2008 rule").  Despite returning the agency to the 2008 Rule's employer-survey regime, the 2013 IFR highlighted that DOL nonetheless had "the concerns expressed in the 2011 rule about the

---

[2] The Consolidated and Further Continuing Appropriations Act, 2012, enacted on November 18, 2011, provided that "[n]one of the funds made available by this or any other Act for fiscal year 2012 may be used to implement, administer, or enforce, prior to January 1, 2012, the [2011 Wage Rule]."  Pub. L. No. 112–55, § 546, 125 Stat. 552, 640 (2011).

consistency, reliability and validity of these surveys[.]"  *Id.* at 24055.  The 2013 IFR solicited

post-rule public comments on a number of issues, such as "the accuracy and reliability of private

surveys," including "state-developed" surveys.  *Id.*  Meanwhile, DOL decided to indefinitely

delay the effective date of the 2011 Wage Rule because Congress continued to refuse

appropriations to implement it.  *See* Wage Methodology for the Temporary Non-Agricultural

Employment H-2B Program; Delay of Effective Date ("Indefinite Delay Rule"), 78 Fed. Reg.

53643, 53645 (Aug. 30, 2013); Wage Methodology for the Temporary Non-Agricultural

Employment H-2B Program ("2015 Wage Rule"), 80 Fed. Reg. 24146, 24150 (Apr. 29, 2015)

(explaining this history).[3]

But the 2013 IFR, too, was quickly vacated; in late 2014, the Third Circuit in *CATA III*

concluded that DOL and DHS had not sufficiently explained their policy of approving employer

survey submissions and held, based on the then-existing record, that the policy was arbitrary and

capricious in violation of the APA.  *CATA III*, 774 F.3d at 186–91.  The Third Circuit ordered

that "private surveys no longer be used in determining the mean rate of wage for occupations."

*Id.* at 191.  But it adopted the two narrow exceptions from the 2011 Wage Rule: "where an

otherwise applicable OES survey does not provide any data for an occupation in a specific

geographical location, or where the OES survey does not accurately represent the relevant job

classification."  *Id.*  *CATA III* also vacated the 2009 Wage Guidance as arbitrary and capricious

on the basis that it continued to maintain skill-level considerations in violation of DOL's own

rules.  *Id.* at 190–91.

---

[3] On January 17, 2014, the Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, was enacted.  For the first time, DOL's appropriations did not prohibit the implementation or enforcement of the 2011 Wage Rule.  *See* 2015 Wage Rule at 24150.  To date, however, DOL and DHS have not revisited the Indefinite Delay Rule.

In response, DOL and DHS jointly published the 2015 Wage Rule.  This rule is at the center of the parties' current dispute.  Defendants published it without notice and comment, and the agencies expressly disclaimed invoking the good cause exception.  2015 Wage Rule at 24153 n.17.  The 2015 Wage Rule purports to finalize the 2013 IFR (even though it had been vacated); because the 2013 IFR solicited (and the agencies had received) comments on the appropriate methodological requirements for and propriety of using employer-submitted surveys, the agencies concluded that further notice and comment was not necessary.  *Id.*  Among other things, the 2015 Wage Rule requires DOL to accept prevailing wage surveys from employers who wish to participate in the H-2B program, so long as the survey "was independently conducted and issued by a state, including any state agency, state college, or state university."  20 C.F.R. § 655.10(f)(1)(i); 2015 Wage Rule at 24184.  Under this rule, "it is appropriate to permit prevailing wage surveys that are conducted and issued by a state as a third, limited category of acceptable employer-provided surveys, even where the occupation is sufficiently represented in the OES."  2015 Wage Rule at 24169–70.

Per the 2015 Wage Rule, when an employer submits such a survey to DOL as part of its application package, it must include "specific information about the survey methodology, including such items as sample size and source, sample selection procedures, and survey job descriptions, to allow a determination of the adequacy of the data provided and validity of the statistical methodology used in conducting the survey."  20 C.F.R. § 655.10(f)(4).  The employer must also attest via a standard form, Form ETA-9165, that the survey was conducted by a third party (not an employer or its agents), that the surveyor either contacted a randomized sample of relevant employers or attempted to contact them all, and, among other things, that the "survey includes wage data from at least 30 workers and three employers."  *Id.* §§ 655.10(f)(4)(i)–(iii).

7

An employer-submitted survey "must be the most current edition of the survey and must be based on wages paid not more than 24 months before the date the survey is submitted for consideration."  *Id.* § 655.10(f)(5).  Once DOL accepts an employer survey and relies on it to certify that the employer is paying the prevailing wage and therefore eligible to participate in the H-2B program, it must specify how long its survey-based determination of the prevailing wage in the industry remains valid.  *Id.* § 655.10(h).  The maximum validity period for any prevailing wage determination is one year from the date of the determination.  *Id.*

At the end of 2015, Congress chimed in with its own view of the use of employer surveys in DOL's prevailing wage determinations.  Beginning in fiscal year 2016 up to the present, Congress has attached a rider to each annual appropriations act that takes the decision whether or not to accept employer-submitted surveys out of DOL and DHS's hands:

> The determination of prevailing wage for the purposes of the H–2B program shall be the greater of—(1) the actual wage level paid by the employer to other employees with similar experience and qualifications for such position in the same location; or (2) the prevailing wage level for the occupational classification of the position in the geographic area in which the H–2B nonimmigrant will be employed, based on the best information available at the time of filing the petition.  In the determination of prevailing wage for the purposes of the H–2B program, the Secretary shall accept private wage surveys even in instances where Occupational Employment Statistics survey data are available unless the Secretary determines that the methodology and data in the provided survey are not statistically supported.

Consol. Appropriations Act, 2022, Pub. L. No. 117-103, § 110, 136 Stat. 49, 439 (2022); *see also* Consol. Appropriations Act, 2021, Pub. L. No. 116-260, § 110, 134 Stat. 1182, 1564–65 (2020) (same); Further Consol. Appropriations Act, 2020, Pub. L. No. 116-94, § 110, 133 Stat. 2534, 2554 (2019) (same); Dep't of Defense, Labor, Health and Hum. Serv., and Educ. Appropriations Act, 2019, and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 111, 132 Stat. 2981, 3065 (2018) (same); Consol. Appropriations Act, 2018, Pub. L. No. 115-141, § 112, 132 Stat. 348, 712 (2018) (same); Consol. Appropriations Act, 2017, Pub. L. No. 115-31, § 112, 131

Stat. 135, 518–19 (2017) (same); Consol. Appropriations Act, 2016, Pub. L. No. 114-113, § 112, 129 Stat. 2242, 2599 (2015) (same).  Because the above-quoted language of each annual appropriations rider is identical, the Court will refer to each version as the "Appropriations Rider" without distinction for ease of discussion.

Thus, from 2016 through the present, DOL has been *required by statute* to accept all statistically supported employer-submitted surveys, regardless of what the DOL regulations, including the 2015 Wage Rule, say.  Notably, the Appropriations Rider is broader than the DOL regulations; it does not limit private employer survey submissions to surveys conducted by a state or state university.  *See* 20 C.F.R. § 655.10(f)(1)(i).  In this way, the Appropriations Rider largely displaces the 2015 Wage Rule's provision for DOL acceptance of state-run employer surveys, *id.* § 655.10(f)(1)(i), and, arguably, the 2015 Wage Rule's methodological requirements for state-run employer surveys, *id.* §§ 655.10(f)(2), (f)(4).

By its terms, the Appropriations Rider raises the question of how DOL is to determine whether "the methodology and data in" a particular employer survey are "statistically supported."  Pub. L. No. 117-103, § 110, 136 Stat. at 439.  Days after Congress passed the Appropriations Rider for the 2016 fiscal year, DOL answered this question.  DOL released a guidance document interpreting these terms to mean the same thing as "those methodological criteria for surveys set out in the 2015 Wage Rule."  DOL, Emp't & Training Admin., Effects of the 2016 Dep't of Labor Appropriations Act (the "FAQ") at 4 (Dec. 29, 2015), https://www.dol. gov/sites/dolgov/files/ETA/oflc/pdfs/H-2B_Prevailing_Wage_FAQs_DOL_Appropriations_Act. pdf.[4]  The FAQ goes on to list specific requirements, many of which match the 2015 Wage Rule

---

[4] The Court notes that *Williams II* inaccurately (albeit harmlessly) stated that this guidance was released months after the passage of the Appropriations Rider in 2015.  2022 WL 2802354, at *6.

requirements for state-institution-run employer surveys codified at 20 C.F.R. § 655.10(f)(4).  *See Williams II*, 2022 WL 2802354, at *6 & n.3.  Thus, the FAQ clarifies that the methodological requirements of the 2015 Wage Rule, 20 C.F.R. §§ 655.10(f)(2), (f)(4), still play a role in prevailing wage determinations.

## B.  Procedural History

Every crawfish season—from January at the earliest to July at the latest each year—crawfish processing plants in Louisiana hire both American and, under the H-2B program, foreign workers to peel crawfish.  *Williams II*, 2022 WL 2802354, at *4.  Like any other prospective H-2B employer, Louisiana crawfish processors must submit applications to DOL for approval to participate in the H-2B program, and as part of this process must obtain a determination that they offer the prevailing wage in the industry.  *Id.*  Crawfish processors typically apply for prevailing wage determinations well in advance of each year's crawfish season kickoff, and they often submit their own wage surveys.  *Id.*  According to Plaintiffs, DOL's acceptance of employer-provided surveys depresses wages in the crawfish industry.  *Id.* For example, Plaintiffs allege that in 2020, "more than two dozen Louisiana seafood companies provided DOL with surveys pursuant to 20 C.F.R. § 655.10(f)(1)(i) that allowed them to pay their workers anywhere from $0.18 to $4.97 less per hour than would have been required under the OES survey"; this amounted to wage losses of "up to 35% of the applicable OES wage."  *Id.* (citation omitted).

DOL issues most of its prevailing wage determinations in August of each year.  *Id.*  The same pattern held this year—DOL adjudicated most crawfish-processor H-2B prevailing wage applications for the 2022 crawfish season in August 2021.  *See id.*  For the 2022 crawfish season, DOL issued at least 20 prevailing wage determinations to Louisiana crawfish processers based on the 2021 edition of the employer-submitted Louisiana Crawfish Wage Survey, a survey

10

conducted by the Louisiana State University Agricultural Center.  *Id.*  One of these prevailing wage determinations went to Crawfish Distributors, Inc. of Breaux Bridge, Louisiana.  *Id.*  The 2021 Louisiana Crawfish Wage Survey returned an average hourly rate for crawfish pickers of $10.43, and Louisiana crawfish employers are offered positions at this rate.  *Id.*  Meanwhile, the OES survey hourly rates for these employers are significantly higher than $10.43; for Crawfish Distributors, the applicable OES wage is $13.51 per hour.  *Id.*

This lawsuit began on April 27, 2021, when Plaintiffs filed a four-count Complaint raising procedural and substantive claims against Defendants.  *See generally* Compl., ECF No. 1. Counts I–III each claimed that the portions of the 2015 Wage Rule that provide for the acceptance and evaluation of employer-submitted state wage surveys (20 C.F.R. §§ 655.10(f)(1)(i), (f)(4)) violate the APA.  *Id.* ¶¶ 102–09.  For relief, Counts I–III each sought a declaration that the challenged portions of the 2015 Wage Rule were unlawful and an order vacating them.  *Id.* ¶¶ 104, 107, 109; *see also id.* at 32.  Count IV was pleaded in the alternative; it alleged that DOL had "repeatedly approv[ed]" past versions of the Louisiana Crawfish Wage Survey "without observing the safeguards required by 20 C.F.R. § 655.10(f)" or the Appropriations Rider's requirement to ensure that the study was "statistically supported."  *Id.* ¶¶ 110–13.

In *Williams I*, this Court dismissed all counts in the original Complaint.  *Williams I*, 581 F. Supp. 3d at 265.  The Court held that Plaintiffs lacked standing to bring Counts I–III because their injuries—depressed wages due to DOL's reliance on the employer-submitted Louisiana Crawfish Wage Survey rather than the OES wage—were not redressable.  *Id.* at 252–54.  The Court noted that even were it to grant Plaintiffs their requested relief and vacate 20 C.F.R. §§ 655.10(f)(1)(i), (f)(4), the Appropriations Rider would still control and require DOL to accept

any employer survey it deemed statistically supported. *Id.* at 253. Accordingly, for the same reason, the Court denied Plaintiffs' request for a preliminary injunction with respect to Counts I–III. *Id.* at 259. Turning to Count IV, the Court held that it was moot because the challenged prevailing wage determinations based on past versions of the Louisiana Crawfish Wage Survey governed only previously concluded crawfish seasons, and there was no indication that Plaintiffs were, for example, seeking a judicial ruling as a basis to seek backpay in a future suit. *Id.* at 259–60. *Williams I*, however, granted Plaintiffs leave to file a Supplemental Complaint to add a new Count V and found that Plaintiffs had standing to bring Count V. *See id.* at 251–52. Count V claims that DOL's prevailing wage determinations for the 2022 crawfish season based on the 2021 Louisiana Crawfish Wage Survey must be vacated under the APA because they are arbitrary and capricious and contrary to law. Suppl. Compl. ¶¶ 30–32, ECF No. 39.

In *Williams II*, Plaintiffs moved for partial reconsideration of the Court's dismissal of Counts I–III, and a preliminary injunction in relation to Count V. 2022 WL 2802354, at *5. Plaintiffs no longer challenged the use of an employer survey when an OES wage is available, nor did they seek reconsideration of the Court's dismissal of Count IV. *Id.* at *6 n.2. The Court granted reconsideration of Counts I–III and revived them insofar as they challenged the 2015 Wage Rule at 20 C.F.R. §§ 655.10(f)(2), (f)(4). *Id.* at *6. It explained that the parties' failure in *Williams I* to mention the existence of the FAQ guidance document gave the Court "an incomplete understanding of the governing regulatory regime." *Id.* at *8. With the FAQ in the picture, "these portions [sections 655.10(f)(2), (f)(4)] of the 2015 Wage Rule continue to operate as a means of interpreting and implementing the Appropriations Rider," and therefore the injuries alleged in Counts I–III were redressable. *Id.* The Court therefore reinstated Counts I–III to the extent that they challenged 20 C.F.R. §§ 655.10(f)(2), (f)(4). *Id. Williams II*, however,

denied Plaintiffs' motion for a preliminary injunction with respect to Count V.  *Id.*  The Court found that Plaintiffs could not carry their burden of showing irreparable harm because of the possibility that their economic injuries could be compensated at a later date.  *Id.* at *8–13.

*Williams II* was decided in July 2022, at the tail end of the 2022 crawfish season.  That season is now over.  The 2022 Louisiana Crawfish Wage Survey has been released, and DOL has received prevailing wage applications for the 2023 crawfish season that rely on the new survey.  *See* Defs.' Notice of Admin. Action (Sept. 9, 2022) at 1, ECF No. 64.  The 2022 survey, according to Plaintiffs, is merely an update of the 2021 survey.  *See* Pls.' Mem. Opp'n to Defs.' Second Mot. to Dismiss ("MTD Opp'n") at 5, ECF No. 60 (stating that emails Plaintiffs obtained through a public records request from Louisiana State University show that the 2022 Louisiana Crawfish Wage Survey "update[s]" the 2021 version).

Defendants now move to dismiss Count V as moot on the basis that the 2022 crawfish season has ended.  *See* Defs.' Mem. of Points and Auth. ("MTD") at 1, ECF No. 59-1.  Meanwhile, Plaintiffs move for summary judgment on their remaining counts—Counts I, II, III, and V.  Pls.' Mem. Supp. Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 62-1.  Plaintiffs ask the Court to vacate two provisions of the 2015 Wage Rule, at 20 C.F.R. §§ 655.10(f)(2), (f)(4), on the basis that they lack adequate notice-and-comment under the APA; are contrary to the language of the Appropriations Rider; and are arbitrary and capricious under the APA.  *Id.* at 11–38.  Plaintiffs also ask the Court to find DOL's prevailing wage determinations, based on the 2021 Louisiana Crawfish Wage Survey, unlawful because they claim that survey violates the 2015 Wage Rule.  *Id.* at 38–40.

For their part, Defendants filed a cross-motion for summary judgment.  Defs.' Cross-Mot. for Summ. J. ("Defs.' Cross-Mot."), ECF No. 63.  Defendants argue that Plaintiffs lack standing

to challenge the 2015 Wage Rule.  Defs.' Reply in Support of Their Cross-Mot. for Summ. J.
("Defs.' Reply") at 1–10, ECF No. 70.  On the merits, Defendants claim that the 2015 Wage
Rule: satisfied the APA's notice-and-comment requirements; is not arbitrary and capricious
under the APA; and is not contrary to the Appropriations Rider.  Defs.' Cross-Mot. at 10–24.
Defendants also argue that DOL properly applied the 2015 Wage Rule in issuing prevailing wage
determinations based on the 2021 Louisiana Crawfish Wage Survey.  *Id.* at 24.  Finally, they
propose that if Plaintiffs are entitled to a remedy, remand without vacatur is the appropriate
remedy.  *Id.* at 24–26.  The motion to dismiss and the cross-motions for summary judgment are
now ripe for decision.

### III.  MOTION TO DISMISS

The Court will first address Defendants' motion to dismiss Count V as moot.  Count V
claims that DOL's prevailing wage determinations based on the 2021 Louisiana Crawfish Wage
Survey fail to comply with the 2015 Wage Rule.  The Court finds that although the 2022
crawfish season is over, Count V is not moot because a determination of the unlawfulness of the
2021 Louisiana Crawfish Wage Survey will enable Plaintiffs to bring potential claims for
backpay.  In the alternative, Count V meets the mootness exception of capable of repetition, yet
evading review.

The United States Constitution limits the jurisdiction of the federal courts to "Cases" and
"Controversies."  U.S. Const. art. III, § 2.  The same Article III case-or-controversy requirement
that underpins the standing doctrine means that federal courts lack jurisdiction to decide moot
cases.  *See Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 285 F. Supp. 3d 128, 132 (D.D.C.
2018).  "A case or claim is moot 'when the issues presented are no longer live or the parties lack
a legally cognizable interest in the outcome.'"  *Id.* (quoting *Schmidt v. United States*, 749 F.3d

1064, 1068 (D.C. Cir. 2014)).  Thus, mootness deprives the court of jurisdiction and requires

dismissal when "intervening events make it impossible to grant the prevailing party effective

relief, or when the [c]ourt's decision will neither presently affect the parties' rights nor have a

more-than-speculative chance of affecting them in the future."  *Id.* (cleaned up and citations

omitted).  "The party seeking jurisdictional dismissal must establish mootness, while the

opposing party has the burden to prove that a mootness exception applies."  *Reid v. Hurwitz*, 920

F.3d 828, 832 (D.C. Cir. 2019).

## A.  Possibility of Back Wages

The parties trade arguments about whether the 2022 crawfish season's expiration renders

Count V moot.  Defendants argue that Count V should meet the same fate as Count IV, which

*Williams I* dismissed as moot because vacatur of the 2018, 2019, and 2020 Louisiana Crawfish

Wage Surveys could not have affected wages for the 2021 crawfish season, which had already

expired.  MTD at 6; *see Williams I*, 581 F. Supp. 3d at 260 ("Vacatur of these approvals would

do nothing to help Plaintiffs with respect to their wages during upcoming crawfish seasons or

otherwise, so Count IV is moot.").  That reasoning would suggest that Count V, which seeks

vacatur of wage determinations under the 2021 Louisiana Crawfish Wage Survey, is also moot

because the 2022 crawfish season is over.  But unlike their position in *Williams I*, Plaintiffs

specifically tie their relief to backpay: they argue there is meaningful relief available because if

the Court finds the wage determinations under the 2021 Louisiana Crawfish Wage Survey

unlawful, Plaintiffs "may use that judgment to seek the wages they are owed for the 2022

season."  MTD Opp'n at 2.  Plaintiffs point out that the Court denied them a preliminary

injunction for Count V on the basis that the potential to seek backpay in future suits showed that

they did not suffer irreparable harm.  *See Williams II*, 2022 WL 2802354, at *10 ("It appears

that, if Plaintiffs were to prevail on the merits, at least some of them would have potentially

viable claims for backpay[.]").  It would be illogical, Plaintiffs argue, for the Court to now "deny Plaintiffs the relief that would make subsequent [backpay] suits possible."  MTD Opp'n at 2.

Although Plaintiffs did not cite a case for the proposition that an action against a defendant is justiciable because a ruling could serve as a predicate for a future backpay suit against a third party, the Court has located a similar case in this District that supports their position: *Calixto v. Walsh*, No. 19-cv-1853, 2022 WL 4446383 (D.D.C. Sept. 23, 2022).  *Calixto* involved a suit brought by seasonal laborers under the H2-B program against the Secretary of Labor alleging that DOL's vacatur of certain supplemental wage determinations was arbitrary and capricious.  *Id.* at *1.  There, the agency argued that the court could not provide meaningful relief to the plaintiffs because "the challenged agency action involved [a] directive issued to Plaintiffs' employers (rather than Plaintiffs themselves)."  *Id.* at *11.  The court rejected that argument.  It ruled that a judicial ruling on the lawfulness of the agency's action "would permit Plaintiffs to pursue back wages based on the wage rates specified" in the vacated supplemental wage determinations.  *Id.* at *12.  As in *Calixto*, a judicial determination here that prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey are unlawful is meaningful to Plaintiffs because they plan to use this as a basis to claim backpay in future suits. Even though the outcomes of those future suits are uncertain, "[a] party need not demonstrate with certainty that its injury will be redressed[.]"  *NTCH, Inc. v. Fed. Commc'ns Comm'n*, 841 F.3d 497, 506 (D.C. Cir. 2016).  Thus, Count V is not moot.

### B.  Capable of Repetition, Yet Evading Review

The Court holds in the alternative that even if Plaintiffs' potential claim for damages does not save their claim from mootness, it is capable of repetition, yet evading review.  It is well established that although a case may be moot, "an exception to the mootness doctrine" exists "for a controversy that is 'capable of repetition, yet evading review.'"  *Kingdomware Techs., Inc. v.*

*United States*, 579 U.S. 162, 170 (2016) (cleaned up and citation omitted).  "To satisfy the exception, a party must demonstrate that '(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.'"  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 321 (D.C. Cir. 2014) (cleaned up) (quoting *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990)).

Here, Count V is a "classic example of a legal injury that is capable of repetition yet evading review."  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 325 (D.C. Cir. 2009).  First, the challenged action evades review.  An action "evades review" when "it is too short in duration to be fully litigated in the United States Supreme Court before it expires."  *Ralls*, 758 F.3d at 321.  Thus, "[a]s a rule of thumb, 'agency actions of less than two years' duration cannot be fully litigated prior to cessation or expiration, so long as the short duration is typical of the challenged action.'"  *Id.* (cleaned up) (quoting *Del Monte*, 570 F.3d at 322).  Here, DOL's prevailing wage determinations for the 2022 crawfish season based on the 2021 Louisiana Crawfish Wage Survey were only valid for one year.  *See Williams II*, 2022 WL 2802354, at *3 (citing 20 C.F.R. § 655.10(h)); Defs.' Reply Supp. Mot. to Dismiss ("MTD Reply") at 6, ECF No. 61.  And Plaintiffs' opportunity to challenge those prevailing wage determinations was "shorter still."  MTD Opp'n at 6.  Using the 2022 crawfish season as an example, Plaintiffs explain that DOL did not release information regarding 2022 prevailing wage determinations until November 2021, and the 2022 crawfish season ended in July 2022—thus affording Plaintiffs merely nine months to challenge agency action.  *Id.*

Defendants do not contest the brevity of Plaintiffs' window.  Instead, they argue that Plaintiffs' self-inflicted delays are responsible for mooting this case.  Defendants rely on

*Armstrong v. FAA*, 515 F.3d 1294 (D.C. Cir. 2008), for the proposition that "[a] litigant cannot

credibly claim his case 'evades review' when he himself has delayed its disposition." *Id.* at

1296; *see Newdow v. Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010) ("It is clear the principle

of *Armstrong* requires a plaintiff to make a full attempt to prevent his case from becoming moot,

an obligation that includes filing for preliminary injunctions and appealing denials of preliminary

injunctions."). Defendants argue that Plaintiffs could have moved for a preliminary injunction

on Count V sooner, and that Plaintiffs took the fatal misstep of failing to appeal the Court's

denial of their motion for preliminary injunction. MTD at 10–11. Plaintiffs counter that they did

not delay, and in any event, would not have been able to exhaust the review process within a

year. MTD Opp'n at 6–7.

 Plaintiffs have the better view. As *Newdow* explains, *Armstrong* stands for the

proposition that "[t]he capable-of-repetition doctrine is not meant to save mooted cases that may

have remained live *but for* the neglect of the plaintiff." 603 F.3d at 1009 (emphasis added); *cf.*

*Burrage v. United States*, 571 U.S. 204, 211 (2014) (stating that "but for" causation requires

action that was "the straw that broke the camel's back"). Thus, in *Ralls*, the D.C. Circuit found

that an agency's order that was in effect for 57 days (and no more than 90 days maximum)

satisfied the capable of repetition, yet evading review exception. 758 F.3d at 321–23. *Ralls*

distinguished *Armstrong* on the basis that *Armstrong* involved "just two levels of [judicial]

review" and that, "[h]ad Armstrong acted with more alacrity, he might have been able to obtain

review" by the Supreme Court before his claim was mooted. *Id.* at 323. Given Ralls's short

timeline to challenge the agency's order, however, the Circuit refused to "attach [ ] significance"

to Ralls's purported delays, because "*[e]ven if* Ralls had sought judicial review of the CFIUS

Order on the day it issued, it could not have obtained review by the district court, this Court and the Supreme Court before the order was revoked." *Id.* (emphasis added).

This case is like *Ralls*. "Even if" Plaintiffs moved with utmost speed, they would not have been able to obtain review of DOL's 2022 prevailing wage determinations in this Court, the D.C. Circuit, and the Supreme Court in the nine-month window before the 2022 crawfish season expired. *Id.* To put the pace of this litigation in perspective, by the time *this Court* denied Plaintiffs' motion for a preliminary injunction on Count V in mid-July 2022, the 2022 crawfish season was already weeks away from ending. Given the short timeline Plaintiffs had to work with, an earlier-filed motion for a preliminary injunction or an appeal of the denial of the preliminary injunction would not have made a difference here, and therefore, like the D.C. Circuit in *Ralls*, the Court will not "attach [ ] significance" to these purported delays. *Id.* Thus, DOL's 2022 prevailing wage determinations satisfy the evading review prong of this exception.[5]

Second, the agency action at issue is also capable of repetition. Whether an unlawful agency action is capable of repetition turns on "whether the legal wrong complained of by the plaintiff is reasonably likely to recur," and not "whether the precise historical facts that spawned the plaintiff's claims are likely to recur." *Del Monte*, 570 F.3d at 324. "In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *Clarke v. United States*, 915 F.2d 699, 704 (D.C. Cir. 1990).

Here, the legal wrong at issue is DOL's prevailing wage determinations based on the purportedly flawed 2021 Louisiana Crawfish Wage Survey. Plaintiffs claim that "[e]very year for at least the past four years, DOL has approved employer-provided surveys that are

---

[5] Plaintiffs did not invoke the "capable of repetition, yet evading review" doctrine with respect to Count IV, which the Court dismissed as moot and on which Plaintiffs did not move for reconsideration. *Williams I*, 581 F. Supp. 3d at 262; *Williams II*, 2022 WL 2802354, at *6 n.2.

functionally identical to the 2021 Louisiana Crawfish Wage Survey."  MTD Opp'n at 4; *see also, e.g.*, *id.* at 5 (stating that emails that Plaintiffs obtained through a public records request from Louisiana State University show that the 2022 Louisiana Crawfish Wage Survey "update[s]" the 2021 version).  According to Plaintiffs, these annual surveys suffer from the same flaws.  *Id.* at 4; *see* Pls.' Mot. at 38 ("[T]he 2021 Survey fails to comply with the requirements of the 2015 Wage Rule.").  Defendants, however, argue that Plaintiffs engage in "pure speculation" regarding whether employers will continue to use these surveys in future years and whether DOL will issue prevailing wage determinations based on these surveys.  MTD Reply at 6.  Yet days after filing their reply brief, Defendants notified the Court that DOL had recently received "several prevailing-wage-determination [ ] applications relying on a newly-released Louisiana Crawfish Wage Survey" and that it would "process them in due course."  Defs.' Notice of Admin. Action at 1.

Plaintiffs have the better argument.  "[T]he capable-of-repetition prong is not to be applied with excessive 'stringency.'"  *Ralls*, 758 F.3d at 324 (quoting *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988)).  "[A] controversy need only be '*capable* of repetition,' not 'more probable than not.'"  *Id.* (emphasis in original).  For that reason, "a controversy is *capable* of repetition even if its recurrence is far from certain."  *Id.* (emphasis in original).  Plaintiffs have met this standard here.  Plaintiffs plan to continue working in this industry.  *See, e.g.*, Johnson Suppl. Decl. ¶ 6, ECF No. 74-1.  Defendants' reliance on the Louisiana Crawfish Wage Surveys in the previous four years, coupled with their insistence on the surveys' soundness, show that this precise dispute is likely—and at the very least, capable—of repetition in the near future.  Accordingly, Count V is not moot.

### IV.  MOTION FOR SUMMARY JUDGMENT

Having resolved Defendants' motion to dismiss, the Court now turns to the parties' cross-motions for summary-judgment.  To recap, Defendants argue that Plaintiffs lack standing to bring their claims.  Plaintiffs argue that the 2015 Wage Rule is procedurally and substantively defective under the APA.  Plaintiffs also aver that DOL improperly applied the 2015 Wage Rule to its prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey.  The Court will consider these arguments in order.

### A.  Standing

Courts employ the doctrine of standing to determine whether a plaintiff's claims present a case or controversy.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  It is by now familiar

> that the irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61 (cleaned up).  Plaintiffs bear the burden of establishing each of these elements for each form of relief they seek.  *See Cato Inst. v. SEC*, 4 F.4th 91, 94 (D.C. Cir. 2021) (per curiam).  Moreover, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  Thus, "on summary judgment, the plaintiffs must prove injury in fact with 'specific facts' in the record."  *Humane Soc'y of the United States v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) (citation omitted).

In *Williams II*, the Court already explained that "vacatur of 20 C.F.R. § 655.10(f)(2),

(f)(4) . . . would likely redress the injuries Plaintiffs claim in connection with [Counts I–III]."

*Williams II*, 2022 WL 2802354, at *7.

> With the FAQ and the challenged portions of the 2015 Wage Rule out of the picture, DOL would likely issue a new interpretation of the Appropriations Rider "statistically supported" requirement that would not be guided by the alleged methodologically defective requirements of the 2015 Wage Rule.  Such an interpretation could well benefit Plaintiffs by implementing more stringent methodological requirements that result in surveys that report higher wages.

*Id.*; *see also id.* ("[T]he relief requested in connection with Counts II and III would likely

redress, and indeed prevent, future injuries in the form of depressed wages these plaintiffs sustain

as a result of employer survey methodologies that are acceptable under current rules.").  The

Court noted, however, that "Defendants remain free to raise any additional arguments about

standing, and even about redressability, at the summary judgment stage."  *Id.* at *8.[6]

Defendants' standing objections now center on injury in fact and traceability.  With

respect to injury in fact, they argue that "Plaintiffs have not directly related this theory of injury

to themselves, either currently or going forward."  Defs.' Reply at 3.  Not so.  As the Court

previously observed, "Plaintiffs allege that 20 C.F.R. § 655.10(f)(2) and 20 C.F.R. § 655.10(f)(4)

permit employer surveys that report artificially low wages."  *Williams II*, 2022 WL 2802354, at

*7.  Under Plaintiffs' theory, they are injured by DOL's "methodologically defective

requirements of the 2015 Wage Rule" and its decision to forgo "more stringent methodological

---

[6] It is not clear to the Court whether Defendants also lodge a standing challenge against Count V.  Regardless, the Court finds that Plaintiffs have standing to bring Count V.  The Court's ruling above that Count V is not moot also goes to show that Plaintiffs' alleged injury is redressable.  *See Cause of Action Inst. v. Tillerson*, 285 F. Supp. 3d 201, 207–08 (D.D.C. 2018) ("Both mootness and standing involve the question of redressability.").  Plaintiffs have also demonstrated injury and traceability for the reasons discussed in *Williams I*, *see* 581 F. Supp. 3d at 263–64, and this section.

requirements that [would] result in surveys that report higher wages." *Id.*  According to

Plaintiffs, DOL's prevailing wage determinations based on employer surveys under the 2015

Wage Rule cause them to receive artificially low wages.  That is plainly a direct and concrete

injury.

      Plaintiffs have also established injury under a theory of competitor standing.  Even if

Plaintiffs' employers do not rely on employer surveys, the use of methodologically defective

employer surveys by *other* Louisiana crawfish employers will result in competitive harm for *all*

Plaintiffs.  *See* Pls.' Sur-reply Regarding Injury-in-Fact and Traceability ("Pls.' Sur-Reply") at 6,

ECF No. 74.  "The D.C. Circuit 'has repeatedly held that an individual who competes in a labor

market has standing to challenge allegedly unlawful government action that is likely to lead to an

increased supply of labor—and thus competition—in that market.'"  *Garcia v. Stewart*, 531 F.

Supp. 3d 194, 206 (D.D.C. 2021) (quoting *Save Jobs USA v. Dep't of Homeland Sec.*, 942 F.3d

504, 509 (D.C. Cir. 2019)).  According to Plaintiffs, "approval of a substandard wage rate for

any Louisiana crawfish processors necessarily impacts both the wages that their non-H-2-B

competitors will pay and the workers' opportunities to apply for those jobs at higher wages."

*Williams II*, 2022 WL 2802354, at \*10 (emphasis removed); *see also* Pls.' Sur-reply at 6 ("[T]he

increase in competition from foreign workers admitted at the substandard wages permitted by the

survey regulations will adversely affect the wages of all workers in the industry.").  That makes

sense.  As this Court previously observed, "[w]hen Congress authorized this program, it was

mindful of the risk that unfettered admission of foreign workers willing to work at lower rates

might harm United States workers by depressing wages in their fields."  *Williams II*, 2022 WL

2802354, at \*1; *see also Garcia*, 531 F. Supp. 3d at 206 (observing that "basic economic logic"

teaches that "an increase in labor supply drives labor prices (*i.e.*, wages) down" (cleaned up)).

Defendants' attempt to minimize Plaintiffs' injury to "some day" intentions, Defs.' Reply at 3 (quoting *Lujan*, 504 U.S. at 564), is doubly wrong.  As an initial matter, Plaintiffs intend to seek backpay for allegedly artificially deflated wages (at least for the 2022 crawfish season), and this past injury—what the Supreme Court has called "foregone action"—adequately satisfies the injury in fact element to standing.  *Lujan*, 504 U.S. at 561.  Defendants also overlook the ongoing/future injury here.  Plaintiffs represent that crawfish processing is the "source of their livelihood."  Pls.' Sur-reply at 4.  In *Williams I*, the Court noted that several Plaintiffs had worked at the Crawfish Distributors plant for numerous years and planned to continue working there for the 2022 season.  *See* 581 F. Supp. 3d at 247.  Although the 2022 season is now over, Plaintiff Martin Johnson has submitted a supplemental declaration attesting that he intends to continue working for Crawfish Distributors and has received assurance from his employer that he will be hired back for 2023.  Pls.' Sur-reply at 4; Johnson Suppl. Decl. ¶ 6.  Moreover, Defendants admit that DOL has recently received "several prevailing-wage-determination [ ] applications relying on a newly-released Louisiana Crawfish Wage Survey" and that it would "process them in due course."  Defs.' Notice of Admin. Action at 1.[7]  Thus, Plaintiffs like Mr. Johnson who intend to work in the 2023 crawfish season will continue to be injured, whether in the form of artificially low wages or other competitive harms in the industry.  Plaintiffs therefore have amply demonstrated injury in fact.

---

[7] Defendants did not indicate one way or the other whether Crawfish Distributors was one of the employers that submitted the 2022 Louisiana Crawfish Wage Survey for consideration. Under the theory of competitive harm as explained above, however, Plaintiffs' standing does not turn on whether their specific employers will rely on the 2022 Louisiana Crawfish Wage Survey. And because at least one Plaintiff has standing, the Court need not analyze whether other plaintiffs have standing.  *See Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 10 (D.C. Cir. 2015); *Williams II*, 2022 WL 2802354, at *7 n.4.

Defendants' traceability objection fares no better.  They argue that Plaintiffs' alleged injury is not traceable because of "a protracted chain of causation" between the 2015 Wage Rule and Plaintiffs' alleged lower pay.  Defs.' Reply at 7 (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996)).  While "mere speculation about the decisions of third parties" does not suffice to establish traceability, "the predictable effect of Government action on the decision of third parties" does.  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).  In *New York*, the plaintiffs, consisting of government and non-government entities, challenged the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 census questionnaire.  *Id.* at 2561.  The government argued that the plaintiffs could not trace the harms associated with a depressed census response rate to the Secretary's decision because such harms would be caused by "the independent action of third parties choosing to violate their legal duty to respond to the census."  *Id.* at 2565.  The Supreme Court disagreed.  Citing to evidence that "noncitizen households have historically responded to the census at lower rates than other groups," the Court found that plaintiffs adequately showed that "third parties will likely react in predictable ways to the citizenship question."  *Id.* at 2566.  It therefore found that plaintiffs had standing.  *Id.*

So too, here.  If DOL continues to administer the regulatory scheme under 20 C.F.R. §§ 655.10(f)(2), (f)(4), employers will likely continue to submit allegedly methodologically defective surveys.  As rational economic actors, employers have an incentive to pay low wages. *See* Pls.' Sur-reply at 8 (citing 2011 Wage Rule at 3465).  As Plaintiffs aver, "[e]very year for at least the past four years, DOL has approved employer-provided surveys that are functionally identical to the 2021 Louisiana Crawfish Wage Survey."  MTD Opp'n at 4.  Indeed, Defendants recently informed the Court that DOL received "several prevailing-wage-determination [ ]

applications relying on a newly-released Louisiana Crawfish Wage Survey" and that it would "process them in due course."  Defs.' Notice of Admin. Action.  The employers' "historical[] respon[se]" to the regulatory scheme shows that their behavior is closely and predictably tied to the allegedly unlawful agency action at issue.  *New York*, 139 S. Ct. at 2566; *see also Growth Energy v. EPA*, 5 F.4th 1, 33 (D.C. Cir. 2021) (finding that "'voluntary but reasonably predictable' third-party conduct suffices to establish redressability" (citation omitted)).

Defendants' cases from this Circuit are inapposite.  *See Bentsen*, 94 F.3d at 666, 671 (finding that plaintiffs who attempted to tie tax credit to agricultural pollution failed to establish causation because they relied on "a lengthy chain of conjecture" and "sound economic reasoning may well suggest a contrary result"); *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 25 (D.C. Cir. 2015) (finding that intervenors failed to establish standing by arguing that FERC's failure to consolidate two licensing proceedings into one resulted in uncoordinated fish passage and therefore a decline in tourism revenue, because the record showed it was "wholly speculative" to suggest that FERC could not coordinate fish passage despite separate licensing); *Arpaio v. Obama*, 797 F.3d 11, 20–21 (D.C. Cir. 2015) (rejecting plaintiff sheriff's traceability argument that government's DACA or DAPA policies would result in increased expenditures by plaintiff because it was unreasonable to think that foreign citizens would attempt to enter the United States illegally in reliance on a policy that could not benefit them).

Finally, Defendants attempt to weave a statute of limitations argument into their objection to standing.  "[A] suit challenging final agency action pursuant to [the APA] must be commenced within six years after the right of action first accrues."  *Harris v. FAA*, 353 F.3d 1006, 1009 (D.C. Cir. 2004).  Notably, Defendants admit that Plaintiffs timely filed the original Complaint.  *See* Defs.' Cross-Mot. at 8.  But they argue that Plaintiffs lacked standing at the

commencement of this lawsuit, and then improperly relied on facts *outside* the six-year statute of limitations in the Supplemental Complaint to cure their standing defect.  That is not the case. *Williams II* established that Plaintiffs adequately demonstrated standing based on "Counts I–III of the *original Complaint*."  2022 WL 2802354, at *8 (emphasis added).  Subsequent factual developments alleged in the Supplemental Complaint merely show that Plaintiffs *continue* to have standing to bring their timely claims.  Because Plaintiffs have established standing, the Court will proceed to assess their APA claims.[8]

## B.  APA Challenges

Plaintiffs bring both procedural and substantive APA challenges to the 2015 Wage Rule. First, they argue that the 2015 Wage Rule fails to satisfy the APA's notice-and-comment procedures.  Second, Plaintiffs argue that the 2015 Wage Rule is facially arbitrary and capricious.  Third, they argue that DOL's prevailing wage determinations under the 2021 Louisiana Crawfish Wage Survey are unlawful.  For the reasons described below, the Court finds that the 2015 Wage Rule fails the APA's notice-and comment requirement, and accordingly declines to address at this moment whether the 2015 Rule is also facially arbitrary and capricious.  Finally, the Court finds that DOL's prevailing wage determinations under the 2021 Louisiana Crawfish Wage Survey are unlawful.

### 1.  Procedural Challenge to 2015 Wage Rule

Plaintiffs argue that the 2015 Wage Rule fails to satisfy the APA's notice-and-comment procedures.  Recall that the 2015 Wage Rule purports to finalize the 2013 IFR, but the Third

---

[8] In *Williams II*, the Court noted that a claim of injury to procedural rights (Count I) is subject to a more relaxed standing standard.  *See* 2022 WL 2802354, at *7.  Because the Court finds that Plaintiffs have established standing under the usual standard, it need not assess the merits of standing under the more relaxed standard.

Circuit vacated the 2013 IFR in *CATA III*.  *Williams II*, 2022 WL 2802354, at *2–3.  Plaintiffs rely on *AFL-CIO v. Chao*, 496 F. Supp. 2d 76 (D.D.C. 2007), for the proposition that the vacatur of the 2013 IFR required Defendants to either open notice and comment anew or find good cause not to do so before issuing the 2015 Wage Rule.  In *Chao*, the plaintiff challenged a DOL rule establishing a new annual reporting requirement for labor organizations.  *Id.* at 78.  On appeal, the D.C. Circuit vacated a portion of that rule.  *Id.*  In response, DOL "reissued the rule in modified form without providing notice and an additional period for interested parties to comment."  *Id.*  The district court found that the agency's reissuance of the vacated rule without providing new notice and comment or invoking the good cause exception violated the APA.  *Id.* at 79.  Relying on a pair of D.C. Circuit precedents, the court found that "the *effect* of the vacatur" was "critical" to the analysis.  *Id.* at 85 (emphasis in original) (citing *Action on Smoking and Health v. Civil Aeronautics Bd.,* 713 F.2d 795 (D.C. Cir. 1983); *Mobil Oil Corp. v. U.S. EPA*, 35 F.3d 579 (D.C. Cir. 1994)).  Vacatur, the court explained, "takes[s] the rule off the books and reinstate[s] the prior regulatory regime."  *Id.*  As a result, "[i]f the agency then wants to reissue the rule—that is, if it wants to engage in rulemaking—it must follow the APA's rulemaking procedures, which require notice and comment or a finding of good cause on the record."  *Id.*

 *Chao* is directly on point.  In *CATA III*, the Third Circuit vacated the 2013 IFR with respect to its provision governing employer surveys, 20 C.F.R. § 655.10(f), thereby "tak[ing] the rule off the books and reinstat[ing] the prior regulatory regime."  *Chao*, 496 F. Supp. 2d at 85.  Thus, to promulgate the 2015 Wage Rule's employer-survey provision—that is, "to engage in rulemaking"—DOL and DHS were put "to a simple either/or choice: either notice-and-comment procedures or the good-cause exception."  *Id.* at 84–85; *see also Am. Great Lakes Ports Ass'n v.*

*Zukunft ("American Great Lakes I")*, 301 F. Supp. 3d 99, 103–04 (D.D.C. 2018) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect and the agency must initiate another rulemaking proceeding if it would seek to confront the problem anew." (citation omitted)), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz ("American Great Lakes II")*, 962 F.3d 510 (D.C. Cir. 2020). Defendants acknowledge that they failed to elect either choice. Accordingly, the 2015 Wage Rule fails the APA's notice-and-comment requirements.

Defendants' attempts to get around *Chao* are unpersuasive because they gloss over vacatur's impact on subsequent rulemaking. Even though the Court instructed Defendants to "engage[]" with Judge Bates's "persuasive" analysis in *Chao*, their opening brief makes no mention of *Chao*'s discussion of vacatur. *Williams II*, 2022 WL 2802354, at *14. Predictably, then, their two main cases are inapposite. In *Federal Express Corp. v. Mineta*, 373 F.3d 112 (D.C. Cir. 2004), plaintiffs were air cargo carriers who sought review of Department of Transportation compensation rules in the wake of the September 11, 2001 terrorist attacks. *Id.* at 113–14. Over the course of a year, the agency issued four cumulative and superseding final rules. *Id.* at 114. The agency published the first three rules without notice and comment, but in each case invited notice and comment after the rule's publication. *Id.* at 114–15. The agency's fourth and final rule responded to the prior rules' comments. *Id.* at 115, 120. The D.C. Circuit agreed with the agency that it had satisfied the APA's notice-and-comment procedures, because "interested persons, including [plaintiffs], had three opportunities to comment on the Fourth Final Rule while it was still in the formative stage." *Id.* at 120 (cleaned up and citation omitted). *Mineta* is not analogous because none of the final rules in that case was vacated, and the opinion never had occasion to consider the APA's procedural requirements in the context of a rule's

29

vacatur.  It is telling that *Chao* did not find *Mineta*—Circuit precedent available to it at the time of decision—worth mentioning at all.

Defendants' out-of-circuit case, *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271 (N.D. Fla. 2016), is also unpersuasive.  In that case, H-2B employers brought suit to challenge various rules under the H-2B program, including, as here, the 2015 Wage Rule.  *Id.* at 1275–76, 1287.  The court had occasion to analyze the same issue here: whether "DHS and DOL violated the APA by failing to allow for notice and comment before promulgating the 2015 Wage Rule."  *Id.* at 1286.  The court relied on *Mineta* in finding that the agency adequately satisfied APA procedures because "the public had a meaningful opportunity to comment on the major issues of the 2015 Wage Rule in response to the interim version of that rule promulgated in 2013."  *Id.* at 1287.  But like Defendants' briefing here, *Bayou Lawn* did not acknowledge the significance of the 2013 IFR's vacatur.  Nor did it mention *Chao*.  By only assessing whether "the public had a meaningful opportunity to comment," *Bayou Lawn* did not give any consideration to the impact of the 2013 IFR's vacatur.  *Id.*  The Court will therefore follow the persuasive analysis of *Chao*—a case in this District applying this Circuit's caselaw—in concluding that the 2015 Wage Rule violates the APA's notice-and-comment requirement.[9]

---

[9] Perhaps realizing their failure to engage with the issue of vacatur, Defendants' reply brief attempts to distinguish the vacatur of the 2013 IFR on the basis that "the notice aspect of the 2013 IFR was not itself vacated."  Defs.' Reply at 10–12.  Besides the fact that Defendants' new argument is late to the game and forfeit, *see Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 204 n.4 (D.D.C. 2016), the Court is also unpersuaded by its merits.  Nothing in *Chao* suggests that after a rule is vacated, the notice component of that rule lives on.  That idea would contradict *Chao*'s straightforward instruction that to engage in rulemaking post-vacatur, the APA puts the agency "to a simple either/or choice: either notice-and-comment procedures or the good-cause exception."  *Chao*, 496 F. Supp. 2d at 84.  Because Defendants have not elected either choice here, the 2015 Wage Rule violates the APA.

But that is not the end of the inquiry.  As *Chao* observed, if a rule violated the procedures under the APA, the Court must determine whether that failure was harmless error.  *See* 496 F. Supp. 2d at 88; 5 U.S.C. § 706 ("[T]he court shall . . . [take] "due account . . . of the rule of prejudicial error.").  In *Chao*, the court applied the Circuit's harmless error standard "that normally applies where the procedural error at issue is failure to provide notice and comment." *Id.* at 89.[10]  The D.C. Circuit "has not required a particularly robust showing of prejudice in notice-and-comment cases."  *Chamber of Com. of U.S v. S.E.C.*, 443 F.3d 890, 904 (D.C. Cir. 2006).

> Neither a showing of actual prejudice nor proof that the agency would have reached a different result is required to establish prejudicial error.  Rather, the challenging party "must indicate with reasonable specificity what portions of the [rule] it objects to and how it might have responded if given the opportunity." "[A]ll that is required to defeat [the agency's] claim of harmless error" is a showing that the party could "mount a credible challenge" to the rule on remand.

*Chao*, 496 F. Supp. 2d at 89–90 (cleaned up) (citing *Chamber of Com.*, 443 F.3d at 905; *Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003); *Gerber v. Norton*, 294 F.3d 182, 182 (D.C. Cir. 2002)).  The burden is on Plaintiffs to show that the error was harmful.  *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Chao*, 496 F. Supp. 2d at 89.

The Court finds that Plaintiffs have shown they are prejudiced by the 2015 Wage Rule's lack of notice and comment.  Consider, for example, the 2015 Wage Rule's definition of the relevant occupation.  Plaintiffs argue that the 2013 IFR gave "no notice at all" that the 2015 Wage Rule would allow a survey to consider "actual job duties" of a "particular position rather

---

[10] *Chao* did not apply the more demanding "utter failure" harmless error test because it noted that "[t]he Secretary's initial compliance with notice-and-comment procedures arguably means that the subsequent error does not rise to the level of an 'utter failure' to comply with the APA."  *Chao*, 496 F. Supp. 3d at 89.  Likewise, the parties do not dispute that Defendants properly provided a post-rule comment period for the 2013 IFR.  Therefore, the Court will not apply the "utter failure" test.

than an occupational classification."  Pls.' Response in Opp'n to Defs.' Cross-Mot. for Summ. J.

("Pls.' Opp'n") at 14, ECF No. 66; Pls.' Mot. at 15–16; *see* 2015 Wage Rule at 24170–71.

Plaintiffs aver that had they received proper notice, they would have highlighted the problems

behind the agency's decision to narrowly define the relevant occupation.  Pls.' Opp'n at 13–14.

According to Plaintiffs, the 2015 Wage Rule is "internal[ly] inconsisten[t]" because it permits

the surveying of "actual job duties" while simultaneously abolishing SCA and DBA surveys on

the basis that those surveys "gave employers an 'incentive to craft job descriptions to fit the

relatively more narrow SCA and DBA occupational categories.'"  Pls.' Mot. at 25 (quoting 2015

Wage Rule at 24164).  And it makes no sense, Plaintiffs add, to "permit[] the surveying of a

particular job while simultaneously requiring surveys to consider wages across 'industries that

employ workers in the occupation.'"  Pls.' Opp'n at 13 (quoting 20 C.F.R. § 655.10(f)(4)(iv)).

Here, as with *Chao*, Plaintiffs have "indicated with 'reasonable specificity,' even

precision, the portions of the [2015 Wage Rule] to which [they] object and how [they] would

respond if given the opportunity."  *Chao*, 496 F. Supp. 2d at 90 (citation omitted).  Defendants

counter that the 2013 IFR's post-rule comment period already gave Plaintiffs an opportunity to

address this precise issue because it invited comment on "methodological standards" in employer

surveys, and "[a]ctual job duties are one of several factors that comprise the methodological

standards for private wage surveys."  Defs.' Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n")

at 8, ECF No. 67.  But that open-ended invitation did not give Plaintiffs *any* insight into

Defendants' decision to narrowly define the relevant occupation, much less the apparently

contradictory reasoning behind its change.  Out of the 2013 IFR's over 300 post-rule comments,

Defendants have only identified one sentence of one comment touching on this issue, and even

that comment did not contemplate the narrower classification that Defendants ultimately

adopted.  *See* SAR at 672, ECF No. 75 (Joint Appendix).[11]  The Court is satisfied that Plaintiffs

have raised a "colorable claim" that they "would have more thoroughly presented [their]

arguments" had they received the proper notice.  *Chao*, 496 F. Supp. 2d at 90 (quoting *Sprint*,

315 F.3d at 377 (D.C. Cir. 2003)); *Gerber*, 294 F.3d at 184.  "Nothing more is required to

establish prejudice[.]"  *Chao*, 496 F. Supp. 2d at 90.

    As another example supporting Plaintiffs' claim of prejudice, consider the 2015 Wage

Rule's adoption of Form ETA-9165.  Recall that the 2015 Wage Rule requires, as a new policy,

that employers submit information about the employer survey on a standard form—Form ETA-

9165—and attest that the information "is true and accurate" "to the best of [their] knowledge."

2015 Wage Rule at 24190.  Simultaneously, the 2015 Wage Rule eliminates section 655.10(f)'s

reference to the 2009 Wage Guidance, which Plaintiffs claim required additional documentation.

*Compare* 20 C.F.R. § 655.10(f)(2) (2009) (requiring employers to "provide specific information

about the survey methodology . . . *in accordance with guidance issued by the OFLC national

office [2009 Wage Guidance]*." (emphasis added)), *with* 20 C.F.R. § 655.10(f)(4) (2021)

(eliminating the italicized portion above).[12]  The 2009 Wage Guidance required an employer to

"[p]rovide documentation" on "[m]ethodology used for the survey to show that it is reasonable

and consistent with recognized statistical standards and principles."  2009 Wage Guidance, App.

F at 3.  Per Plaintiffs, this language required employers to document things such as "margin of

---

[11] Defendants make much of the fact that one of several counsel behind this comment is counsel to Plaintiffs here, but that is of little significance.  *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("[T]he EPA must *itself* provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment." (cleaned up) (emphasis in original)).

[12] OFLC stands for the DOL's Office of Foreign Labor Certification.  *See* 2015 Wage Rule at 24158.  There is no dispute that the 2009 Wage Guidance is part of the "guidance" to which section 655.10(f)(2) (2009) referred.  *See id.* at 24172.

error, level of confidence, and efforts made to guard against nonresponse bias and other forms of non-sampling error."  Pls.' Mot. at 37.[13]

The upshot of Plaintiffs' argument is that Form ETA-9165 alone does not provide Defendants sufficient documentation to determine whether employer surveys are statistically supported.  Following the 2013 IFR but prior to the 2015 Wage Rule, *CATA III* vacated the 2009 Wage Guidance, *see CATA III*, 774 F.3d at 191, which might explain why section 655.10(f) no longer mentions the 2009 Wage Guidance, *see* 2015 Wage Rule at 24510 (acknowledging that *CATA III* vacated 2009 Wage Guidance); *id.* at 24184 (amending section 655.10(f) to omit refence to the 2009 Wage Guidance).  Because Plaintiffs were not afforded an opportunity to comment on the consequences of the 2009 Wage Guidance's vacatur and what documentation a standard form should require to sufficiently assess a survey's reliability, they could not have shared their views about the inadequacy of Form ETA-9165.  While the 2013 IFR gave Plaintiffs notice that Defendants were considering how "the validity and reliability of employer-submitted surveys can be strengthened," it certainly gave no insight into their decision to create a standard form that, in Plaintiffs' view, actually *weakens* the reliability of employer surveys.  2013 IFR at 24055; *see* Pls.' Mot. at 36–37.  Plaintiffs have therefore shown that they could "'mount a credible challenge' to the rule on remand."  *Chao*, 496 F. Supp. 2d at 89–90 (cleaned up and citation omitted); *see also CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082–83 (D.C. Cir. 2009) (finding that where the notice of proposed rulemaking "nowhere even hinted that the [agency] might consider" adopting a particular data requirement, plaintiffs "were

---

[13] Notably, Defendants' briefing does not contest Plaintiffs' characterization that ETA Form-9165 requires less statistical documentation from employers compared to the now-vacated 2009 Wage Guidance.  The Court will not attempt to independently assess the merits of this assertion.  It suffices to say that Plaintiffs have raised colorable claims showing they were prejudiced by a lack of opportunity to comment on these important issues.

prejudiced by their inability to persuade the [agency] not to adopt the [policy] in the first place, thus requiring them to litigate the issue").

To sum up, the 2015 Wage Rule fails the APA's notice-and-comment requirements because Defendants promulgated it following the 2013 IFR's vacatur without a new notice and comment period or the good cause exception.  Defendants' failure to provide notice and comment prejudiced Plaintiffs.  Because of the 2015 Wage Rule's procedural defects, the Court will not reach Plaintiffs' facial substantive challenges to the 2015 Wage Rule.[14]  *See, e.g.*, *Chao*, 496 F. Supp. 2d at 93 (noting that "the resolution of the [plaintiff's] procedural argument in its favor has obviated the need for the Court to pass on [its] 'potentially meritorious' substantive challenge"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 96 (D.D.C. 2018) ("Because the Court concludes that the Department improperly invoked the good cause exception . . . there is no need to reach Plaintiffs' substantive challenges."); *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 266 (D.D.C. 2015) ("Because commenters were not able to raise [substantive] concerns in response to the deficient notice of proposed rulemaking, however, no administrative record was ever developed for the Court to review.  Thus, the Court concludes that these arguments should be addressed, if at all, after further proceedings at the administrative level and an opportunity for additional comment.").  The only question that remains concerning the 2015

---

[14] These facial challenges claim that: (1) requiring employer surveys to include H2-B wages is arbitrary and capricious, Pls.' Mot. at 25–28; (2) the definition of the relevant occupation is (a) arbitrary and capricious because its explanation is cursory and internally inconsistent; and (b) contrary to law because the plain language of the Appropriations Rider does not allow DOL to consider a particular job in a survey, *id.* at 17–25; and (3) reliance on Form ETA-9165 is arbitrary and capricious because it weakens the existing methodological standards by not requiring sufficient documentation of statistical support as was the practice in the now-vacated 2009 Wage Guidance, *id.* at 29–38.

Wage Rule's procedural defects is whether remand, or vacatur, is the appropriate remedy.  The Court will consider the issue of remedy in its own section at the end.

## 2.  As-Applied Challenge to 2015 Wage Rule

Plaintiffs' last claim, Count V, is an as-applied challenge to the 2015 Wage Rule. "Where a challenged rule does not exceed statutory authority and comports with the APA," plaintiffs may still "bring as-applied challenges against any alleged unlawful applications." *Brennan v. Dickson*, 45 F.4th 48, 61 (D.C. Cir. 2022) (quoting *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012)).  Plaintiffs argue that even if the 2015 Wage Rule withstands their procedural and substantive challenges under the APA, Defendants improperly applied the 2015 Wage Rule in issuing prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey.  Pls.' Opp'n at 20; *see* Suppl. Compl. ¶ 30 (alleging that these prevailing wage determinations were "contrary to [DOL's] regulations governing the approval of employer-provided surveys at 20 C.F.R. § 655.10(f)").  The Court agrees.

Plaintiffs find fault with a host of issues in the 2021 Louisiana Crawfish Wage Survey, such as its allegedly poor survey outreach, its inability to conduct a cross-industry survey, and email communications between employers and the state surveyor (LSU) purportedly revealing improper employer involvement in the survey process.  Pls.' Mot. at 38–40.  The Court need not parse through each of these issues because one defect alone demonstrates that the 2021 Louisiana Crawfish Wage Survey is flawed and should not have been used to issue prevailing wage determinations.  Specifically, the 2021 survey failed to comply with the 2015 Wage Rule's instructions on surveying beyond the area of intended employment.  The 2015 Wage Rule:

> permits the survey to cover a geographic area larger than the area of intended employment only if all of the following conditions are met: (1) The expansion is limited to geographic areas that are contiguous to the area of intended employment; (2) the expansion is required to meet either the 30-worker or three-

employer minimum; and (3) the geographic area is expanded no more than
necessary to meet these minimum requirements.

2015 Wage Rule at 24173.  The 2015 Wage Rule defines "area of intended employment" as "the

metropolitan statistical area of the job opportunity and the area within normal commuting

distance from the job opportunity."  *Id.*  Here, the 2021 Louisiana Crawfish Wage Survey

covered the entire state of Louisiana, yet only provided one sentence to justify its sweeping

geographic scope: "[i]n an effort. [sic] to mask dominant employers, and due to remote plant

locations, we have surveyed statewide."  CAR at 22, ECF No. 75 (Joint Appendix).  This cursory

explanation is inadequate.  The 2015 Wage Rule explains that the "no more than necessary"

requirement "reflects DOL's view that surveys submitted for labor certification purposes must

take a careful approach to expansion *rather than default immediately to state-wide coverage*."

2015 Wage Rule at 24174 (emphasis added).  The 2021 survey fails to heed this admonition.  It

does not explain why expansion to the entire state was "necessary" to meet the 30-worker/three-

employer threshold.  *Id.* at 24174.  The survey justifies the expansion on "remote plant

locations," CAR at 22, but those three words do not show that it considered, for example, where

these plants were located, how they affected the 30-worker/three-employer threshold, and why

statewide expansion was needed instead of a "more incremental approach."  *Id.*; *cf. id.* at 24173

("[I]n most cases a surveyor should be able to report data for at least 30 workers and three

employers in the occupation and area of intended employment without expanding the survey

beyond the area of intended employment.").

      Worse still, the 2021 Louisiana Crawfish Wage Survey also expanded the geographic

scope to "mask dominant employers," CAR at 22, but that consideration is decidedly *not* one of

the "limited circumstances" the 2015 Wage Rule enumerates that would justify expansion, 2015

Wage Rule at 24173.  Indeed, section 655.10(f) clearly instructs that "the geographic area

surveyed may be expanded beyond the area of intended employment . . . only as necessary to meet the requirement[]" *that the survey* "*include[] wage data from at least 30 workers and three employers*." 20 C.F.R. §§ 655.10(f)(3), (4)(ii) (emphasis added); *see also, e.g.*, U.S. Dep't of Labor, Form ETA-9165 – General Instructions, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/Form_ETA-9165_Instructions_rev_DOL%20Appropriations_Act.pdf ("Note that the only permissible reasons to expand the survey beyond the area of intended employment are to meet the 3 employer or 30 worker standards[.]"). Because the 2021 Louisiana Crawfish Wage Survey does not comply with the 2015 Wage Rule's instructions on surveying beyond the area of intended employment, Defendants' prevailing wage determinations relying on this survey are unlawful.

## C. Remedy

Having established that the 2015 Wage Rule is procedurally deficient (and prejudicial), and that the application of the rule to the 2021 Louisiana Crawfish Wage Survey was unlawful, the Court must decide the appropriate remedy. "The final question is which of two available remedies, vacatur or remand without vacatur, is the appropriate one." *Chao*, 496 F. Supp. 2d at 90. "When a rule is contrary to law, the 'ordinary practice is to vacate' it." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 673 (D.C. Cir. 2019) (citation omitted). Even though "vacatur is the normal remedy," the D.C. Circuit has stated that "a court [may] remand without vacating the agency's action in limited circumstances." *American Great Lakes II*, 962 F.3d at 518 (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). "To determine whether to remand without vacatur, this court considers first, the seriousness of the [action's] deficiencies, and, second, the likely disruptive consequences of vacatur." *Id.* at 518 (cleaned up) (quoting *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). "Because vacatur is the default remedy . . . defendants bear the burden to

prove that vacatur is unnecessary." *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 157 (D.D.C. 2022) (quoting *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019)).

The first *Allied-Signal* factor weighs in favor of vacatur.  The notice-and-comment defect to the 2015 Wage Rule is "unquestionably" serious.  *Chao*, 496 F. Supp. 2d at 91.  "Failure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule."  *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citation omitted); *accord Allina Health Servs.*, 746 F.3d at 1110; *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 58 (D.D.C. 2020).  *But see Shands*, 139 F. Supp. 3d at 267 (noting that this proposition is "not absolute" and citing Circuit cases remanding agency action without vacatur).  Vacatur is also favored where, as here, it "has the virtue of eliminating the significant risk that [plaintiffs] will be forced . . . to comply with a rule that this Court has found to be procedurally defective and whose substantive validity has not yet been confirmed."  *Chao*, 496 F. Supp. at 93; *accord Cap. Area Immigrants' Rts. Coal.*, 471 F. Supp. 3d at 58.  Of course, it is entirely possible that with a new notice and comment period, the agency may be able to cure the procedural defect and justify its decisionmaking.  But the "uncertainty" of this outcome "merely highlights the magnitude of the procedural violation." *Shands*, 139 F. Supp. 3d at 268.

The second *Allied-Signal* factor, however, weighs substantially in favor of remand without vacatur.  On this point, this Court's opinion in *American Great Lakes I* is instructive. That case involved a 2016 rule promulgated by the Coast Guard for calculating rates that international shippers must pay maritime pilots on the waters of the Great Lakes.  301 F. Supp. 3d at 100.  The Court found that the Coast Guard's failures to explain its ten-percent upward

adjustment policy, or the propriety of using weighting factor revenue in its rate setting methodology, were arbitrary and capricious.  *Id.* at 101.  On the issue of remedy, the Court found that although the defects were serious under the first *Allied-Signal* factor, the second *Allied-Signal* factor weighed against vacatur because of the "considerable disruption that vacatur would likely invite."  *Id.* at 105.  That was so, the Court reasoned, because "[s]hipping companies and pilotage associations would, after vacatur, find that every payment that was made in the 2016 season was erroneous" and that it would be plainly disruptive for pilotage associations to issue refunds.  *Id.* at 104.  Accordingly, the Court found that "the appropriate remedy is to remand the matter to the Coast Guard" for further action.  *Id.* at 105.

The D.C. Circuit affirmed on appeal.  *American Great Lakes II*, 962 F.3d at 520.  The Circuit noted that "[u]nder our precedents, a quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome."  *Id.* at 519.  It agreed with this Court that vacatur would be disruptive, as it could "involve the Coast Guard and the Shippers attempting to recoup and redistribute funds that changed hands years ago in numerous separate transactions," in addition to the fact that "the precise amount of each refund would be unclear given the lack of an operative 2016 rate."  *Id.*

As with *American Great Lakes I* and *II*, the second *Allied-Signal* factor substantially weighs in favor of remand without vacatur here.  Vacating the 2015 Wage Rule's methodological provisions for employer surveys, 20 C.F.R. §§ 655.10(f)(2), (f)(4), would "set aside" Defendants' employer-survey based prevailing wage determinations since 2015—that is, potentially seven years' worth of wage determinations.  *American Great Lakes I*, 301 F. Supp. 3d at 104; *Williams II*, 2022 WL 2802354, at *13.  Like the lack of a clear operative rate upon which to base refunds in *American Great Lakes II*, the long and convoluted history of the H-2B

wage rules—which have gone to the drawing board time and again—complicates the question of what prevailing wage would set the basis for refunds here. *See Sugar Cane Growers v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("The egg has been scrambled and there is no apparent way to restore the status quo ante.").

Plaintiffs argue that the disruptive consequences are mitigated for two reasons, but neither is persuasive. First, they note that vacatur of sections 655.10(f)(2), (f)(4) would not disrupt DOL's ongoing administration of the H2-B program because it could still issue prevailing wage determinations from non-employer surveys—that is, OES surveys. Pls.' Opp'n at 21. This argument fails to recognize that the Appropriations Rider *requires* DOL to "accept [statistically supported] private wage surveys even in instances where [OES] survey data are available." Appropriations Rider (2022); *see* Pls.' Mot. Recons. at 1 n.1, ECF No. 41-1. If those methodological standards are vacated, DOL will be in a position where it cannot administer this statute.

Second, Plaintiffs argue that vacatur would not open the floodgates to backpay claims because employers are apparently only liable for backpay if they were properly on notice. Pls.' Opp'n at 21–22. The Court is skeptical that a potential defense that some employers could attempt to raise in future litigation is enough to stem the demands for backpay that would follow vacatur. *See Williams II*, 2022 WL 2802354, at *13 ("The Court cannot say for certain whether or not Plaintiffs would be able to defeat a hypothetical reasonable reliance argument in a hypothetical future action for back wages[.]"). Even if Plaintiffs are right that the universe of viable claims is more limited, they downplay the sheer number of transactions that vacatur could call into question. Consider that in *Williams II*, the Court observed that employers were arguably on notice since April 2021, when this lawsuit was filed. *Id.* To put things in perspective, in the

fourth quarter of fiscal year 2022 alone, DOL granted *over ten thousand H2-B prevailing wage certifications*. *See* U.S. Dep't of Labor, Performance Data, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2B_Disclosure_Data_FY2022_Q4.xlsx; *cf.* SAR 656 (comment noting that DOL approved certifications for 74,458 job vacancies in fiscal year 2012).  Vacatur against this backdrop is inevitably "an invitation to chaos."  *Sugar Cane Growers*, 289 F.3d at 97.

To conclude, although the 2015 Wage Rule is procedurally deficient, the significant disruptive consequences that would follow from vacatur leads the Court to conclude that remand without vacatur is the best route.  *See American Great Lakes I*, 301 F. Supp. 3d at 105 (balancing competing *Allied-Signal* factors and taking same approach); *Shands*, 139 F. Supp. 3d at 270 (same).[15]  The Court is sympathetic to Plaintiffs' concern that the agencies on remand might not address their concerns as expeditiously as compared to vacatur.  But the Court is bound to apply the *Allied-Signal* factors, which weigh in favor of remand without vacatur.  The Court expects that on remand, DHS and DOL will act with haste for further consideration consistent with this Opinion.

## V.  CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motion to dismiss, grant in part and deny in part Plaintiffs' motion for summary judgment, and grant in part and deny in part Defendants' cross-motion for summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

---

[15] The Court also remands without vacatur Defendants' unlawful application of the 2015 Wage Rule to prevailing wage determinations based on the 2021 Louisiana Crawfish Wage Survey.  *See EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (finding petitioners' as-applied challenges meritorious but remanding without vacatur to avoid "substantial disruption").  It does so for the same reasons described in this section.

Dated:  December 23, 2022                          RUDOLPH CONTRERAS
                                                   United States District Judge